**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE: | CHAPTER 11 |
| KALERA INC.,[1] | CASE NO.: 23-90290 |
| Debtor. | (Emergency Hearing Requested) |

**DEBTOR'S *AMENDED*[2] <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION FINANCING, (II) AUTHORIZING THE DEBTOR TO USE CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) APPROVING ADEQUATE PROTECTION TO PRE-PETITION SECURED CREDITORS, (V) MODIFYING <u>THE AUTOMATIC STAY, AND (VI) SCHEDULING A FINAL HEARING</u>**

> **Emergency relief has been requested. Relief is requested not later than 4:00 p.m. (prevailing Central Time) on April 6, 2023.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on April 6, 2023 at 4:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk, Houston, Texas 77002.**
>
> **Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter the conference room number. Judge Jones' conference room number is 205691. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Jones' home page. The meeting code is "JudgeJones." Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Jones' home page. Select the case name, complete the required fields and click "submit" to complete your appearance.**

---

[1] The last four digits of the Debtor's federal tax identification number is 7838. The Debtor's mailing address is Kalera, Inc., Gateway Business Center 23, 18000 East 40th Avenue, Aurora, CO 80011.

[2] The Motion is being amended to reflect all proposed milestones under the proposed DIP Loan Documents. A blackline showing the changes to the Motion is attached as **<u>Exhibit B</u>**.

Kalera Inc. (the "**Debtor**" or "**Kalera**"), as debtor and debtor in possession in the above-captioned chapter 11 case (the "**Chapter 11 Case**"), represents as follows in support of this motion (the "**Motion**"):

## Jurisdiction and Venue

1.     The United States Bankruptcy Court for the Southern District of Texas (the "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue of the Chapter 11 Case in this judicial district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     This Court has constitutional authority to enter final orders with respect to the relief requested herein. The Debtor further confirms its consent to this Court's entry of final orders or judgments on this Motion, if it is later determined that, in the absence of the consent of the parties, this Court does not have constitutional authority to enter final orders or judgments.

## Relief Requested

3.     Pursuant to sections 105(a), 361, 362, 363, 364, 503, 506(c), 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and 9014 of the Federal Rule of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1, 4001-1(b), 5005-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "**Local Rules**"), the Debtor seeks entry of an interim order, substantially in the form attached hereto (the "**Interim Order**"), and, subsequently, a final order to be proposed granting the relief requested herein on a final basis (the "**Final Order**" and, together with the Interim DIP Order, the "**DIP Orders**"), providing as follows:

     a.    authorizing the Debtor to obtain postpetition financing, consisting of senior secured superpriority, multi-draw term loans (the "**DIP Loan(s)**," and together with all other obligations under the DIP Loan Documents (as defined below), the "**DIP Obligations**") to be advanced and made available to the Debtor in the aggregate maximum principal amount of

$1.13 million (such amount, the "**Committed Amount**"; such loan facility, the "**DIP Facility**" from lender Sandton Capital Solutions Master Fund V, L.P. (the "**DIP Lender**")), under the terms of this Interim Order, the Final Order, and all other agreements, documents, instruments, delivered or executed in connection therewith, as hereafter amended, supplemented or otherwise modified from time to time, including the Budget (as defined below) (collectively, the "**DIP Loan Documents**") (A) to pay certain costs, fees and expenses related to this Chapter 11 Case as provided for in this Interim Order, (B) subject to entry of the Final DIP Order (as defined below) to roll up and convert up to $1 million (the "**Roll-up Amount**") of the prepetition Bridge Loan (as defined below) into DIP Loans, and (C) to provide working capital and for other general corporate purposes of the Debtor;

b.    authorizing the Debtor to use the "cash collateral," as such term is defined in Section 363 of the Bankruptcy Code (the "**Cash Collateral**"), of the DIP Lender and Prepetition Lender (as defined below) pursuant to the Budget;

c.    granting to the DIP Lender (x) the DIP Liens (as defined in the Interim Order) on the DIP Collateral (as defined in the Interim Order) to secure all amounts owed under the DIP Loan Documents and DIP Obligations, (y) the DIP Credit Facility Superpriority Claims (as defined in the Interim Order) in respect of the DIP Obligations, in each case subject to the terms and conditions hereof and the DIP Loan Documents, and (z) on behalf of the DIP Facility, superpriority, administrative expense claim status in respect of the DIP Obligations;

d.    approving the roll up and conversion of up to $1 million (i.e., the Roll-up Amount) of the prepetition Bridge Loan into the DIP Loans, to the extent the funds are actually lent under the Bridge Loan;

e.    approving certain stipulations by the Debtor regarding the Prepetition Obligations (defined below) as set forth in the Interim Order;

f.    vacating and modifying the automatic stay imposed by Section 362 of the Bankruptcy Code, to the extent necessary to implement and effectuate the terms and provisions of this Interim Order and the Final Order, in each case, to the extent set forth herein; provided, however, that such modification shall not permit the DIP Lender or Prepetition Lender to foreclose or otherwise enforce any rights with respect to their respective collateral without providing the Debtor notice and an opportunity to cure the purported default and further relief from the automatic stay;

g.    subject to the Carve Out and any Permitted Liens, granting adequate protection to the Prepetition Lender (as defined below); and

h.      scheduling a final hearing (the "**Final Hearing**") to consider entry of the Final Order.

**Summary of Terms of DIP Facility and Use of Cash Collateral**

4.      In accordance with Bankruptcy Rules 4001(b), (c) and (d), and the *Procedures for Complex Chapter 11 Cases in the Southern District of Texas* (the "**Complex Rules**"), the following is a concise statement and summary of the material terms of the proposed DIP Facility, as set forth in the DIP Documents and Interim Order:[3]

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Parties** *Fed. R. Bankr. P. 4001(c)(1)(B)* | Borrower:  Kalera Inc., as a debtor and debtor-in-possession<br><br>DIP Lender:  Sandton Capital Solutions Master Fund V, L.P.<br><br>*See* Interim Order, Preamble. |
| **DIP Facility and Borrowing Limits** *Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Facility shall consist of a new money term loan facility in the aggregate principal amount of $5.1 million, with $1.13 million available on an interim based pursuant to the terms of the Interim Order.<br><br>*See* Interim Order, Preamble. |
| **Roll-Up** *Fed. R. Bankr. P. 4001(c)(1)(B)* | Subject to entry of the Final Order, the DIP Facility shall roll-up and convert into postpetition debt up to $1 million due and owing under the prepetition Bridge Loan; provided, however, pending entry of the Final Order, one dollar ($1) of the prepetition Bridge Loan Obligations shall be roll-up and converted into the postpetition DIP Facility for every dollar ($1) advanced under the Interim Order.<br><br>*See* Interim Order at Paragraph 7. |
| **Interest Rate** *Fed. R. Bankr. P. 4001(c)(1)(B)* | All loans made to or for the benefit of the Debtor on or after the Petition Date pursuant to the DIP Loan Documents shall bear interest payable and incur fees at a rate of 9% *per annum* and default rate of 2% *per annum*.  Interest shall accrue and be payable at maturity.<br><br>*See* Interim Order at Paragraph 9. |
| **Term** *Fed. R. Bankr. P. 4001(c)(1)(B)* | Unless otherwise agreed, the Debtor's right to draw under the DIP Facility as established under the Interim Order shall terminate upon the occurrence and during the continuation of an Event of Default, as described in the Interim Order.<br><br>*See* Interim Order at Paragraph 21. |

[3] The summary of the DIP Loan Documents and Interim Order set forth herein is a summary of material terms; accordingly, certain terms of the DIP Loan Documents and Interim Order may be omitted, in whole or in part. Interested parties should read the Interim Order in its entirety.  In the event of any inconsistencies between this summary and the DIP Loan Documents or Interim Order, the DIP Loan Documents or Interim Order, as applicable, shall control.  If there are any inconsistencies between the DIP Loan Documents and DIP Orders, the terms of the Interim Order shall control until entry of the Final Order, at which time the terms of the Final Order shall govern, including in the event of any inconsistency between the Interim Order and the Final Order.  Unless otherwise states, capitalized terms used in this summary shall have the meanings ascribed to them in the Interim DIP Order, Final Order, or DIP Loan Documents, as applicable.

| | |
|---|---|
| **DIP Facility Events of Default**<br>*FED. R. BANKR. P. 4001(c)(1)(B)* | Events of Default under the DIP Facility, as established pursuant to the Inteirm Order, consist of:<br><br>a.  The failure by the Debtor to comply with any material provision of the Interim Order, except where such failure would not materially and adversely affect the DIP Lender;<br><br>b.  Dismissal of the Chapter 11 Case or conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code;<br><br>c.  Appointment of a chapter 11 trustee or examiner with enlarged powers relating to the operation of the business of the Debtor or the Debtor shall file a motion or other pleading seeking such appointment;<br><br>d.  The sale of all or substantially all assets of the Debtor pursuant to section 363 of the Bankruptcy Code, unless such sale is conducted in accordance with the Bid Procedures (defined in the Interim Order) and consented to by the DIP Lender; and<br><br>e.  The failure to meet an Interim Milestone, unless extended or waived pursuant to the prior written consent of the DIP Lender; *provided, however*, to the extent the Debtor shall fail to meet an Interim Milestone despite good faith efforts, the DIP Lender shall, in its reasonable discretion, consider extending such Milestone and amending the Budget accordingly.<br><br>*See* Interim Order at Paragraph 22. |
| **Liens and Priority Granted for New Credit**<br>*FED. R. BANKR. P. 4001(c)(1)(B)* | Pursuant to the Interim Order, the DIP Lender shall receive the DIP Liens in the DIP Collateral.  The DIP Collateral consists of all prepetition and postpetition tangible and intangible property and assets of the Debtor; provide that the DIP Collateral shall not include any Avoidance Actions unless and until entry of the Final Order.<br><br>The DIP Liens shall be first priority priming security interests and liens on all DIP Collateral.  The DIP Liens shall be senior in all prepetition security interests or postpetition security interests granted as adequate protection in the DIP Collateral.<br><br>*See* Interim Order at Paragraph 4. |
| **Superpriority Expense Claims for New Credit**<br>*FED. R. BANKR. P. 4001(c)(1)(B)(i)* | All DIP Obligations shall constitute allowed superpriority administrative expense claims, subject to the Carve-Out, but with priority over any and all administrative expanses of the Debtor.<br><br>*See* Interim Order at Paragraph 5. |
| **Carve-Out**<br>*FED. R. BANKR. P. 4001(c)(1)(B)(i)* | The Interim Order provides a "Carve Out" of certain statutory fees and allowed fees of estate professionals whose retention has been approved by the Court, to the extent provided for in the Budget; provided that the "Carve Out" for professional fees after the Carve-Out Trigger Date (i.e., the date the DIP Lender delivers a notice of event of default) shall be capped at $250,000.<br><br>*See* Interim Order at Paragraph 29. |
| **Parties with an Interest in Cash Collateral**<br>*FED. R. BANKR. P. 4001(c)(1)(B)(i)* | The following parties have an interest in Cash Collateral:<br><br>a.  The DIP Lender, and<br><br>b.  The Prepetition Lender.<br><br>*See* Interim Order at Section F, G. |
| **Duration/Use of Cash Collateral**<br>*FED. R. BANKR. P. 4001(b)(1)(B)(ii)* | Subject to the terms and conditions of the Interim, and in accordance with the Budget (as defined below), the Debtor may use Cash Collateral until the occurrence of the Termination Date. |

| | *See* Interim Order at Paragraphs 8, 11, 12. |
|---|---|
| **Liens, Cash Payments, or Adequate Protection Provided for Use of Cash Collateral** *Fed. R. Bankr. P. 4001(b)(1)(B)(iv) 4001(c)(1)(B)(ii)* | As adequate protection for any diminution of the Prepetition Collateral resulting from the Debtor's use of Prepetition Collateral (including Cash Collateral), and in exchange for their consent to the priming of the their liens by the DIP Liens pursuant to the Interim Order, the Debtor grants the Prepetition Secured Parties the following adequate protection

a. Replacement liens (the "**Adequate Protection Liens**") in the DIP Collateral, provided that such Adequate Protection Liens shall be junior to the DIP Liens;

b. An allowed superpriority administrative expense claim, subject only to the Carve Out and junior position to the DIP Superpriority Claims; and

c. Provision of any and all reports and notices delivered to the DIP Lender.

*See* Interim Order at Paragraph 10. |
| **DIP Budget** *Fed. R. Bankr. P. 4001(c)(1)(B)* | The use of DIP Facility proceeds and Cash Collateral is subject to the Budget attached as **Exhibit 1** to the Interim Order, as may be amended from time to time; however, the Budget permits up to a 10% variance for each enumerated line items.

*See* Interim Order at Paragraph 11. |
| **Conditions to Borrowing** *Fed. R. Bankr. P. 4001(c)(1)(B)* | The Interim Order conditions the DIP Loan on the Debtor meeting certain milestones, as provided therein and discussed below, and permits the roll-up and conversion of the Bridge Loan Obligations, as provided in the Interim Order.

*See* Interim Order at Paragraphs 7, 23. |
| **Covenants** *Fed. R. Bankr. P. 4001(c)(1)(B)* | The Interim Order does not contain any covenants; however, DIP Credit Agreement may contain usual and customary affirmative and negative covenants for financings of this type. |
| **Fees, Expenses, and Additional Payments** *Fed. R. Bankr. P. 4001(c)(1)(B)* | The Interim Order provides for the payment of the following fees and expenses:

**Termination Fee**: Two percent (2%) shall be earned by and payable to the DIP Lender upon the sale of substantially all of the Debtor's assets or confirmation of a chapter 11 plan to which the DIP Lender objects.

**Fees and Expenses of DIP Lender and Prepetition Secured Parties:** Debtor shall promptly pay or reimburse DIP Lender and Prepetition Secured Parties all reasonable costs and expenses of the counsel (including, without limitation, local counsel) and financial advisors relating to the DIP Facility.

*See* Interim Order at Paragraphs 14, 24. |
| **Prepayments** *Fed. R. Bankr. P. 4001(c)(1)(B)* | The Interim Order does not contain any provisions pertaining to prepayment of the DIP Obligation. |
| **Terms of Use and Purposes for Use of DIP Proceeds and Cash Collateral** *Fed. R. Bankr. P. 4001(c)(1)(B) 4001(b)(1)(B)(ii)* | The Debtor is authorized to use "cash collateral" and the proceeds of the DIP Facility in accordance with the Interim Order and the Budget, subject to any permitted variances.

Proceeds of the DIP Facility may be used for payment of

a. interest, fees and expenses to the DIP Agent in accordance with the DIP Facility,

b. post-petition operating expenses and other working capital and financing requirements of the Debtor, including provision of adequate protection and prepetition expenses whose payment is approved by the Court and is consistent with the Budget; |

| | |
|---|---|
| | c. post-petition and approved pre-petition employee wages, benefits and related obligations; |
| | d. certain transaction and bankruptcy related fees, costs and expenses, (including the attorneys' fees and disbursements of counsel to the Debtors and Guarantors, and the professional fees and disbursements of other professional advisors of the Debtors and Guarantors), |
| | e. Prepetition claims of critical vendors, only as approved by the Court; and |
| | f. the fees, costs and expenses incurred by the DIP Agent and its professionals. |
| | *See* Interim Order at Section G and Paragraph 8. |
| **Waiver or Modification of the Automatic Stay** *FED. R. BANKR. P. 4001(c)(1)(B)(iv)* | Pursuant to the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code are modified, to the extent necessary, to implement and effectuate the terms of the Interim Order.<br><br>*See* Interim Order at Paragraph 28. |
| **Stipulations of the Debtor** *FED. R. BANKR. P. 4001(b)(1)(B)(iii)* | The Debtors have stipulated to, among other things, the validity, enforceability, perfection, priority and amount, as applicable, of the claims, rights and liens of the Prepetition Secured Parties.<br><br>*See* Interim Order at Section E. |
| **Releases, Waivers, or Limitation on any Claim or Cause of Action** *FED. R. BANKR. P. 4001(c)(1)(B)(viii)* | Subject to entry of the Final Order, the Debtor stipulates and agrees to release the DIP Lender and the Prepetition Lender, and each of their Releasees, of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions, and causes of action of any and every kind whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to, as applicable, the DIP Facility, the DIP Loan Documents, the Prepetition Facility, the Prepetition Loan Documents, and/or the transactions contemplated hereunder or; provided that the forgoing shall not release any claims against a Releasee that a court of competent jurisdiction determines results primarily from the bad faith, gross negligence, or willful misconduct of such Releasee.<br><br>The Debtor further waives and releases any defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition Obligations and the DIP Obligations which the Debtor now has or may claim to have, directly or indirectly against the Releasees, arising out of, connected with or relating to any and all acts, omissions, or events occurring prior to the Court entering this Interim Order.<br><br>*See* Interim Order at Section E. |
| **Effect of Stipulations and Releases; Challenge Period** *FED. R. BANKR. P. 4001(b)(1)(B)(iii), 4001(c)(1)(B)(iii), (viii)* | The stipulations and releases contained in the Interim Order bind the Debtor, but no other parties in interest or estate professionals; provided, however, in the event no timely Challenge (as defined in the Interim Order) is filed, . the stipulations contained in the Interim Order shall be binding on the Committee and other interested parties<br><br>*See* Interim Order at Section E, Paragraph 33. |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** *FED. R. BANKR. P. 4001(c)(1)(B)(vii)* | All DIP Liens and Adequate Protection Liens (each as defined in the Interim Order) shall be valid and automatically perfected upon the entry of the Interim Order.<br><br>*See* Interim Order at Paragraph 4. |

| | |
|---|---|
| **Reporting Information**<br>*FED. R. BANKR. P.*<br>*4001(c)(1)(B)* | Under the Interim Order, the DIP Lender and Prepetition Secured Parties shall receive customary financial reporting from the Debtor during the Chapter 11 Case.<br><br>*See* Interim Order at Paragraphs 10(c), 13. |
| **Indemnification**<br>*FED. R. BANKR. P.*<br>*4001(c)(1)(B)(ix)* | The Debtor shall indemnify and hold harmless the DIP Lender and its assigns, successors, affiliates, officers, directors, employees and agents (including all of their professionals) from claims of the sort that are typical in DIP facility indemnity provisions, except for gross negligence or intentional misconduct, as described in more detail in the Interim Order.<br><br>*See* Interim Order at Paragraph 41. |
| **Section 506(c) and 552(b) Waivers**<br>*FED. R. BANKR. P.*<br>*4001(c)(1)(B)* | Subject to entry of the Final Order, the Interim Order provides that the DIP Obligations will have priority over any claims arising under Section 506(c) and 552 (b) and such provisions are waived as to the DIP Lender and Prepetition Secured Parties.<br><br>*See* Interim Order at Paragraphs 35-36. |
| **Liens on Avoidance Actions**<br>*FED. R. BANKR. P.*<br>*4001(c)(1)(B)(xi)* | Pending entry of a Final Order, the DIP Liens shall not attach to any Avoidance Actions (as defined in the Interim Order); however, upon entry of the Final Order, the DIP Collateral may be deemed to include any Avoidance Actions or proceeds therefrom.<br><br>*See* Interim Order at Paragraph 4. |
| **Milestones**<br>*FED. R. BANKR. P.*<br>*4001(c)(1)(B)(vi)* | The Interim Order contains the following milestones (the "**Interim Milestones**") for the DIP Facility:<br><br>a.  No later than five (5) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order;<br><br>b.  No later than ten (10) business days after the Petition Date, the Debtor shall have filed a motion seeking bid procedures for the sale of its assets and operations under an asset purchase agreement with the Senior Secured Lender as the stalking horse bidder with customary stalking horse protections (the "**Acquired Assets**"); and<br><br>c.  No later than twenty-five (25) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final Order.<br><br>*See* Interim Order at Paragraph 23.<br><br>Additionally, the DIP Loan Documents are expected to contain further milestones, which are not incorporated into the Interim Order, including:<br><br>d.  The deadline for the submission of binding bids shall be no later than sixty (60) calendar days after the Petition Date;<br><br>e.  No later than sixty-five (65) calendar days after the Petition Date, the Borrower shall commence an auction for the Acquired Assets in accordance with the bid procedures;<br><br>f.  No later than seventy (70) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order (which shall be in form and substance acceptable to Lender and the Prepetition Lender) approving the winning bid resulting from the auction of the Acquired Assets or, if no auction is held, approving a sale pursuant to the stalking horse bid(s); and<br><br>g.  No later than seventy-five (75) calendar days after the Petition Date, the Debtor shall consummate a sale transaction for the Acquired Assets. |

## Statement Highlighting Certain Provisions per the Complex Rules

5.     The DIP Orders contain certain provisions (the "**Highlighted Provisions**") listed in section J, paragraph 27 of the Complex Rules.  A summary of the Highlighted Provisions is set forth below:

a.  ***Sale or Plan Confirmation Milestones.***  The Interim Order provides that the Debtor shall have filed a motion seeking approval of bid procedures for the sale of its assets and operations under an asset purchase agreement with the Prepetition Secured Parties as the stalking horse bidder, with customary stalking horse protections, if the Prepetition Secured Parties elect to present a stalking horse bid and, if not, under an asset purchase agreement presented pursuant to the bid procedures, no later than ten (10) business days after the Petition Date. Additionally, the DIP Loan Documents are expected to contain further milestones related to the sale of the Acquired Assets, including (i) the Debtor shall establish a date that is no later than sixty (60) calendar days after the Petition Date as the deadline for the submission of binding bids with respect to the Acquired Assets, (ii) no later than sixty-five (65) calendar days after the Petition Date, the Debtor shall commence an auction for the Acquired Assets, in accordance with the bid procedures; <u>provided</u> that if there is no higher or better offer submitted in comparison to the stalking horse bid(s), no auction shall be held, (iii) no later than seventy (70) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order (which shall be in form and substance acceptable to Lender and the Prepetition Lender) approving the winning bid resulting from the auction of the Acquired Assets or, if no auction is held, approving a sale pursuant to the stalking horse bid(s), and (iv) no later than seventy-five (75) calendar days after the Petition Date, consummate a sale transaction for the Acquired Assets.

b.  ***Cross-collateralization.***  The Interim Order does not provide for cross-collateralization.

c.  ***Roll-up or Requirement that Postpetition Loans be Used to Repay Prepetition Debt.***  The Interim Order provides for roll-up, or that postpetition loans be used to repay prepetition debt.

d.  ***Liens on Avoidance Actions and Proceeds Thereof.*** Pending entry of the Final Order, the DIP Liens exclude any Avoidance Actions of the Debtor, but, upon entry of the Final Order, Avoidance Actions and any proceeds thereof may constitute DIP Collateral.

e.  ***Default Provisions and Remedies.*** The Interim Order includes certain usual and customary events of default and related remedies, and the use of Cash Collateral is subject to various usual and customary termination events.

f.  ***Release of Claims.***  The Interim Order does not provide for the Debtor's release of any claims or causes of action; however, upon entry of the Final Order, the

Debtor shall be deemed to release the DIP Lender and the Prepetition Lender, and each of their Releasees, of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable attorneys' fees), debts, liens, actions, and causes of action of any and every kind whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to, as applicable, the DIP Facility, the DIP Loan Documents, the Prepetition Facility, the Prepetition Loan Documents, and/or the transactions contemplated hereunder or; provided that the forgoing shall not release any claims against a Releasee that a court of competent jurisdiction determines results primarily from the bad faith, gross negligence, or willful misconduct of such Releasee; provided further that such waiver is subject to a Challenge (as defined in the Interim Order) brought within sixty (60) days of entry of the Interim Order.   .

g. ***Limitations on the Use of Cash Collateral Other than General "Carve-Outs" to Pay Approved Fees and Expenses of Advisors to Official Committees or Future Trustees.*** The Debtors are authorized to use proceeds of the DIP Financing in accordance with the Interim Order and the Budget, subject to the Budget Variance.

h. ***Priming Liens.*** The Interim Order provides that the DIP Liens and DIP Credit Facility Superpriority Claims granted thereunder shall, pursuant to section 364(d)(1) of the Bankruptcy Code, be subject to the Carve-Out, but shall otherwise be a first priority priming lien.

i. ***Limitations on the Ability of Estate Fiduciaries to Fulfill their Duties.*** There are no limitations on the ability of estate fiduciaries to fulfill their respective duties in the Interim Order.

6.      As discussed below, the Debtor requires immediate access to funding to maintain existing operations and preserve assets pending a sale or exit from the Chapter 11 Case. The Debtor engaged in an extensive marketing and solicitation campaign to procure debtor in possession financing on the most advantageous terms available.  While the DIP Facility contains the Highlighted Provisions, the DIP Lender would not have agreed to provide financing, and the Prepetition Secured Parties would not have agreed to the use of Cash Collateral, without the inclusion of the Highlighted Provisions in the Interim Order.  Based on their sound business judgment, as determined by the Debtor's independent director and chief restructuring officer, the Debtor has concluded that the DIP Facility is the best debtor in possession financing option available to the Debtor and serves the best interests of the estates and interested parties.

Accordingly, the Debtor submits that the Highlighted Provisions are appropriate under the facts and circumstances of the Chapter 11 Case and, thus, the DIP Facility, including the Highlighted Provisions, should be approved.

**<u>Background</u>**

**A.    Chapter 11 Case**

7.      On April 4, 2023 (the "**Petition Date**"), the Debtor filed with this Court a voluntary petition for relief under Chapter 11 of the Bankruptcy Code—thereby commencing the Chapter 11 Case.  The Debtor continues to operate its businesses as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Case, and no official committees have been appointed or designated.

8.      A discussion of the facts and circumstances surrounding the Chapter 11 Case and the relief requested herein is set forth in the *Declaration of Mark Shapiro in Support of Chapter 11 Petition and First Day Motions* (the "**First Day Declaration**"), which is being filed simultaneously with the Motion and incorporated herein by reference in its entirety.[4]

**B.    Summary of the Debtors' Prepetition Capital Structure**

**1.    Debtors' Cash Management System**

9.      In the ordinary course of business, the Debtor maintains a cash management system (the "**Cash Management System**"). The Cash Management System is comprised of bank accounts (collectively, the "**Bank Accounts**") with PNC Bank and Bank of America. Two of the Bank of America accounts are maintained in accordance with the terms of that certain Deposit Account Control Agreement (the "**BofA DACA**") dated June 15, 2022 among the Debtor, Bank

---

[4] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the First Day Declaration.

of America and Sandton Capital Solutions Master Fund V, L.P. ("**Sandton**"), as assignee of Farm Credit of Central Florida ("**Farm Credit**")

10.     As of the Petition Date, the Debtors Debtor has approximately $51,743.13 of unrestricted cash on hand, which amount is held in the Bank Accounts.

**2. Prepetition Secured Indebtedness.**

11.     As of the Petition Date, the Debtor was indebted and liable to Sandton under (a) that certain Loan and Security Agreement, dated as of April 14, 2022 (as amended, supplemented, or otherwise modified, the "**Prepetition Loans**"), in the aggregate principal amount of approximately $30 million (the "**Prepetition Facility**") between Sandton, as successor-in-trust to Farm Credit (the "**Prepetition Lender**"), and the Debtor and (b) all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the Prepetition Lender, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements, and all other related agreements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto (all the foregoing, together with the Prepetition Loans, as all of the same have been supplemented, modified, extended renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "**Prepetition Loan Documents**").

12.     All obligations of the Debtor arising under the Prepetition Loans or any other Prepetition Loan Documents, including under the Prepetition Facility and all loans, advances, debts, liabilities, principal, accrued or hereafter accruing interest, fees, costs, charges, indemnification obligations, expenses (including any and all reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable, reimbursable, or otherwise payable, in each case, solely to the extent provided under the Prepetition Loan Documents), or other amounts, of any kind or nature, whether or not evidenced

by any note, agreement or other instrument, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations under the Prepetition Loan Documents or Bridge Loan (as defined below) shall hereinafter be referred to collectively as the "**Prepetition Obligations**."

13.     On or about May 13, 2022, Farm Credit perfected a security interest in certain assets of the Debtor through the filing of a UCC Financing Statement (the "**Farm Credit UCC**").  Farm Credit assigned its rights under the Farm Credit UCC to Sandton in or about March 2023.

14.     On or about March 17, 2023, Farm Credit assigned to Sandton all of its rights and interest in the Prepetition Facility and any collateral for the security interest, including its rights under the Prepetition Facility, Bridge Loan, and BofA DACA.

15.     On or about March 20, 2023, the Sandton and the Debtor entered into an amendment to the Prepetition Facility to increase the Revolving Credit Facility from $10 million to $11 million—providing an additional $1 million in available funding to the Debtor.  The amendment and additional $1 million under the Revolving Credit Facility may referred to as the "**Bridge Loan**".  The Bridge Loan is secured by a lien on the assets of the Debtor to the same extent as the Revolving Credit Facility.  As of the Petition Date, the Debtor is informed and believes that the Debtor has drawn approximately $500,000 under the Bridge Loan.

**Solicitation of Debtor in Possession Financing Proposals**

16.     The Debtor, through its CRO or qualified employees, contacted more than ten (10) lenders and financial institutions, including the Prepetition Lender, regarding extensions of existing credit arrangements and the provision of distress or debtor in possession financing.  The Debtor requested and the Prepetition Lender would not agree to permit a senior lien ahead of the priority of the Prepetition Obligations.  Based on the existence of the Prepetition Obligations, the

Debtor only received interest from Prepetition Lender.  The Debtor negotiated extensively regarding the terms of proposed DIP Facility.  Ultimately, the Debtor selected the DIP Facility based on the conclusion that it provided the most favorable terms available to the Debtor and allowed the Debtor to preserve the value of its business.

## Liquidity Needs and Proposed DIP Facility

17.     The Debtors are in the midst of an extreme liquidity crisis.  As of the Petition Date, the Debtor had $51,743.13 in unrestricted cash on hand in the Bank Accounts.  Aside from the proposed DIP Facility, the Debtor does not have access to funds for operational expenses through existing credit facilities as such facilities are either fully drawn or the Debtor is unable to satisfy certain prerequisites to obtain additional extensions.  Unless the DIP Facility is approved on an interim basis, the Debtor will be unable to meet certain immediate obligations, including, without limitation, the payment of payroll on April 14, 2023.

18.     The DIP Facility will provide the Debtors with a $1.13 million draw upon entry of the Interim Order, with a committed financing facility up to $5.1 million proposed by the Debtor to be considered at a subsequent hearing, subject to the terms and conditions described herein, and set forth in the Interim Order.  The DIP Facility is the product of arms-length, good faith negotiations between the Debtor and the DIP Lender.  The DIP Agent is not an insider, affiliate, or control person of the Debtor, but is a third-party lender. The DIP Lender and Debtor are working to finalize a credit agreement memorializing the terms of the DIP Facility.

## Basis for Relief Requested

19.     After evaluating available funding under existing facilities and a broad solicitation effort to obtain the most advantageous terms for debtor in possession financing, the Debtor has concluded, in the exercise of its sound business judgment, that the DIP Facility serves the best interests of the estate and creditors in the Chapter 11 Case.  Accordingly, the Debtor requests that

the Court enter the Interim Order authorizing the Debtor to obtain the DIP Loan and access and utilize the DIP Facility and advances thereunder as well as Cash Collateral (as defined below) in accordance with the initial form of budget attached to the Interim Order as **Exhibit 1**, as modified from time to time in accordance with the DIP Orders and the DIP Credit Agreement (the "**Budget**").

20.     The proceeds from the proposed DIP Facility will be used for, among other things, making payments integral to the Debtor's business operations. Indeed, the liquidity to be provided under the DIP Facility, combined with access to Cash Collateral, will enable the Debtor to (a) fund their operations during the course of this Chapter 11 Case; (b) ensure that administrative costs are paid in full and value is preserved during the course of the Chapter 11 Case; and (c) pursue a sale or restructuring transactions that will help the Debtor maximize value for all of its stakeholders.

**A.     The DIP Facility Satisfies Section 364 of the Bankruptcy Code and Represents a Sound Exercise of the Debtor's Business Judgment.**

21.     The Debtor proposes to obtain financing under the DIP Facility by providing the DIP Lender with security interests, liens, and claims as set forth in the Interim Order pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code.  Specifically, the Debtor proposes to provide liens and superpriority administrative claims to the DIP Lender as follows:

a.     **DIP Lender Superpriority Claim**.  Subject to the Carve-Out, the Debtor seeks authority to grant the DIP Lender a superpriority administrative expanse claim, pursuant to sections 364(c)(1) and 364(e) of the Bankruptcy Code (the "**DIP Superpriority Claim**") on account of the DIP Obligations.  The DIP Superpriority Claim shall be payable from and have recourse to all pre- and postpetition property of the Debtor and its estates and all proceeds thereof.

b.     **Priming Lien Pursuant to Section 364(d)(1)**.  The Debtor seeks to grant to the DIP Lender a first priority, priming security interest in and lien on, pursuant to section 364(d)(1), all encumbered DIP Collateral, which shall be senior to any existing liens or claims, including, but not limited to, the Prepetition Secured Loans (as defined in the Interim Order), and subject and junior only to the Carve-Out.

c.   **Roll-up of Bridge Loan**.  The Debtors seeks authority to "roll-up" the Bridge Loan into the DIP Obligations in full upon entry of a Final Order, and prior thereto, a dollar-for-dollar "roll-up" based on advances under the DIP Loan.

**1.  Obtaining the DIP Facility is a Sound Exercise of the Debtor's Business Judgment**

22.    Courts give debtors in possession considerable deference in acting in accordance with their sound business judgment in obtaining such credit. *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (approving postpetition-financing on an interim basis as an exercise of debtors' business judgment); *In re Republic Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("Debtors correctly posit that courts will almost always defer to the business judgment of a debtor in the selection of a lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

23.    To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06- 11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (internal citations omitted); *see also In re Monitor Dynamics*, *Inc.*, No. 10-51821, 2010 WL 4780371 (Bankr. W.D. Tex. June 11, 2010) (approving financing motion on interim basis as exercise of debtor's prudent business judgment).

24.    Here, the Debtor's decision to obtain debtor in possession financing under the terms of the DIP Facility is a sound exercise of their business judgment, as determined by its independent director and chief restructuring officer.  There is no question that the Debtor require

the immediate infusion of liquidity provided under the DIP Facility; absent the relief requested, the Debtors could not maintain operations and preserve assets for the benefit of creditors. Furthermore, the failure to approve the DIP Financing would substantially diminish the value of the Debtor's assets, including the farming facilities and equipment.   Additionally, the DIP Facility was negotiated at arm's length, with each of the parties thereto utilizing disinterested counsel and advisors, and was approved by the Debtor's independent director.  Finally, the terms of the DIP Facility are fair and reasonable.  The DIP Facility is "right sized" for the needs of the Debtor during the pendency of the Chapter 11 Case.  Accordingly, the Court should authorize approve the DIP Facility and DIP Loan on an interim basis pursuant to the terms of the proposed Interim Order, and, subject to final approval, finding that the Debtor may execute and enter into any agreements or other documentation related to the DIP Facility as a reasonable exercise of the Debtor's business judgment.

### 2. The Debtor Should Be Authorized to Grant the DIP Liens as well as the DIP Superpriority Claims

25.     Section 364(c) of the Bankruptcy Code provides:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt— [¶] (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; [¶] (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or [¶] (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).  In evaluating whether a debtor has satisfied the requirements of Section 364(c) of the Bankruptcy Code, courts consider (a) whether the debtor made reasonable efforts to obtain unsecured credit under Sections 364(a) and 364(b) of the Bankruptcy Code, (b) whether the credit transaction benefits the debtor or are necessary to preserve estate assets, and (c) whether the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender.  *See In re Republic Airways Holdings Inc.*,

2016 WL 2616717, at *11; *In re Los Angeles Dodgers LLC*, 457 B.R. at 312–13; *In re Beechgrove Redevelopment, L.L.C.*, Nos. 07-12057 and 07-12058, 2007 WL 4414777 (Bankr. E.D. La. Dec. 13, 2007); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40.

26.     Notwithstanding, Section 364 of the Bankruptcy Code "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by Section 364(c) of the Bankruptcy Code. *Id.*; *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)). The Debtor has satisfied the requirements of Section 364(c) of the Bankruptcy Code and, thus, should be authorized to grant priming liens and superpriority claims provided under the DIP Facility.

27.     The DIP Facility is the result of a robust solicitation process and arms' length negotiations through qualified, disinterested representatives overseen by the Debtor's chief restructuring officer and independent director. In sum, the Debtor, through its CRO or qualified employees, contacted more than ten (10) lenders and financial institutions, including the Prepetition Lender, regarding extensions of existing credit arrangements and the provision of distress or debtor in possession financing. The Debtor requested and the Prepetition Lender would not agree to permit a senior lien ahead of the priority of the Prepetition Obligations. Based on the existence of the Prepetition Obligations, the Debtor only received interest from Prepetition Lender. The Debtor negotiated extensively regarding the terms of proposed DIP Facility. Ultimately, the Debtor selected the DIP Facility based on the conclusion that it

provided the most favorable terms available to the Debtor and allowed the Debtor to preserve the value of its business.

28.     Based on the foregoing, the Debtor submits that the requirements of Section 364(c) of the Bankruptcy Code have been satisfied and, as such, the Court should authorize the Debtor to grant the DIP Lender superpriority administrative expenses status for the obligations under the DIP Facility as provided for in Section 364(c)(1) of the Bankruptcy Code and the proposed Interim Order.

### 3.  Authorizing Debtor to Grant Priming Liens on Encumbered Assets is Appropriate

29.     Authorization to grant the DIP Lender "priming" liens on certain assets of the Debtor is necessary and appropriate under the circumstances presented.  Section 364(d)(1) of the Bankruptcy Code provides:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if— [¶] (A) the trustee is unable to obtain such credit otherwise; and [¶] (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).  Under the DIP Facility, the Debtor proposes granting the DIP Lender the priming liens securing the DIP Obligations on certain encumbered assets.

30.     As set forth herein, the Debtor was unable to obtain postpetition financing on more advantageous terms than governing the DIP Facility.  More specifically, the Debtor engaged in an extensive marketing campaign in an effort to locate potential distressed or debtor in possession financing.  *In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *11 ("Section 364(d) [of the Bankruptcy Code] 'does not require that debtors seek alternative financing from every possible lender. However, the debtor must make an effort to obtain credit without priming a senior lien.'").  While the Debtor received multiple proposals, the only

proposals containing reasonable market terms required the Debtor to grant "priming" liens as a prerequisite to funding the debtor in possession facility.

31.     As set forth herein, the Prepetition Secured Parties have consented to the DIP Financing, in exchange for the bargained-for protections set forth in the Interim Order (the "**Prepetiton Secured Party Protections**"), including both adequate protection and certain other protections set forth in the Interim Order, absent each of which the Prepetition Secured Parties would not have consented to such DIP Financing.   To the extent that the DIP Financing implicates section 364(d)(1)(B) of the Bankruptcy Code, the Debtor believes that the interests of senior lenders are adequately protected under the DIP Facility by virtue of these Prepetition Secured Party Protections.   *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

32.     Based on the foregoing, the Debtor submits that the requirements for granting priming liens for the benefit of the DIP Lender pursuant to Section 364(d)(1) of the Bankruptcy Code and, therefore, respectfully requests that the Court authorize the Debtor to grant such liens in accordance with the terms of the DIP Facility and Interim Order.

**4.   Authorization to Pay Fees under the DIP Documents is Appropriate and Necessary**

33.     Finally, the Debtor has agreed, subject to Court approval, to pay certain fees, expenses, and other payments to the DIP Lender, as provided for in the Interim Order.   The provisions regarding the payment of such fees and expenses were negotiated at arm's length through the parties' respective representative and are integral conditions to the bargain struck between the Debtor and the DIP Lender.   Further, the Debtor considered the amounts described above when determining in their sound business judgment that the DIP Facility constituted the best terms on which the Debtor could obtain the post-petition financing necessary to maintain its

operations and assets and administer the Chapter 11 Case.  As set forth herein, no financing, let alone with terms similar to those in the DIP Facility, is available to the Debtor for lower fees or better terms overall.  Accordingly, the Debtor respectfully submits that the Court should authorize the Debtor to pay the fees and expenses provided for under the Interim Order in connection with the DIP Facility.

**B.      The DIP Lender Constitutes a Good-Faith Lender Under Section 364(e) of the Bankruptcy Code**

34.      Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  11 U.S.C. § 364(e).   Here, the terms of the DIP Loan are the result of the Debtor's reasonable and informed determination that the DIP Lender has offered the most favorable terms under the circumstances.  All negotiations of the DIP Facility were conducted in good faith and at arm's length.  The proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code, DIP Orders and the Budget, as amended or modified consistent with the foregoing.  Accordingly, the Court should find that the DIP Lender is a "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code.

**C.      The Proposed Adequate Protection and Use of Cash Collateral should be Approved**

35.      Section 363(c)(1) of the Bankruptcy Code permits a debtor to "use property of the estate in the ordinary course of business without notice or a hearing." 11 U.S.C. § 363(c)(1). Section 363(c)(1) of the Bankruptcy Code provides a debtor flexibility to operate its business without unnecessary creditor or court oversight.  *See In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) ("Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets.") (internal quotation omitted).  A debtor may

use, sell, or lease cash collateral if either: (a) each entity that has an interest in such collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of Section 363 of the Bankruptcy Code.  11 U.S.C. § 363(c)(2).

36.     It is axiomatic that the continued availability of cash postpetition is essential to the ability of a debtor to effectively reorganize under chapter 11.  As such, courts generally recognize that the use of cash collateral is appropriate where necessary to preserve a debtor's estate or ability to maintain operations and reorganize.  *See, e.g., In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (stating that "the purpose of Chapter 11 is to rehabilitate debtors, and, generally, access to such cash collateral is necessary in order to operate a business") (internal citations omitted); *Chrysler Credit Corp. v. George Ruggiere Chrysler-Plymouth, Inc. (In re George Ruggiere Chrysler-Plymouth, Inc.)*, 727 F.2d 1017, 1020 (11th Cir. 1984) (allowing debtor to use cash collateral over secured creditor's objection after noting that "[w]ithout the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated."); *Stein v. U.S. Farmers Home Admin. (In re Stein)*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982) (granting cash collateral motion and noting that access to cash is imperative for a debtor to operate its business); *In re Constable Plaza Assocs.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991).

37.     In addition to the funds available under the DIP Facility, the Debtors require immediate access to cash collateral to maintain operations and ensure the continued preservation of estate assets.  The Prepetition Secured Parties hold security interests in the Debtor's Bank of America Bank Accounts pursuant to the BofA DACA.  Accordingly, prior to the Petition Date, the Debtor and the Prepetition Secured Party negotiated terms for the use of the Cash Collateral of the Prepetition Secured Parties, which agreement is memorialized in the provisions of the

Budget and the Interim Order.  In addition to the terms of the Budget and the Interim Order, both of which were the subject of extensive negotiations, the Prepetition Secured Parties consented to the use of Cash Collateral subject to the following provisions:

    a.    valid and automatically perfected priority replacement liens and security interests in and on all real and personal property of the Debtor and its bankruptcy estate, in each case, subject to the DIP Liens securing the DIP Financing in the same order and priority as existed prepetition;

    b.    superpriority administrative claims and all of the other benefits and protections allowable under section 507(b) of the Bankruptcy Code, with priority as provided therein, to the extent of any diminution in each Prepetition Secured Parties' respective Prepetition Collateral, and

    c.    reporting to the Prepetition Secured Parties regarding any actions of the Debtor in connection with the Chapter 11 Case..

38.    In addition, pursuant to the DIP Orders and the agreement of Prepetition Secured Parties, the Debtor's ability to use Cash Collateral is limited by the Budget, which is subject to approval by the DIP Lender.

39.    The Debtor submits that their continued use of their cash resources on an interim basis, including Cash Collateral, subject to the provisions of the Interim Order and Budget, is reasonable and necessary, consistent with the Bankruptcy Code and applicable law, and serves the best interest of the Debtor's estates and all interest holders, including the Prepetition Secured Parties.  Therefore, the Debtor seeks authority to continue to use their cash, including any Cash Collateral, on the terms of the Interim Order and Budget.

**D.    Limited Modification of the Automatic Stay to Effectuate the DIP Documents is Necessary**

40.    The proposed Interim Order provides that the automatic stay provisions of Section 362 of the Bankruptcy Code will be modified to the extent necessary to implement and effectuate the terms and provisions of the Interim Order.  Specifically, the Interim Order provides that:

> The automatic stay imposed by Bankruptcy Code § 362 is hereby modified, to the extent necessary, to implement and effectuate the terms and conditions of this Interim Order.

Interim Order at ¶ 28.  Stay modifications of this kind are ordinary features of debtor in possession financing arrangements, and, indeed, are necessary to effectuate the terms and purposes of the DIP Facility.  Accordingly, the Debtor requests that the Court modify the automatic stay in accordance with the terms of the proposed Interim Order.

### E.    Access to the DIP Facility on an Interim Basis is Necessary to Avoid Immediate and Irreparable Harm to the Debtor and its Estate

41.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to Section 364 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

42.    The Debtor requests that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtor, from entry of the Interim Order until the Final Hearing, to withdraw and borrow funds under the DIP Facility, subject to the Interim Order and Budget. The Debtor will suffer immediate and irreparable harm if the Interim Order approving the DIP Facility is not entered sooner than 14 days after service of the Motion and, as a result, the Debtor is not permitted to access the up to $1.13 million of the DIP Facility during the interim period. The Debtor requires access to the DIP Facility prior to the Final Hearing on the Motion and entry of the Final Order approving the DIP Facility in order to, among other things, pay employee payroll and benefits, preserve assets of the bankruptcy estate, including produce that may spoil if left unattended, and position the Debtor and its facilities for a sale in the Chapter 11 Case.  Such relief is necessary for the Debtor to preserve and maximize the value of assets of the estates and,

therefore, to avoid immediate and irreparable harm and prejudice to the Debtor's estate and parties in interest.

## Request for Emergency Relief

43.     As set forth herein and in the First Day Declaration, the Debtor has an immediate need to access the funds available under the DIP Facility and use existing Cash Collateral.  The DIP Facility is structured to provide immediate liquidity to the Debtor to fund imminent expenses essential to continued maintenance of the company and its various assets for the benefit of all creditors, including, without limitation, funds necessary to pay employees on April 14, 2023.  Absent the relief sought in this Motion, the Debtor and its estate would suffer immediate and irreparable harm and, thus, the Debtor respectfully requests that the Court approve the interim relief request in the Motion on an emergency basis.

## Request for Final Hearing

44.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing that is as soon as practicable, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## Reservation of Rights

45.     Except to the extent provided in the Interim Order and the forthcoming DIP Documents, nothing contained herein is intended or should be construed as, or deemed to constitute, an agreement or admission as to the validity of any claim against the Debtor on any grounds, a waiver or impairment of the Debtor's rights to dispute any claim on any grounds, or an assumption or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  Except as expressly provided in the Interim Order and the DIP Documents, the Debtor reserves any and all rights to contest any claims related to the DIP Facility under applicable bankruptcy and non-bankruptcy law.  Similarly, if the Court grants the relief sought

herein, any payment made pursuant to the Court's order is not intended, and should not be construed, as an admission as to the validity of any claim or a waiver of the Debtor's rights to dispute such claim subsequently.

<b>Compliance with Bankruptcy Rule 6004(a) and<br>Waiver of Stay under Bankruptcy Rule 6004(h)</b>

46.     To implement successfully the relief sought herein, the Debtor requests that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances presented.  The Debtor further requests that, to the extent applicable to the relief requested in this Motion, the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As discussed, *supra*, the Debtor require immediate access to the funds under the DIP Facility.  Delaying the availability of such funds will result in immediate and irreparable harm, including, without limitation, the inability to pay employees as the Debtor transitions into bankruptcy, which may have a catastrophic effect on the Debtor's ability to preserve assets of the estates and maximize the value of such assets for the benefit of creditors.  Accordingly, the Debtor respectfully submits that ample cause exists to justify the finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

<b><u>Notice</u></b>

47.     Notice of this Motion, whether by facsimile, electronic mail, or overnight courier, will be given to the following parties: (a) the United States Trustee for the Southern District of Texas; (b) the Debtor; (c) all secured creditors; (d) the Offices of the Attorney General of the States of Texas, Florida, Colorado, Georgia, Washington, Minnesota, Hawaii and Ohio; (e) the

thirty (30) largest unsecured creditors for the Debtor; (f) the Debtor's identified, interested taxing authorities, including the Internal Revenue Service; (g) the Debtor's identified, interested government and regulatory entities, including the U.S. Securities and Exchange Commission, the Food and Drug Administration, the Federal Trade Commission, the United States Department of Agriculture, the Environmental Protection Agency and the Occupational Safety and Health Administration; (h) other interested parties as identified by the Debtor; (i) any known counsel for (d) – (h); and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002. The method of service for each party will be described more fully in the certificate of service prepared by the Debtors' claims and noticing agent. The Debtors respectfully submit that, under the circumstances, such notice is sufficient and that no other or further notice of this Motion is required.

**WHEREFORE,** the Debtor respectfully requests entry of the Proposed Interim Order granting the relief requested herein and for all other relief that is appropriate under the circumstances.

RESPECTFULLY SUBMITTED this 5th day of April, 2023.

**BAKER & HOSTETLER LLP**

/s/ Elizabeth A. Green

**Elizabeth A. Green, Esq.**
Fed ID No.: 903144
**Jimmy D. Parrish, Esq.**
Fed. ID No. 2687598
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL  32801-3432
Telephone:  407.649.4000
Facsimile:   407.841.0168
Email: egreen@bakerlaw.com
        jparrish@bakerlaw.com

**BAKER & HOSTETLER LLP**
**Jorian L. Rose, Esq.**
N.Y. Reg. No. 2901783
45 Rockefeller Plaza
New York, New York
Telephone:  212.589.4200
Facsimile:  212.589.4201
Email: jrose@bakerlaw.com
*(Admitted Pro Hac Vice)*

*Proposed Counsel for the Debtors and Debtors in Possession*

### Certificate of Accuracy

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Elizabeth A. Green*

Elizabeth A. Green

### Certificate of Service

I certify that on April 5, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Elizabeth A. Green*
Elizabeth A. Green

4870-6644-3868.1