## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **In re:** | **CHAPTER 11** |
| **KALERA, INC.,**[1] | **CASE NO.: 23-90290 (CML)** |
| **Debtor.** | |

## COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF LIQUIDATION OF KALERA, INC. PROPOSED BY THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Dated: October __, 2023
Houston, Texas

**BAKER & HOSTETLER LLP**
*Attorneys to the Debtor and
Debtor in Possession*

Elizabeth A. Green, Esq. (Fed ID No. 903144)
Email:  egreen@bakerlaw.com
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, Florida 32801-3432
Telephone: (407) 649-4000
Facsimile: (407) 841-0168

Jorian L. Rose, Esq. (*admitted pro hac vice*)
Email:  jrose@bakerlaw.com
45 Rockefeller Plaza
New York, New York
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

Michael T. Delaney, Esq. (*admitted pro hac vice*)
Email:  mdelaney@bakerlaw.com
Key Tower, 127 Public Sq., Ste. 2000
Cleveland, Ohio 44114
Telephone:  (216) 861-7874
Facsimile:  (216) 696-0740

**DYKEMA GOSSETT PLLC**
*Attorneys to the Official Committee
of Unsecured Creditors*

Basil A. Umari (S.D. Tex. ID No. 30472)
Email: bumari@dykema.com
Nicholas Zugaro (S.D. Tex. ID No. 1054893)
Email: nzugaro@dykema.com
5 Houston Center
1401 McKinney Street, Suite 1625
Houston, Texas 77010
Telephone: (713) 904-6900
Facsimile: (214) 462-6401

Alexandria R. Rahn (S.D. Tex. ID No. 3708968)
Email: arahn@dykema.com
1717 Main Street, Suite 4200
Dallas, Texas 75201
Telephone: (214) 462-6400
Facsimile: (214) 462-6401

---

[1] The last four digits of the Debtor's federal tax identification number is 7838.  The Debtor's mailing address is Kalera, Inc., Gateway Business Center 23, 18000 East 40th Avenue, Aurora, CO 80011.

# **TABLE OF CONTENTS**

I. EXECUTIVE SUMMARY ...................................................................................................... 3

    A.      Introduction................................................................................................. 3

    B.      Plan Overview............................................................................................ 3

    C.      Treatment of Claims and Interests Under the Plan. ................................... 4

II. DEFINITIONS AND CONSTRUCTION OF TERMS ......................................................... 6

    A.      Definitions. ................................................................................................. 6

    B.      Interpretation; Application of Definitions and Rules of Construction............................ 17

III. BACKGROUND ................................................................................................................. 18

    A.      Nature and History of the Debtor's Business. ........................................... 18

    B.      Corporate Structure and Ownership........................................................... 21

    C.      The Debtor's Prepetition Indebtedness....................................................... 22

    D.      Events Leading to the Filing of the Bankruptcy Case. .............................. 22

    E.      The Chapter 11 Case................................................................................... 24

            1.      Administrative Motions. ................................................................ 24

            2.      First Days Orders. ......................................................................... 24

            3.      Appointment of the Creditors' Committee. ................................... 25

            4.      Employment of Professionals and Advisors. ................................ 25

            5.      Stay of Pending Litigation. ........................................................... 25

            6.      Claims Process and Bar Date. ....................................................... 26

            7.      Postpetition Financing and Cash Collateral Orders....................... 26

    8.      Sale of Substantially All the Debtor's Assets. ......................................... 27

    9.      Investigation of Directors and Officers of the Debtor by the Committee......................... 27

IV. CONFIRMATION AND VOTING ..................................................................................... 27

    A.      Plan Confirmation Hearing. ....................................................................... 27

    B.      Requirements for Plan Confirmation. ........................................................ 28

    C.      Best Interests of the Creditors Test. .......................................................... 28

    D.      Plan Feasibility. ......................................................................................... 29

    E.      Classification of Claims and Interests......................................................... 29

    F.      Impaired Claims or Interests. ..................................................................... 30

    G.      Eligibility to Vote on this Plan................................................................... 30

    H.      Voting Procedure and Deadlines. ............................................................... 30

    I.      Acceptance of this Plan............................................................................... 32

    J.      Elimination of Vacant Classes. .................................................................. 32

i

V. TREATMENT OF UNCLASSIFIED CLAIMS ................................................................. 32

    A.     Administrative Expense Claims.............................................................. 32

    B.     Professional Fee Claims.......................................................................... 33

    C.     Priority Tax Claims................................................................................. 34

VI. CLASSIFICATION OF CLAIMS AND INTERESTS; ESTIMATED RECOVERIES ..................... 35

VII. TREATMENT OF CLAIMS AND INTERESTS ................................................................... 35

    A.     Classification and Treatment of Claims and Interests. ....................... 35

         1.     Class 1 — Other Priority Claims. ........................................ 35

         2.     Class 2 — Sandton Capital Secured Claim........................... 36

         3.     Class 3 — Other Secured Claims. ........................................ 36

         4.     Class 4 — General Unsecured Claims................................... 37

         5.     Class 5 — Equity Interests.................................................... 37

VIII. THE LIQUIDATION OF THE DEBTOR .......................................................................... 37

IX. PROVISIONS REGARDING THE LIQUIDATING TRUST .................................................... 38

    A.     Appointment of the Liquidating Trustee............................................... 38

    B.     Creation of the Liquidating Trust. ......................................................... 38

    C.     Beneficiaries of the Liquidating Trust. .................................................. 39

    D.     Vesting and Transfer of Assets to the Liquidating Trust. ...................... 39

    E.     Certain Powers and Duties of the Liquidating Trust and Liquidating Trustee. ............... 40

         1.     General Powers of the Liquidating Trustee .......................... 40

         2.     Books and Records ............................................................... 41

         3.     Investments of Cash ............................................................. 42

         4.     Costs and Expenses of Administration of the Liquidating Trust ........................ 42

         5.     Reporting .............................................................................. 42

    F.     Post-Effective Date Notice. ................................................................... 42

    G.     Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets; Preparation and Filing of Tax Returns for Debtor................................ 42

    H.     Term of Liquidating Trust. ..................................................................... 43

    I.     Limitation of Liability of the Liquidating Trustee................................. 44

X. MEANS FOR IMPLEMENTATION .................................................................................. 44

    A.     Preservation of Right to Conduct Investigations. ................................. 44

    B.     Prosecution and Resolution of Causes of Action and Avoidance Actions. ...................... 44

    C.     Effectuating Documents and Further Transactions................................ 45

    D.     Funding of Liabilities and Distributions. ............................................... 45

    E.     Release of Liens....................................................................................... 45

F.     Exemption from Securities Laws. ........................................................................... 46

G.    Exemption from Certain Taxes and Fees. ............................................................... 46

H.    Debtor's Privileges as to Certain Causes of Action. ............................................. 46

I.     Insurance Policies. .................................................................................................. 47

J.     Filing of Monthly and Quarterly Reports and Payment of Statutory Fees. ......... 47

K.    Completion of Services of Professionals. ............................................................. 47

L.     Operations of the Debtor Between the Confirmation Date and the Effective Date. ......... 48

XI. PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN ............................ 48

A.    Distribution Record Date. ...................................................................................... 48

B.    Method of Payment. ............................................................................................... 48

C.    Claims Objection Deadline. ................................................................................... 48

D.    No Distribution Pending Allowance. ..................................................................... 48

E.    Reserve of Cash Distributions. .............................................................................. 48

F.     Delivery of Distributions. ...................................................................................... 49

G.    Fractional Dollars; *De Minimis* Distributions. ..................................................... 49

H.    Excess Funds. ......................................................................................................... 49

I.     Unclaimed Distributions. ....................................................................................... 50

J.     Set-Off. 50

K.    Maximum Recovery and Postpetition Interest. ..................................................... 50

L.     Allocation of Distributions Between Principal and Interest. ................................. 50

M.   Prepayment. ........................................................................................................... 51

XII. EXECUTORY CONTRACTS ........................................................................................... 51

A.    Rejection of Executory Contracts and Unexpired Leases. .................................... 51

B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases. .......... 51

XIII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ........................................... 51

XIV. RELEASE, EXCULPATION, INJUNCTION, AND RELATED PROVISIONS ............. 52

A.    Releases by the Debtor. ......................................................................................... 52

B.    Releases by the Releasing Parties. ........................................................................ 53

C.    Exculpation. ........................................................................................................... 55

D.    Preservation of Causes of Action. ......................................................................... 55

1.     Vesting of Causes of Action .................................................................................. 55

2.     Preservation of All Causes of Action Not Expressly Settled or Released. ........... 56

E.    Injunction. .............................................................................................................. 56

C.    Termination of All Employee and Workers' Compensation Benefits. .................. 58

D.    Exclusions and Limitations on Liability. .............................................................. 58

iii

XV. RETENTION OF JURISDICTION ................................................................................................. 58

XVI. MISCELLANEOUS PROVISIONS ............................................................................................ 60

    A.       Modification of Plan. ............................................................................................. 60

    B.       Revocation of Plan. ............................................................................................... 60

    C.       Successors and Assigns. ........................................................................................ 61

    D.       Governing Law. ..................................................................................................... 61

    E.       Reservation of Rights. ........................................................................................... 61

    F.       Effectuating Documents; Further Transactions. ................................................... 61

    G.       Further Assurances. ............................................................................................... 61

    H.       Dissolution of the Debtor and Closing of the Chapter 11 Case. .......................... 61

    I.       Dissolution of the Committee. .............................................................................. 62

    J.       Service of Documents. .......................................................................................... 62

    K.       Filing of Additional Documents. .......................................................................... 63

XVII. RISKS AND OTHER CONSIDERATIONS ............................................................................. 63

    A.       Bankruptcy Considerations. .................................................................................. 64

    B.       No Duty to Update Disclosures. ............................................................................ 64

    C.       Alternatives to Confirmation and Consummation of the Plan. ............................. 64

            1.       Alternate Plan ........................................................................................... 64

            2.       Chapter 7 Liquidation or Dismissal ......................................................... 65

    D.       Certain Federal Tax Consequences ...................................................................... 65

            1.       Federal Income Tax Consequences to the Debtor ................................... 66

            2.       Federal Income Tax Consequences to Holders of Allowed Claims ................... 67

            3.       Federal Income Tax Consequence to Holders of Disputed Claims ................... 70

            4.       Tax Treatment of the Liquidating Trust and Holders of Beneficial Interests Therein ...................................................................................... 71

            5.       FATCA ...................................................................................................... 73

            6.       Backup Withholding and Information Reporting ..................................... 73

XVIII. RECOMMENDATION AND CONCLUSION .......................................................................... 75

## DISCLAIMER

This Combined Plan and Disclosure Statement[2] has been prepared in accordance with section 1125 of the Bankruptcy Code, Rules 3016 and 3017 of the Federal Rules of Bankruptcy Procedure, Rule 3016-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of Texas, and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas, and not in accordance with federal or state securities law or other applicable non-bankruptcy law. Persons or Entities trading in or otherwise purchasing, selling, or transferring Claims against the Debtor should evaluate this Combined Plan and Disclosure Statement considering the purpose for which it was prepared.

Pursuant to Local Rule 3016-2, this Combined Plan and Disclosure Statement is being submitted for conditional approval only.  Contemporaneously with the filing of this Combined Plan and Disclosure Statement, the Debtor is filing a motion to, among other things, schedule a hearing to consider final approval of the adequacy of the Disclosure Statement and confirmation of the Plan.

To ensure compliance with IRS circular 230, Holders of Claims and Equity Interests are hereby notified that: (a) any discussion of U.S. federal tax issues contained or referred to in this Combined Plan and Disclosure Statement is not intended or written to be used, and cannot be used, by Holders of Claims for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (b) such discussion is written in connection with the promotion or marketing by the Debtor of the transactions or matters addressed herein; and (c) Holders of Claims should seek advice based on their particular circumstances from an independent tax advisor.

There has been no independent audit of the financial information contained in this Combined Plan and Disclosure Statement, except as expressly indicated herein. This Combined Plan and Disclosure Statement was compiled from information obtained from numerous sources believed to be accurate to the best of the Plan Proponents' knowledge, information, and belief. This Combined Plan and Disclosure Statement was not filed with the Securities and Exchange Commission or any state authority and neither the Securities and Exchange Commission nor any state authority has passed upon the accuracy, adequacy, or merits of this Combined Plan and Disclosure Statement. Neither this Combined Plan and Disclosure Statement nor the solicitation of votes to accept or reject the Plan constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

This Combined Plan and Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement, other than a recitation of historical fact, and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.

---

[2] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed and defined *infra*.

**Error! Unknown document property name.**

Any projected recoveries to Holders of Claims and Equity Interests in this Combined Plan and Disclosure Statement are based upon the analyses performed by the Debtor and its advisors. Although the Debtor and its advisors have made every effort to verify the accuracy of the information presented herein, the Debtor and its advisors cannot make any representations or warranties regarding the accuracy of the information.

Nothing stated herein shall be deemed or construed as an admission of any fact or liability by any party or be admissible in any proceeding involving the Plan Proponents or any other party. The statements contained herein are made as of the date hereof unless another time is specified. The delivery of this Combined Plan and Disclosure Statement shall not be deemed or construed to create any implication that the information contained herein is correct at any time after the date hereof.

It is the Plan Proponents' opinion that the treatment of Creditors under the Plan contemplates a greater recovery for Creditors than that which is likely to be achieved under other alternatives for the Debtor, including, without limitation, a liquidation pursuant to Chapter 7 of the Bankruptcy Code. Accordingly, the Plan Proponents believe that confirmation of the Plan is in the best interests of Creditors and recommend that all Holders of Claims whose votes are being solicited to vote to accept the Plan.

# I. **EXECUTIVE SUMMARY**[3]

## A.   **Introduction.**

Kalera, Inc., debtor and debtor in possession in the above-captioned Chapter 11 Case, and the Official Committee of Unsecured Creditors of Kalera, Inc. hereby propose this Combined Plan and Disclosure Statement, as may be further amended from time to time, for the full and final resolution of outstanding Claims against and Equity Interests in the Debtor.

During the Chapter 11 Case, the Debtor conducted a sale process of all or substantially all assets of the Debtor and Estate in an effort to elicit proposals for the acquisition of such assets. Following the conclusion of the sale process and resulting auction, and in accordance with prior orders of the Bankruptcy Court, the Debtor sold substantially all of its assets to Sandton Capital Solutions Master Fund V, L.P.  The Debtor and Sandton Capital consummated and closed the Sale on September 29, 2023.

This is a liquidating plan.  The primary objective of the Plan is to liquidate the assets of the Estate in order to maximize the value of recoveries to all Holders of Allowed Claims and Equity Interests and to distribute all property of the Estate, or proceeds thereof, that is or becomes available for distribution generally in accordance with the priorities established by the Bankruptcy Code and terms of this Plan. The Plan Proponents believe that the Plan accomplishes this objective and is in the best interest of the Estate and its Creditors and therefore seek to confirm the Plan.

The Plan contemplates the creation of a liquidating trust to liquidate and administer substantially all remaining property of the Debtor (i.e., the Liquidating Trust Assets), including Claims and Causes of Action, not sold, transferred or otherwise waived or released before the Effective Date and distributing the proceeds in accordance with this Plan and corresponding Liquidating Trust Agreement (defined below).

As set forth in greater detail below, the Plan provides for the liquidation of the Debtor's remaining assets and payment and distributions to Creditors, or other satisfaction, as described below, on or after the Effective Date, with respect to allowed Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, the Sandton Capital Secured Claim, Other Secured Claims, and General Unsecured Claims.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Section XVI.A of this Combined Plan and Disclosure Statement, the Plan Proponents expressly reserve the right to alter, amend, or modify this Combined Plan and Disclosure Statement, including the Plan Supplement, one or more times before substantial consummation thereof.

## B.   **Plan Overview.**

The Plan is a plan for the orderly liquidation of the Debtor and its Estate.  The following is a brief overview of certain material provisions of the Plan.  This overview is qualified by reference

---

[3] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed and defined *infra*.

to the provisions of the Combined Plan and Disclosure Statement, and the attachments, supplements and exhibits thereto, as may be amended from time to time.  If any inconsistency or conflict exists between this summary and the Combined Plan and Disclosure Statement, the terms of the Combined Plan and Disclosure Statement will control.

As noted, the Debtor has sold substantially all of its assets to Sandton Capital following completion of a Bankruptcy Court approved sale process and auction via the Sale Order , which Sale transaction closed on September 29, 2023.  Under the terms of the Sale, the Debtor retained certain litigation claims, funds, and other assets which will allow for an orderly wind down of its operations and distributions to Creditors with Allowed Claims.

The Plan contemplates the creation of a Liquidating Trust on the Effective Date for the purposes of effectuating the liquidation of the Liquidating Trust Assets and distributing the proceeds of the Liquidating Trust to the Beneficiaries of the Liquidating Trust. The Liquidating Trust shall issue Liquidating Trust Units to Beneficiaries of the Liquidating Trust, as described in this Plan and the Liquidating Trust Agreement. The Liquidating Trust shall be managed by a Liquidating Trustee in accordance with this Plan and the Liquidating Trust Agreement.  The Liquidating Trustee shall be selected by the Committee, with the consent of Sandton Capital, and identified in the Plan Supplement. The primary purpose of the Liquidating Trust and its Liquidating Trustee shall be: (i) administering, monetizing and liquidating the Liquidating Trust Assets; (ii) resolving all Disputed Claims; and (iii) making all Distributions from the Liquidating Trust as provided for in the Plan and the Liquidating Trust Agreement.  The Liquidating Trust Assets shall primarily consist of the Liquidating Trust Funding Amount and the Liquidating Trust Causes of Action.

Following the Effective Date of the Plan, the Liquidating Trustee will be responsible for all payments and distributions to be made under the Plan. Each executory contract and unexpired lease to which the Debtor is a party shall be deemed rejected unless (a) otherwise provided herein or in the Plan Supplement or (b) the Debtor expressly assumes and assign such agreements before the Effective Date.

## C.    Treatment of Claims and Interests Under the Plan.

Each Holder of a Claim against the Debtor that is entitled to vote to accept or reject the Plan should read this Combined Plan and Disclosure Statement in its entirety before voting. No solicitation of votes to accept or reject this Plan may be made except pursuant to the terms hereof and section 1125 of the Bankruptcy Code. If you are entitled to vote on the Plan, you are receiving a Ballot with your notice of this Combined Plan and Disclosure Statement. The Plan Proponents strongly urge you to vote to accept the Plan.

The following chart provides a summary of the anticipated recovery to Holders of Claims and Equity Interests under the Plan. Any estimates of Claims or Equity Interests in this Plan may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive Distributions under the Plan depends on the Plan Proponents' ability to obtain Confirmation and meet the conditions necessary to consummate the Plan, and allowance of your Claim(s) and/or Equity Interest(s).

4873-4343-6936.5

Except to the extent that a Holder of an Allowed Claim or Allowed Equity Interest has agreed to a less favorable treatment of such Claim or Equity Interest, each Holder of an Allowed Claim or Allowed Equity Interest shall receive under the Plan the treatment described below in full and final satisfaction of such Holder's Allowed Claim or Allowed Equity Interest. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Equity Interest shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

As explained more fully in Sections VI and VII of this Combined Plan and Disclosure Statement,[4] the Plan provides for the creation of a Liquidating Trust. Holders of Liquidating Trust Units shall receive Distributions from the liquidation of the Liquidating Trust Assets. The classification and Distribution scheme proposed under the Plan is as follows:

| Class | Description | Estimated Recovery | Treatment | Entitled to Vote? |
|---|---|---|---|---|
| 1 | Other Priority Claims | 100% | Unimpaired. Each Holder of an Allowed Other Priority Claim shall receive in full and final satisfaction of such Holder's Allowed Claim: (i) Cash in an amount equal to such Allowed Other Priority Claim on the Effective Date or as soon thereafter as is reasonably practicable, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | No. Deemed to accept. |
| 2 | Sandton Capital Secured Claim | ___% | Sandton Capital shall receive in full and final satisfaction of the Sandton Capital Secured Claim Cash in an amount equal to 80% of the net proceeds of the sale of the Light Bulb Assets, which sums shall be paid as soon as reasonably practicable following completion of such sale. | Yes. |
| 3 | Other Secured Claims | 100% | Unimpaired. On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive or retain, in full and final satisfaction and settlement of such Claim, at the election of the Debtor, | No. Deemed to accept. |

---

[4] To the extent that the terms of this summary conflict with the terms of Sections VI and VII of this Combined Plan and Disclosure Statement, the terms of Sections VI and VII shall control.

| | | | except to the extent any Holder of an Allowed Other Secured Claim agrees to different treatment: (i) the Collateral securing such Allowed Other Secured Claim; (ii) Cash in an amount equal to the value of the collateral securing such Allowed Other Secured Claim; or (iii) the treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be reinstated or rendered unimpaired. | |
|---|---|---|---|---|
| 4 | General Unsecured Claims | —% | Impaired. In full and final satisfaction of each Allowed General Unsecured Claim, the Holder of such Claim shall receive its Pro Rata Share of the Liquidating Trust Units. | Yes. |
| 5 | Equity Interests | 0% | Impaired. On the Effective Date, all Equity Interests will be deemed cancelled and extinguished. Holders of Equity Interests will receive no property or Distribution under the Plan on account of such Interests. | No. Deemed to reject. |

Holders of Claims in Classes 1 and 3 are unimpaired under the Plan and are thus deemed to accept the Plan. Holders of Equity Interests in Class 5 will receive no Distribution on account of such Equity Interest under the Plan and are thus deemed to reject the Plan. Holders of Claims in Classes 2 and 4 are impaired under the Plan and are the only Holders of Claims entitled to vote to accept or reject the Plan.

## II. DEFINITIONS AND CONSTRUCTION OF TERMS

### A. Definitions.

As used herein, the following terms have the respective meanings specified below, unless the context otherwise requires:

1.      "**Administrative Expense Claim**" means Claims that have been timely filed, pursuant to the deadline and procedures set forth in any bar date order or Plan Confirmation Order, as applicable, or late filed Claims otherwise allowed by Final Order for costs and expenses of administration under sections 503(b), 507(a)(2) or 1114(e)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the businesses of the Debtor (such as wages, salaries or

commissions for services and payments for goods and other services and leased premises); (b) administrative expense claims Allowed under section 503(b)(9) of the Bankruptcy Code (if any); and (c) Professional Fee Claims. For the avoidance of doubt, pursuant to Local Rule 3002-1, the government shall not be required to file any proof of claim or application for allowance for any claims covered by section 503(b)(1)(B), (C), or (D).

2.      "**Administrative Expense Claim Bar Date**" means July 21, 2023, at 5:00 p.m. (prevailing Central Time), the deadline for filing requests for allowance and payment of Administrative Expense Claims established by order of the Bankruptcy Court.

3.      "**Allowed**" means, with respect to Claims: (a) any Claim for which a proof of Claim was filed (or a Claim that does not require the filing of a proof of Claim as provided for under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court,); (b) any Claim which has been or hereafter is listed by the Debtor in the Schedules as liquidated in amount and not disputed or contingent and for which no superseding proof of Claim has been filed; (c) any Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; and (d) any Claim that is compromised, settled, or otherwise resolved pursuant to the authority granted to the Liquidating Trustee under the Plan and the Liquidating Trust Agreement; *provided* that with respect to any Claim described in clauses (a) and (b), such Claim shall be considered Allowed only if and to the extent that with respect to such Claim, no objection to the allowance was timely filed (including but not limited to, an objection relating to the timeliness of the filing of the proof of claim), or if such timely objection was filed, the Claim is subsequently Allowed by a Final Order or through an agreement between the claimant and the Liquidating Trustee.  Notwithstanding anything herein to the contrary, Claims allowed solely for the purpose of voting to accept or reject this Combined Plan and Disclosure Statement pursuant to an order of the Bankruptcy Court shall not be considered "Allowed" Claims hereunder.

4.      "**Assets**" means all tangible and intangible assets of every kind and nature of the Debtor and its Estate within the meaning of section 541 of the Bankruptcy Code.

5.      "**Available Trust Cash**" means proceeds of the Liquidating Trust Assets that are available for distribution to Beneficiaries of the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement; *provided, however,* Available Trust Cash shall not include Liquidating Trust Funding Amount.

6.      "**Avoidance Action Stipulation**" means the *Stipulation and Agreed Order regarding Waiver of Avoidance Actions under Sale Order and Related Matters* filed by Debtor on August 21, 2023 [Docket Nos. 336, 345].

7.      "**Avoidance Actions**" means all rights to avoid transfers or distributions and recover any such avoided transfers or distributions for the benefit of the Estate under chapter 5 of the Bankruptcy Code or otherwise, including, but not limited to, Bankruptcy Code sections 506(d), 522, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553, or otherwise under the Bankruptcy Code or under similar or related state or federal statutes and common law, including, without limitation, all preference, fraudulent conveyance, fraudulent transfer, voidable transfer, and/or other similar avoidance claims, rights, and causes of action, whether or not demand has been made or litigation has been commenced as of the Effective Date to prosecute such Avoidance Actions,

*provided, however*, that Avoidance Actions does not include any claims or Causes of Action waived by the Debtor pursuant to the Avoidance Action Stipulation.

8.      "**Ballot**" means the ballot on which each Holder of a Claim entitled to vote to accept or reject this Plan casts such vote.

9.      "**Bankruptcy Code**" means title 11 of the United States Code, as amended from time to time.

10.      "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

11.      "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as amended from time to time.

12.      "**Beneficiaries**" or "**Beneficial Interests**" means holders of or beneficial interests in Liquidating Trust Units.

13.      "**Bidding Procedures**" means those Bidding Procedures attached as Appendix A to the Bidding Procedures Order, as amended or modified from time to time.

14.      "**Bidding Procedures Motion**" means the *Debtor's Emergency Motion for Entry of Order: (A) Approving Bidding and Assumption and Assignment Procedures; (B) Approving the Sale of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, and (C) Granting Related Relief* filed by the Debtor on April 21, 2023 [Docket No. 66].

15.      "**Bidding Procedures Order**" means the *Order Granting Debtor's Emergency Motion for Entry of Order: (A) Approving Bidding and Assumption and Assignment Procedures; (B) Approving the Sale of the Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, and (C) Granting Related Relief*, entered by the Bankruptcy Court on April 27, 2023 [Docket No. 98].

16.      "**Business Day**" means any day other than a Saturday, Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

17.      "**Cash**" means legal tender of the United States of America and equivalents thereof.

18.      "**Causes of Action**" means all claims, actions (including the Avoidance Actions), causes of action (including commercial tort claims), choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims, and crossclaims of the Debtor and/or the Estate against any Person or Entity, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted.

8

19.   "**Chapter 11 Case**" means the Debtor's bankruptcy case commenced by the filing of voluntary petition for relief for the Debtor on April 4, 2023 under chapter 11 the Bankruptcy Code, Case No. 23-90290 currently pending in the Bankruptcy Court.

20.   "**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

21.   "**Claims Agent**" or "**Balloting Agent**" means BMC Group, having the address of BMC Group, Attn: Kalera Claims Processing, 3732 W. 120th Street, Hawthorne, CA 90250 and the following website:  https://www.bmcgroup.com/kalera.

22.   "**Claims Objection Deadline**" means the date that is one hundred and eighty (180) days after the Effective Date or such later date as may be approved by the Bankruptcy Court upon motion.

23.   "**Class**" means any group of substantially similar Claims or Equity Interests classified by this Combined Plan and Disclosure Statement pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

24.   "**Clerk**" means the clerk of the Bankruptcy Court.

25.   "**Collateral**" means any property or interest in property of the Estate of the Debtor subject to a lien, charge, or other encumbrance to secure the payment or performance of a Claim, which lien, charge, or other encumbrance is not subject to avoidance under the Bankruptcy Code.

26.   "**Combined Plan and Disclosure Statement**" or "**Plan**" or "**Disclosure Statement**", as appropriate, means this *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Kalera, Inc. Proposed by the Debtor and the Official Committee of Unsecured Creditors of Kalera, Inc.*, including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, modified, or supplemented from time to time through substantial consummation thereof, including the Plan Supplement.

27.   "**Creditors' Committee**" or "**Committee**" means the Official Committee of Unsecured Creditors of the Debtor, appointed in the Chapter 11 Case by the United States Trustee on April 19, 2023, as such membership may be amended.

28.   "**Creditor**" shall have the meaning ascribed to such term in section 101(10) of the Bankruptcy Code.

29.   "**D&O Causes of Action**" means any and all claims and causes of action the Debtor or Estate has, may have, or may accrue at any time on or after the Effective Date against any current or former officer or director of the Debtor, except to the extent expressly waived or released via prior court order or under this Plan.

30.   "**Debtor**" means Kalera, Inc., as debtor and debtor in possession in the Chapter 11 Case.

31.   "**Deferred Administrative Claims**" means, collectively, the Professional Fee Deferred Claims and Sandton Capital Deferred Claim.

32.    "**DIP Collateral**" means such property of the Debtor encumbered by the DIP Liens as described in the Final DIP Order.

33.    "**DIP Facility**" means that certain super-priority, senior secured debtor-in-possession credit facility under the DIP Loan Documents and the DIP Orders, as amended, modified, extended, revised or otherwise altered.

34.    "**DIP Financing Motion**" means the *Debtor's Amended Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Obtain Post-Petition Financing (II) Authorizing the Debtor to Use Cash Collateral, (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (IV) Approving Adequate Protection to Pre-petition Secured Creditors, (V) Modifying the Automatic Stay, and (IV) Scheduling a Final Hearing*, filed by the Debtor on April 5, 2023 [Docket No. 22].

35.    "**DIP Lender**" means Sandton Capital.

36.    "**DIP Liens**" means such liens on and security interests granted to the DIP Lender as described in the Final DIP Order.

37.    "**DIP Loan Documents**" means the term sheet for the DIP Facility entered into between the Debtor and the DIP Lender, the DIP Orders, and all documents, instruments, guarantees, and agreements executed and delivered in connection therewith.

38.    "**DIP Obligations**" has the meaning ascribed in the Final DIP Order.

39.    "**DIP Orders**" means, collectively, the Interim DIP Orders and the Final DIP Order.

40.    "**Disputed Claim**" means any Claim that is or hereafter may be listed on the Schedules as disputed, contingent, or unliquidated, or which is objected to in whole or in part prior to the Claims Objection Deadline and has not been Allowed in whole or in part by settlement or Final Order or compromised, settled, or otherwise resolved pursuant to the authority granted to the Liquidating Trustee under the Plan and the Liquidating Trust Agreement.

41.    "**Disputed Claims Reserve**" means the reserve established by the Liquidating Trustee for the benefit of Holders of Disputed Claims. Any such reserve shall be made from the Liquidating Trust Assets and shall consist of the amounts payable to Holder(s) of Disputed Claim(s), which amounts shall be funded at the time of any Distributions, subject to available funds.

42.    "**Distribution**" means any distribution to Holders of Allowed Claims, or their designated agents, Beneficiaries under or pursuant to this Plan and/or the Liquidating Trust Agreement.

43.    "**Distribution Record Date**" means the record date for purposes of making Distributions under the Plan on account of Allowed Claims, which date shall be the Effective Date.

44.    "**Docket**" means the docket in the Chapter 11 Case maintained by the Clerk.

45.    "**Effective Date**" means the date on which the conditions specified in Section XIII of this Plan have been satisfied or waived in accordance with the terms hereof and the transactions

contemplated hereunder have been consummated. The Debtor shall file a Notice of Effective Date (as defined below) on the Docket indicating the calendar date which corresponds to the Effective Date.

46.     "**Employment Tax Incentive**" means the taxable benefit under which the Debtor or its Estate is entitled to payment as more comprehensively described in the Plan Supplement, which taxable benefit was sold and assigned to Sandton Capital pursuant to the Sale Order.

47.     "**Entity**" means an entity as defined in section 101(15) of the Bankruptcy Code.

48.     "**Equity Interest**" means any equity interest in the Debtor, including, without limitation, any "equity security," as defined in section 101(16) of the Bankruptcy Code.

49.     "**Estate**" means the estate of the Debtor created upon the commencement of the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

50.     "**Exculpated Parties**" means, to the extent permitted under applicable law, each of the following solely in its capacity as such: (i) the Debtor; (ii) the Debtor's officers and directors as of the Effective Date, solely in connection with the Chapter 11 Case and solely with respect to the Exculpation Timeframe; (iii) the Debtor's chief restructuring officer, Mark Shapiro, and GlassRatner Advisory & Capital Group LLC, d/b/a B. Riley Services;, (iv) the Committee and its members in their capacities as members of the Committee; (v) Sandton Capital; and (vi) the professionals and advisors of the foregoing parties.[5]

51.     "**Exculpation Timeframe**" means the period from the Petition Date through and including the Effective Date.

52.     "**Executory Contract**" means any executory contract or unexpired lease, within the meaning of section 365 of the Bankruptcy Code, as of the Petition Date between the Debtor and any Entity.

53.     "**Final DIP Order**" means the *Final Order (I) Authorizing the Debtor to Obtain Post-Petition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 129], as may be amended or modified from time to time, entered by the Bankruptcy Court on May 10, 2023.

54.     "**Final Order**" means an Order of the Bankruptcy Court or a Court of competent jurisdiction, including any Court of competent jurisdiction to hear appeals from the Bankruptcy Court, that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, to petition for certiorari, or to move for reargument or rehearing has expired, and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending; *provided*, *however,* that the possibility that a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state

---

[5] NTD:  Qualification aimed at addressing Highland Capital decision.  It may be prudent to incorporate a footnote to the definition referencing Highland and expressly providing that exculpation will be deemed modified based on any SCOTUS ruling in the Highland appeal.

4873-4343-6936.5

court rules of civil procedure, may be filed with respect to such order shall not cause such order not to be a Final Order.

55.    "**General Bar Date**" means August 7, 2023, the deadline for each Person or Entity, including without limitation, individuals, partnerships, corporations, joint ventures and trusts, other than Governmental Units, to file a proof of Claim against the Debtor for a Claim that arose prior to the Petition Date.

56.    "**General Unsecured Claim**" means any Claim against any Debtor that is (i) not an Administrative Expense Claim, Priority Tax Claim, Other Priority Claim, Sandton Capital Secured Claim, or Other Secured Claim but includes (a) any Claim arising from the rejection of an executory contract under section 365 of the Bankruptcy Code and (b) any portion of a Claim to the extent the value of the Holder's interest in the Estate's interest in the property securing such Claim is less than the amount of the Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Claim, as determined pursuant to section 506(a) of the Bankruptcy Code, or (ii) otherwise determined by the Bankruptcy Court to be a general unsecured Claim not entitled to priority treatment under the Bankruptcy Code.

57.    "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

58.    "**Governmental Unit Bar Date**" means October 10, 2023, the deadline for Governmental Units to file a proof of Claim against the Debtor for a Claim that arose prior to the Petition Date.

59.    "**Holder**" means the legal or beneficial holder of any Claim or Equity Interest.

60.    "**Impaired**" means, when used with reference to a Claim or Equity Interest, a Claim or Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

61.    "**Insurance Policies**" means all insurance policies of the Debtor, including any director and officer liability policies.

62.    "**Interim Compensation Order**" means the Bankruptcy Court's June 7, 2023, *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Professionals* [Docket No. 117].

63.    "**Interim DIP Order**" means the *Interim Order (I) Authorizing Kalera, Inc. to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claim, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, entered by the Bankruptcy Court on April 6, 2023 [Docket No. 33], together with subsequent interim order extending the terms thereof [Docket No. 99].

64.    "**IRS**" means the Internal Revenue Service.

65.    "**Lien**" means any mortgage, pledge, deed of trust, assessment, security interest, lease, lien, adverse claim, levy, charge, right of first refusal or surrender right, or other encumbrance of any kind, including any "lien" as defined in section 101(37) of the Bankruptcy Code.

4873-4343-6936.5

66.    "**Light Bulb Assets**" means the light bulbs that were not acquired by Sandton Capital in the Sale, as more comprehensively described in the Plan Supplement.

67.    "**Liquidating Trust**" means the trust that will come into existence upon the Effective Date and into which all of the Liquidating Trust Assets will vest pursuant to the Plan, which trust shall be formed pursuant to and governed by the Liquidating Trust Agreement.

68.    "**Liquidating Trust Advisors**" means any firm(s) or individual(s) retained by a Liquidating Trustee to serve as a legal counsel or provide other professional services in connection with the performance of the Liquidating Trustee's duties and responsibilities under this Plan and the Liquidating Trust Agreement.

69.    "**Liquidating Trust Agreement**" means the agreement governing the Liquidating Trust, dated on or about the Effective Date, substantially in the form included in the Plan Supplement.

70.    "**Liquidating Trust Assets**" means (i) the Liquidating Trust Funding Amount, (ii) the Liquidating Trust Causes of Action, (iii) the Light Bulb Assets,[6] , and (iv) all other Assets of the Debtor and its Estate as of the Effective Date, excluding Assets previously distributed and not otherwise subject to recovery. For the avoidance of doubt, the Liquidating Trust Assets exclude funds held in trust by the Liquidating Trust for the payment of certain identified Claims under the Plan.

71.    "**Liquidating Trust Causes of Action**" means all Causes of Action held or owned by the Debtor's Estate immediately prior to the Effective Date (whether asserted directly or derivatively) against all parties, *provided that* the Liquidating Trust Causes of Action exclude: (i) any Causes of Action sold to the Purchaser pursuant to the Sale Order; (ii) any Claims or Causes of Action released or exculpated as provided in the Plan, including pursuant to Section XIV of the Plan;  and (iii) any Claims or Causes of Action released pursuant to the Final DIP Order. The Liquidating Trust Causes of Action shall include all Preserved Causes of Action.

72.    "**Liquidating Trust Funding Amount**" means up to $250,000 of Cash which shall be loaned by Sandton Capital to Debtor under the DIP Facility on or immediately before the Effective Date and contributed to the Liquidating Trust by the Debtor on the Effective Date for use in accordance with the terms of the Liquidating Trust Agreement.

73.    "**Liquidating Trust Operating Expenses**" means the overhead and other operational expenses of the Liquidating Trust including, but not limited to: (i) reasonable compensation for the Liquidating Trustee in accordance with the Liquidating Trust Agreement,; (ii) costs and expenses incurred by the Liquidating Trustee in administering the Liquidating Trust; (iii) Statutory

---

[6] For the avoidance of doubt, the Estate or Liquidating Trust, as applicable, shall sell or otherwise liquidate the Light Bulb Assets pursuant to and in accordance with the terms of this Plan.  The Light Bulb Assets and any proceeds thereof are subject to the security interest of Sandton Capital.  Pursuant to the terms of the Avoidance Action Stipulation, which are incorporated into this Plan, as applicable, Sandton Capital shall receive eighty percent (80%) of the proceeds from the sale of the Light Bulb Assets in satisfaction of its Class 2 Claim.  The remaining twenty percent (20%) of the proceeds from the sale of the Light Bulb Assets shall be retained by the Liquidating Trust for distribution in accordance with the provisions of the Plan and Liquidating Trust Agreement; *provided*, *however*, that Sandton Capital shall not receive any portion of such funds distributed to Holders of Class 4 Claims.

Fees that may become payable by the Liquidating Trust after the Effective Date to the U.S. Trustee; and (iv) any fees and expenses payable to the Liquidating Trust Advisors.

74.     "**Liquidating Trust Recoveries**" means the recoveries from the Liquidating Trust on account of any proceeds from the liquidation of any Liquidating Trust Assets.

75.     "**Liquidating Trust Units**" means beneficial interests in the Liquidating Trust entitling each Holder thereof to receive its Pro Rata Share of Distributions of Liquidating Trust Recoveries.

76.     "**Liquidating Trustee**" means the person or Entity identified in the Liquidating Trust Agreement and selected by the Committee upon the consent of Sandton Capital, as of the Effective Date or as soon as reasonably practicable thereafter, as the fiduciary responsible for administering the Liquidating Trust, and any successor subsequently appointed pursuant to the Liquidating Trust Agreement.

77.     "**Local Rules**" means the of Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas, as amended from time to time.

78.     "**Notice of Effective Date**" means a notice to be filed with the Bankruptcy Court by the Debtor upon the occurrence of all the conditions precedent to the Effective Date set forth in Section XIII of this Combined Plan and Disclosure Statement.

79.     "**Order**" means an order, opinion, or judgment of the Bankruptcy Court as entered on the Docket or other court of competent jurisdiction.

80.     "**Other Priority Claim**" means unsecured Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than Administrative Expense Claims or Priority Tax Claims.

81.     "**Other Secured Claims**" means Claims (or portions thereof), except the Sandton Capital Secured Claim, that are secured by a lien on property in which the Debtor's Estate has an interest, which liens are valid, perfected and enforceable under applicable law, and are senior to the liens held by the Sandton Capital.

82.     "**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

83.     "**Petition Date**" means April 4, 2023, the date on which the Debtor commenced the Chapter 11 Case.

84.     "**Plan Confirmation Date**" means the date on which the Clerk of the Bankruptcy Court enters the Plan Confirmation Order on the Docket.

85.     "**Plan Confirmation Hearing**" means the hearing to be held by the Bankruptcy Court to consider final approval and confirmation of this Combined Plan and Disclosure Statement, as such hearing may be adjourned or continued from time to time.

86.     "**Plan Confirmation Order**" means the order entered by the Bankruptcy Court approving and confirming this Combined Plan and Disclosure Statement.

87.     "**Plan Documents**" means this Combined Plan and Disclosure Statement, the Plan Supplement, and all exhibits, schedules, and other supporting documents or evidence, attached to or submitted in support of any of the foregoing.

88.     "**Plan Proponents**" means the Debtor and the Committee, collectively; *provided, however*, the individual members of the Committee shall not constitute Plan Proponents.

89.     "**Plan Supplement**" means the appendix of any schedules or exhibits that may be filed at least five (5) days prior to the deadline for submission of Ballots to vote to accept or reject a plan or to object to the Plan, whichever occurs earlier. The Plan Supplement will be filed with the Bankruptcy Court and served on the required notice parties and shall be made available on the Debtor's claims agent's website (https://www.bmcgroup.com/kalera). The Plan Supplement shall be in form and substance acceptable to Sandton Capital.

90.     "**Preserved Claims and Causes of Action**" means the Claims and Causes of Action that shall be preserved and vest in the Liquidating Trust in accordance with the Plan and shall be identified in a schedule attached to the Plan Supplement. The Preserved Claims and Causes of Action include, but are not limited to: (i) Claims or Causes of Action to avoid and recover preferential transfers pursuant to section 547 of the Bankruptcy Code and other avoidance actions under Chapter 5 of the Bankruptcy Code; (ii) Claims or Causes of Action against present and former shareholders, officers, directors, affiliates and other insiders of the Debtor or its affiliates; (iii) Claims or Causes of Action against any contractors, vendors, suppliers or other third parties relating to work performed on the Debtor's Assets or good or services provided to the Debtor, including Claims or Causes of Action relating to breach of contract or arising under any warranty obligations; (iv) Claims or Causes of Action based in whole or in part upon any and all insurance contracts, insurance policies, occurrence policies, and occurrence contracts to which the Debtor is a party or pursuant to which the Debtor has any rights whatsoever, including any failure to provide insurance coverage and bad faith insurance claims; and (v) all remaining Liquidating Trust Causes of Action.[7]

91.     "**Priority Amounts**" means as of the Effective Date, the amount of all Allowed Administrative Expense Claims (other than Professional Fee Claims), Priority Tax Claims, and Other Priority Claims, or such other amount as may be determined by Final Order of the Court.

92.     "**Priority Tax Claim**" means an unsecured Claim, or a portion thereof, that is entitled to priority under sections 502(i) or 507(a)(8) of the Bankruptcy Code.

93.     "**Privilege**" means the attorney client privilege, work product protections or other immunities (including without limitation those related to a common interest or a joint defense with other parties to the extent set forth in such documents), or protections from disclosure of any kind held by the Debtor or Estate as permitted under the Rule 501 of the Federal Rules of Evidence and all other applicable law.

---

[7] For the avoidance of doubt, the Preserved Claims and Causes of Action do not include certain claims or causes of action against the Avoidance Released Parties, as that term is defined in the Avoidance Action Stipulation.

4873-4343-6936.5

94.     "**Professional**" means any professional person employed by the Debtor or the Committee in the Chapter 11 Case pursuant to sections 327, 363, or 1103 of the Bankruptcy Code or otherwise pursuant to an Order of the Bankruptcy Court.

95.     "**Professional Fee Claim**" means a Claim under sections 328, 330(a), 331, or 503 of the Bankruptcy Code for compensation of a Professional or other Entity for services rendered or expenses incurred in the Chapter 11 Case.

96.     "**Professional Fee Deferred Claim**" means the Professional Fee Claim pertaining to services rendered on or after October 1, 2023, by any Professional in excess of the amount budgeted for such Professional under the revised budget for the DIP Facility dated on or about September 28, 2023 [Docket No. 364-2] (the "**Final DIP Budget**"), subject to permitted variance under the DIP Orders.

97.     "**Pro Rata Share**" means, with respect to any Distribution on account of any Allowed Claim, a percentage represented by a fraction (i) the numerator of which shall be an amount equal to such Claim and (ii) the denominator of which shall be an amount equal to the aggregate amount of Allowed Claims in the same Class as such Claim.

98.     "**Purchaser**" means Sandton Capital or any designee of Sandton Capital with respect to its rights as purchaser under the subject Asset Purchase Agreement and Sale Order.

99.     "**Rejection Damages Claim**" means any Claim under section 502(g) of the Bankruptcy Code arising from, or relating to, the rejection of an Executory Contract pursuant to section 365(a) of the Bankruptcy Code by the Debtor, as limited, in the case of a rejected employment contract or unexpired lease, by section 502(b) of the Bankruptcy Code.

100.    "**Released Party**" means each of the following solely in its capacity as such: (i) the Debtor, (ii) the Debtor's chief restructuring officer, Mark Shapiro, and GlassRatner Advisory & Capital Group LLC, d/b/a B. Riley Services, (iii) Sandton Capital, and (iv) the professionals and advisors of the foregoing parties.  Notwithstanding the foregoing, any Person or Entity that opts out of the releases set forth in the Plan shall not be a Released Party. For the avoidance of doubt, none of the Debtor's current or former officers or directors (nor those of the Debtor's affiliates), other than Mark Shapiro and GlassRatner Advisory & Capital Group LLC, d/b/a B. Riley Service, shall be a Released Party.

101.    "**Releasing Party**" means each of the following, solely in its capacity as such: (a) all Released Parties; and (b) all Holders of Claims who vote to accept the Plan and who do not affirmatively elect to opt out of the releases provided in the Plan in accordance with the solicitation procedures. For the avoidance of doubt, the Holders of Claims in Classes deemed to accept the Plan shall not be deemed Releasing Parties on account of such Claims.

102.    "**Sandton Capital**" means Sandton Capital Solutions Master Fund V, L.P.

103.    "**Sandton Capital Deferred Administrative Claim**" means the Claim of Sandton Capital arising from advances under the DIP Facility on or after October 1, 2023, which Claim shall be paid by the Liquidating Trust following the Effective Date in accordance with the terms of the

Plan and Liquidating Trust Agreement pursuant to and in accordance with the agreement and consent of Sandton Capital to such treatment.

104.    "**Sandton Capital Deficiency Claim**" means that portion of the Sandton Capital Secured Claim in excess of the proceeds from the sale of the Light Bulb Assets payable to Sandton Capital (i.e., eighty percent (80%)) under Class 2, which outstanding claim shall be treated as a Class 4 Claim for all purposes under the Plan.

105.    "**Sandton Capital Secured Claim**" means the Claim of Sandton Capital that is secured by a lien on the Light Bulb Assets, as classified and described further in Class 2 of the Plan.

106.    "**Sale**" means the Debtor's sale of assets to the Purchaser approved pursuant to the Sale Order.

107.    "**Sale Order**" means the *Order (I) Authorizing and Approving Sale of Certain Assets of Kalera Inc. to Sandton Capital Solutions Master Fund V, L.P. Free and Clear of All Liens, Claims, Interests and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief*, entered by the Bankruptcy Court on July 5, 2023, 2021 [Docket No. 263].

108.    "**Sale Proceeds**" means the net proceeds, if any, from the sale of Assets to Purchaser held by the Debtor, after payment of all DIP Obligations and payments under the Budget, as that term is defined in the Final DIP Order.

109.    "**Schedules**" means the schedules of assets and liabilities and statements of financial affairs filed by the Debtor pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007(b), as such schedules or statements may be amended or supplemented from time to time.

110.    "**Statutory Fees**" means any and all fees payable to the U.S. Trustee pursuant to section 1930 of title 28 of the United States Code and any interest thereupon.

111.    "**Tax Code**" means the Internal Revenue Code of 1986, as amended.

112.    "**Unclaimed Distribution**" means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

113.    "**Unclaimed Distribution Deadline**" means three (3) months from the date the Liquidating Trustee makes a Distribution.

114.    "**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

115.    "**Voting Deadline**" means [•], 2023, at 5:00 p.m. (prevailing Central Time).

116.    "**Voting Procedures**" means the plan voting procedures approved by the Bankruptcy Court.

B.       **Interpretation; Application of Definitions and Rules of Construction.**

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter. Unless otherwise specified, all section, article, schedule or exhibit references in this Combined Plan and Disclosure Statement are to the respective section in, Article of, Schedule to, or Exhibit to this Combined Plan and Disclosure Statement. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection or clause contained in this Combined Plan and Disclosure Statement. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Combined Plan and Disclosure Statement. A term used herein that is not defined herein, but that is defined or used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code. The headings in this Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions of this Combined Plan and Disclosure Statement. Any reference to the "Liquidating Trustee" shall be deemed to include a reference to the "Liquidating Trust" and any reference to the "Liquidating Trust" shall be deemed to include a reference to the "Liquidating Trustee" unless the context otherwise requires. Bankruptcy Rule 9006 shall apply to all computations of time periods prescribed or allowed by this Combined Plan and Disclosure Statement unless otherwise set forth herein or provided by the Bankruptcy Court.

## III.  BACKGROUND

### A.  Nature and History of the Debtor's Business.

Prior to the Petition Date, the Debtor owned and operated an agricultural business focused on the development and implementation of ecologically-friendly technology, including the development of proprietary seeds and vertical hydroponic farming equipment and techniques. The Debtor utilized proprietary technology and plant and seed science to sustainably grow greens year-round for retail and food service markets. It provided its produce to food distribution and grocery store chains such as US Foods, Inc., H-E-B Grocery Company LP, Kroger Company, Safeway, Inc., and other various small food distributors located within the United States. Since the Company's inception, it financed its operations primarily through the sale of shares of common stock and debt financing.

As of the Petition Date, the Debtor operated large-scale vertical farms in Houston, Texas and Denver, Colorado as well as a small-scale hydroponic farming facility located at the Marriott World Center in Orlando, Florida.  Further, the Debtor had two additional operable facilities, Orlando, Florida and Atlanta, Georgia, where operations had been halted prior to the Petition Date and two additional non-operable facilities located in Seattle, Washington and St. Paul, Minnesota that were in various stages of development. The Debtor had completed construction of the Seattle, Washington facility, but the farm was not yet operational. The Debtor was near completion of the St. Paul, Minnesota facility, but construction of that facility was halted.

The Debtor and its affiliates incurred a $7.5 million deficit as a result of expenses related to the Debtor's Business Combination (defined below), and it has incurred additional operating losses since. Due to this deficit, the Debtor was faced with a desperate need to either cease its plans for growth and restructure to become cash flow positive or attempt to raise additional capital to

maintain existing expansion plans and operations. As a result of the Debtor's deteriorating liquidity position and cash reserves, the Debtor retained professionals to advise and assist it in addressing its liquidity position by exploring options to attract new capital, restructuring existing obligations, and pursuing a sale of its assets.

### i.    Historical Business Operations

The Debtor was originally formed in 2010 when a team of scientists and engineers founded Eco Convergence Group Inc. ("**ECG**"—later renamed to Kalera, Inc.) to envision and develop a green city of the future in central Florida. The team researched sustainable construction materials, agriculture, and other ways to drive sustainability forward in an urban context and discover how to make these concepts and products available on a broader scale. One of the key technologies emerging from ECG was vertical hydroponic farming.

In 2013, ECG received its first round of investments. As a result, ECG formed into a Norwegian holding company, Kalera AS, a private limited liability company organized under the laws of Norway ("**Kalera AS**"), for the purpose of the investment in ECG, and began construction of the Tradeport Research and Development facility – a facility focused on plant science and technology and microgreen production, located in Orlando, Florida. The Tradeport Research and Development facility became operational in 2014.

In 2017, construction began at the Marriot World Center facility, a flagship offering of the first modular hydroponic vegetable production system (the "**HyCube**"). In 2018, the HyCube facility commenced operations.

In 2019, ECG was renamed Kalera Inc. (the Debtor) and kickstarted its mission to combine technology and plant science to give communities across the globe access to fresh, nutritious, and clean greens. To accomplish this objective, Kalera began retrofitting an existing warehouse in Orlando, Florida, to establish its first large-scale vertical farming facility (the "**Orlando Facility**"). In 2020, the Orlando Facility commenced operations and showed immediate promise.

Due to early success at the Orlando facility, Kalera began construction of new large-scale facilities in Atlanta, Houston, and Denver. Shortly after, expansions were announced in three new locations namely, Honolulu, Hawaii, Seattle, Washington, and Columbus, Ohio. By 2021, both the Houston and Atlanta vertical farms became operational and Kalera expanded its retail offerings to blue-chip customers including Kroger, Disney, and H-E-B.

### ii.    The Business Combination Agreement

The Debtor has, throughout its existence, operated primarily as a research and development company with a net operating loss each year and financed its operations primarily through the sale of shares of common stock and debt financing.

On or about April 21, 2020, Kalera AS, the parent holding company, initially registered on the Norwegian OTC-list ("**NOTC**"), a marketplace for unlisted shares owned and operated by NOTC AS, a wholly owned subsidiary of Oslo Bors ASA and listed under the ticker "KALERA."

Subsequently, during October 2020, the company listed the shares on the Merkur Market from the Oslo Stock Exchange (subsequently renamed to "**Euronext Oslo Exchange**") and raised net proceeds of $100,000,000 as part of the listing on Merkur Market.  In January of 2022, Kalera AS entered into the Business Combination Agreement with Agrico, a special purpose vehicle sponsored by De Jong Capital, that was listed on NASDAQ, specifically for the purpose of de-listing on the Norway Exchange and to list on the more liquid NASDAQ.

The Business Combination Agreement specified an exchange ratio of approximately 11 Kalera AS shares for each Agrico share at the time of the signing of the Business Combination Agreement. Five months after entering into the agreement, the U.S. Securities and Exchange Commission approved the Business Combination. Throughout those five months, Kalera AS's share price significantly decreased in value compared to the original terms and conditions under the Business Combination Agreement.

Due to the decline in value of Kalera AS's shares, Agrico requested that Kalera AS agree to a modification of the exchange ratio between Kalera AS and Agrico to reflect the new market value of Kalera AS's shares. Kalera AS's board of directors rejected the request to change the exchange ratio to match the existing market value. The rejection of the modification request led investors in Agrico to redeem approximately $150 million that was deposited during Agrico's initial public offering, which was to be used, in part, to finance Kalera PLC following the Business Combination. Despite this, Kalera AS conducted a general meeting in which Kalera AS investors approved the continuation of the Business Combination.

Following approval and completion of the Business Combination, Kalera AS delisted from the Norway Exchange, merged with Agrico in Ireland to form Kalera PLC, and Kalera PLC was immediately listed on NASDAQ.  Following the approval by shareholders and the closing of the Business Combination, there was a deficit of $7.5 million in expenses from the merger and no cash because of the approximately 98% redemption made by Agrico shareholders.  Consequently, there were no additional funds to provide liquidity to the Debtor.

B.     **Corporate Structure and Ownership.**

The Debtor is a Delaware corporation. The Debtor's administrative offices recently relocated to the Denver Facility. The Debtor's principal assets are located at the Houston Facility. The Debtor is a wholly owned subsidiary of Kalera S.A. The graphic below provides a summary of the Debtor's corporate structure:



The following includes additional information about the non-debtor entities listed on the organizational chart:

- Kalera Public Ltd. Co. ("**Kalera PLC**") is an Irish public limited company. Kalera PLC is the parent company of Kalera S.A.

- Kalera S.A. ("**Kalera S.A.**") is a société anonyme existing under the laws of the Grand Duchy of Luxembourg. Kalera SA is a wholly owned subsidiary of Kalera PLC.

- Kalera Real Estate Holdings, LLC is a Delaware limited liability company with its principal place of business in Orlando. It is a wholly owned subsidiary of Kalera, Inc.

- Iveron Materials, Inc. is a Delaware c-corporation established as a geopolymer concrete business (which is conducted separately from the vertical farming business) with its principal place of business in Orlando. It is a wholly owned subsidiary of Kalera S.A.

21

4873-4343-6936.5

- Vindara Inc. is a Delaware corporation with its principal place of business in Orlando. Vindara is a wholly owned subsidiary of Kalera S.A.

**C.      The Debtor's Prepetition Indebtedness.**

On April 14, 2022, a term loan note was executed between Kalera Inc. and Farm Credit of Central Florida, ACA ("**Farm Credit**"), in the amount of $20 million, with a stated interest rate of 4.125% and first payment due on June 1, 2022 ("**Farm Credit Term Note**"), and a revolving loan of up to $10 million was executed between Kalera and Farm Credit, where Farm Credit was to provide revolving credit facilities to Kalera to finance its business through a "Draw Period" beginning April 14, 2022, and ending March 14, 2024, with the full aggregate outstanding principal amount calculated at the end of the draw period and with equal quarterly payments of the outstanding principal amount due beginning July 1, 2024 ("**Farm Credit Revolver**") (together with the Farm Credit Term Note, the "**Farm Credit Facility**").

The Farm Credit Facility was secured by a first-priority lien on substantially all of the Debtor's assets. Additionally, on or about April 14, 2022, Farm Credit perfected its security interest in certain assets of the Debtor through the filing of a UCC Financing Statement (the "**Farm Credit UCC**"). On or about March 17, 2023, Farm Credit assigned its rights under the Farm Credit Facility to Sandton Capital, and Sandton Capital filed an assignment related to the Farm Credit UCC. On or about March 20, 2023, Sandton Capital and the Debtor entered into an amendment to the Farm Credit Facility to increase the revolving credit facility from $10 million to $11 million— providing an additional $1 million in available funding to the Debtor. This amendment and added $1 million may be referred to as the "Bridge Loan." The Bridge Loan was secured by a lien on the Debtor's assets to the same extent as the Farm Credit Facility.

In addition to the secured debt incurred under the Farm Credit Facility, the Debtor used the services of numerous vendors and contractors and acquired equipment secured by UCC filings during the construction of its vertical farms. Several vendors and contractors have asserted certain common law and statutory liens against certain assets of the Debtor based on amounts purportedly due and owing for goods delivered and services rendered.

Finally, the Debtor also has general unsecured debt, which consists primarily of vendors who have provided services to the Debtor, companies that worked on the construction of the Debtor's facilities, and professionals.

**D.      Events Leading to the Filing of the Bankruptcy Case.**

Due to the deficit resulting from the Business Combination Agreement, Kalera was faced with two options: (1) restructure the business to become cash flow positive and reduce overhead expenditures in administrative and research and development costs, or (2) attempt to raise additional capital to maintain existing expansion plans and operations.

### i.      Restructuring of Existing Operations

Following the deficient capital raises, the Debtor and its affiliates shifted their focus from global expansion to one of restructuring the Debtor's existing operations to become cash flow

positive. In light of this shift, on September 22, 2022, the Debtor released a new strategy and path to profitability, which announced an immediate focus on bringing existing, operational farms to cash flow positive through topline and bottom-line growth by the end of 2023. Any further focus on international growth would be through capital light business models that utilize joint ventures, partnerships, and licensing fees, with local partners who aid developing the farms while the Debtor runs the farms' design, construction and operation.

To accelerate profitability at the Houston and Denver Facilities and to permit configuration updates at the Orlando and Atlanta Facilities to increase loose-leaf production capacity, the Debtor temporarily halted production at the Orlando and Atlanta Facilities. Cessation of operations at the Orlando and Atlanta Facilities resulted in an annual run rate reduction of operating expenses of approximately $4.9 million. The Orlando and Atlanta facilities discontinued operations near the end of January 2023. As part of the discontinuation, the Debtor reduced staffing at the facilities. The remaining employee workforce at both the Orlando and Atlanta Facilities totaled three employees, which are employed to maintain the facilities for future operations and to prevent any deterioration of the facility while bringing the Houston and Denver Facilities to cash flow positive and make configuration updates to the Orlando and Atlanta Facilities.

Additionally, to further reduce overhead expenditures while focusing on the Debtor's two largest facilities, the Debtor halted its expansion across the U.S. market. The St. Paul Facility construction was halted, the Seattle Facility (although constructed) did not initiate operations, and the Honolulu and Columbus leases were terminated in or around early 2023.

ii.    *Raymond James Marketing Process*

While implementing measures to restructure the business and improve cash flow from their largest farms, the Debtor and its parent company saw a need to secure additional financing. On October 20, 2022, Kalera PLC retained Raymond James to run a sale process of its Debtor and non-Debtor assets and operations.

Raymond James initiated a marketing process that included the Debtor's business operations, which entailed, among other actions and processes, the creation of a comprehensive targeted investor list, which identified 68 potential lenders and 71 potential strategic partners or prospective purchasers, the creation of a confidential information memorandum to provide interested financiers information regarding Kalera and its operations, an update of Kalera's financial forecasts and capex profile to finalize a financial model, the preparation of a sensitivity analysis of lowered overhead costs, and the handling of diligence and market checks with interested parties.

Of the 68 potential lenders contacted, 35 potential lenders evaluated the opportunity, with 17 non-disclosure agreements ("**NDAs**") signed. Of the 71 strategic partners and prospective purchasers, 50 parties evaluated the opportunity, with three (3) NDAs signed.

Aa a result of the marketing process, Sandton Capital, a special situation fund with a focus on agriculture, acquired Farm Credit's rights under the Farm Credit Facility. Since acquiring rights under the Farm Credit Facility, Sandton Capital has worked closely with the Debtor in its efforts to restructure and preserve value and agreed to provide post-petition, debtor in possession

financing to the Debtor which provided the necessary funding to run the process to sell the Debtor's assets as a going concern through the Chapter 11 Case. Other than the Sandton Capital interest noted above, no indications of interest were received for an acquisition of the Debtor's business or additional financing prior to the Petition Date.

Driven by the lack of liquidity and availability of financing in the conservative investment environment within the agricultural market, the Debtor determined that its best chance to preserve its estate and maximize value for creditors was to seek protection under chapter 11 of the Bankruptcy Code and pursue a court supervised sale process.

## E.    The Chapter 11 Case.

The following is a brief description of certain material events that have occurred during the Chapter 11 Case.

### 1.    Administrative Motions.

On the Petition Date, in addition to the voluntary petitions for relief filed by the Debtor, the Debtor filed limited administrative motions and notices seeking certain "first day" relief.  A summary of the relief sought pursuant to the administrative motions is set forth below:

- ***Prepetition Employee Obligations Motion.*** Pursuant to the *Debtor's Emergency Motion for Authority to (I) Pay Prepetition Wages and Benefits and (II) Continue the Postpetition Maintenance of Employee Benefit Programs, Policies, and Procedures in the Ordinary Course* [Docket No. 11], the Bankruptcy Court entered an Order approving the payment of employee wages and benefits [Docket No. 34].

- ***Application to Retain BMC Group.*** Pursuant to the *Debtor's Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of BMC Group, Inc. as Claims, Noticing, and Solicitation Agent* [Docket No. 6], the Bankruptcy Court entered an Order appointing BMC Group as claims and noticing agent for the Chapter 11 Case [Docket No. 32].

- ***Designation as Complex Chapter 11 Case.*** Pursuant to the Debtor's *Notice of Designation as Complex Chapter 11 Case* [Docket No. 3], the Bankruptcy Court entered an Order directing that the Procedures for Complex Chapter 11 Cases in the Southern District of Texas apply to the Chapter 11 Case [Docket No. 60].

### 2.    First Days Orders.

Following a hearing, the Bankruptcy Court entered the following orders:

- *Order (I) Approving the Debtor's Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtor's Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief* [Docket No. 35].

24

o   *Order Granting Debtor's <u>Emergency</u> Motion for Authority to (I) Pay Prepetition Wages and Benefits and (II) Continue the Postpetition Maintenance of Employee Benefit Programs, Policies, and Procedures in the Ordinary Course* [Docket No. 34].

o   *Final Order (I) Authorizing Kalera, Inc. to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 129].

o   *Final Order Granting Debtor's <u>Emergency</u> Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(A), 345(B), 363, and 364 Authorizing: (I) the Continued Use of the Debtor's Prepetition Cash Management System; and (II) Opening New Debtor In Possession Accounts, if Necessary* [Docket No. 157].

   **3.     Appointment of the Creditors' Committee.**

   On April 19, 2023, the Office of the United States Trustee for Region 7 appointed the Official Committee of Unsecured Creditors, consisting of the following five members: (i) Turatti North America, Inc.; (ii) House of Plastics Unlimited; (iii) Steven Douglas Associates, LLC; (iv) HP Now Aps; and (v) Aaron Electrical Services [Docket No. 58].

   **4.     Employment of Professionals and Advisors.**

   The Debtor sought and obtained Bankruptcy Court approval of the employment of various professionals and advisors to assist with the Chapter 11 Case. Specifically, the Bankruptcy Court has approved the Debtor's retention of the following professionals and advisors: (i) Baker & Hostetler LLP as its legal counsel [Docket No. 187] and (ii) GlassRatner Advisory & Capital LLC *dba* B. Riley Advisory Services as Chief Restructuring Officer and financial advisor to the Debtor [Docket No. 186].

   The Official Committee of Unsecured Creditors has also sought Bankruptcy Court approval of the employment of (i) Dykema Gossett, PLLC, as counsel for Committee and (ii) Reid Collins & Tsai LLP as special counsel to the Committee.

   **5.     Stay of Pending Litigation.**

   As set forth in the Schedules, as of the Petition Date, the Debtor was a party to certain investigations, claims, or lawsuits.  The automatic stay under section 362(a) of the Bankruptcy Code had the immediate effect of halting a significant number such actions against the Debtor, allowing the Debtor to save money that would otherwise have been used on legal expenses.  The automatic stay does not stay the pursuit of governmental police and regulatory actions based on an exception in section 362(b)(4) of the Bankruptcy Code.

6. **Claims Process and Bar Date.**

a. **Schedules and Statements.** On May 4, 2023, the Debtor filed its Schedules with the Bankruptcy Court.[8] The U.S. Trustee held the meeting of creditors pursuant to section 341(a) of the Bankruptcy Code on May 9, 2023, and June 6, 2023.

b. **Bar Dates.** All deadlines for the filing on Claims in the Chapter 11 Case have passed. The Administrative Expense Claims Bar Date was July 21, 2023, at 5:00 p.m. (prevailing Central Time). The General Bar Date was August 7, 2023. The Governmental Unit Bar Date was October 10, 2023.

7. **Postpetition Financing and Cash Collateral Orders.**

On the Petition Date, the Debtor filed the DIP Financing Motion. On April 6, 2023, the Bankruptcy Court entered the Interim DIP Order, which among other things, authorized the Debtor to enter into the DIP Loan Documents, incur postpetition financing thereunder of up to an aggregate principal amount of $1.13 million on an interim basis, to use cash collateral of the Prepetition Secured Party in accordance with the Interim DIP Order and an agreed budget, and granting related relief. On April 27, 2023, the Bankruptcy Court entered the Second Interim DIP Order, which among other things, authorized the Debtor to incur additional postpetition financing thereunder of up to an aggregate principal amount of $2.13 million on an interim basis, including the $1.13 million borrowed under the Interim Order, to use cash collateral in accordance with the Second Interim DIP Order and an agreed budget, and granting related relief.

On May 10, 2023, the Bankruptcy Court entered the Final DIP Order, under which the Debtor was authorized to, among other things, incur up to the full amount of the postpetition commitments under the DIP Loan Documents of $5.1 million *plus* the Roll-up Amount, to use cash collateral in accordance with the Final DIP Order and an agreed budget, granting adequate protection for the liens and security interests, and granting related relief. Except as provided in the Final DIP Order, the DIP Lender was granted priming liens pursuant to section 364(d)(1) of the Bankruptcy Code.

Following entry of the Final DIP Order, the Debtor and Sandton Capital, in consultation with the Committee, agreed to increase the Committed Amount (as defined therein) and extend the term of the DIP Facility—ultimately increasing the Committed Amount to $11.1 million and extending the term of the DIP Facility through and including November 25, 2023. *See* Docket Nos. 224, 278, 377.

The Final DIP Order specifically excluded certain classes of assets from the DIP Liens (the "**Unencumbered Assets**"). The Unencumbered Assets include any commercial tort claims and claims against the Debtor's current or former officers and directors of the Debtor's boards, and all proceeds of any of the foregoing.

Without the funds provided under the DIP Loan Documents, the Debtor would not have had sufficient available sources of capital and financing to, among other things, fund the Chapter

---

[8] Debtor filed its Amended Schedules on May 30, 2023.

11 Case and effectuate the various sales of its assets pursuant to section 363 of the Bankruptcy Code. Thus, as the Bankruptcy Court determined, entry of the DIP Orders was necessary to preserve, maintain, and enhance the value of the Debtor's assets for the benefit of the Estate.

The Final DIP Order provided the Committee with the opportunity to investigate any claims or challenges to the Debtor's stipulations provided under the Final DIP Order. The Committee's Challenge Period (as defined by the Final DIP Order) ended on August 24, 2023—sixty (60) days after entry of the Modified Final DIP Order.

The Final DIP Order further provides for the terms and conditions of the Debtor's continued consensual use of Cash Collateral, the adequate protection to be provided to the Prepetition Secured Party and the terms of a cash collateral budget.

### 8.    Sale of Substantially All the Debtor's Assets.

On April 21, 2023, the Debtor filed the Bidding Procedures Motion that sought Bankruptcy Court approval of bidding procedures to govern the auction and sale of substantially all the Debtor's assets, to approve the sale of those assets to the successful bidder at the conclusion of that auction, and to approve certain procedures for the assumption and assignment of executory contracts and unexpired leases.

The Bankruptcy Court entered the Bidding Procedures Order on April 27, 2023, approving the Bidding Procedures Motion and the Bidding Procedures annexed thereto as Appendix A. Thereafter, the Debtor and its advisors worked to ensure a robust marketing and sale process to maximize the value of the Debtor's assets. On June 27, 2023, the Debtor conducted an auction in accordance with the Bidding Procedures. At the conclusion of that auction, the Debtor declared Sandton Capital as the winning bidder.

The Bankruptcy Court approved the Sale to Sandton Capital by order dated July 5, 2023 [Docket No. 263]. The Sale closed on September 29, 2023. *See* Docket No. 381.

### 9.    Investigation of Directors and Officers of the Debtor by the Committee

Following its formation, the Committee conducted an investigation of potential claims of the Estate against directors and officers of the Debtor and its affiliates, including potential D&O Causes of Action. In particular, the Committee obtained production of documents from the Debtor and Farm Credit and conducted a deposition of the Debtor under Bankruptcy Rule 2004. The Committee then prepared and sent a demand to these directors and officers identifying various claims for breach of fiduciary duty and requesting payment of no less than $20 million.

## IV.  CONFIRMATION AND VOTING

### A.    Plan Confirmation Hearing.

The Bankruptcy Code, Bankruptcy Rules, and Local Rules require the Bankruptcy Court, after appropriate notice, to hold a hearing on approval and confirmation of this Combined Plan and Disclosure Statement. On October [ ], 2023, the Bankruptcy Court entered an order scheduling

4873-4343-6936.5

the Plan Confirmation Hearing for November [   ], **2023 at _:_0 _.m. (prevailing Central Time)**, to consider, among other things, final approval and confirmation of this Combined Plan and Disclosure Statement [Docket No. _____].   Notice of the Plan Confirmation Hearing will be provided to all known Creditors, Holders of Equity Interests, and other parties in interest. The Plan Confirmation Hearing may be adjourned from time to time by the Debtor without further notice, except for an announcement of the adjourned date made at the Plan Confirmation Hearing or by filing a notice with the Bankruptcy Court.

Any objection to confirmation of this Plan and approval of the Disclosure Statement on a final basis must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Equity Interests held or asserted by the objector against the Debtor, the basis for the objection and the specific grounds of the objection, and must be filed with the Bankruptcy Court, with a copy to chambers, together with proof of service thereof, and served upon the following parties by no later than November [   ], **2023 at _:_0 p.m. (prevailing Central Time)** through the CM/ECF system, with courtesy copies by email: (i) Counsel to the Debtor at the contact information on the first page of this Plan; (ii) Counsel to the Committee at the contact information on the first page of this Plan; (iii) the Office of the United States Trustee for Region 7; and (iv) such other parties as the Bankruptcy Court may order.

Bankruptcy Rule 9014 governs objections to approval and confirmation of this Combined Plan and Disclosure Statement. **UNLESS AN OBJECTION TO APPROVAL AND CONFIRMATION OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING WHETHER TO APPROVE AND CONFIRM THIS COMBINED PLAN AND DISCLOSURE STATEMENT.**

## B.    Requirements for Plan Confirmation.

The Bankruptcy Court will confirm this Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among the requirements for confirmation in this Chapter 11 Case is that this Plan be (i) accepted by all impaired Classes of Claims and Equity Interests or, if rejected by an impaired Class, that this Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to such Class; and (ii) feasible.  The Bankruptcy Court must also find, among other things, that:

  a.    this Plan has classified Claims and Equity Interests in a permissible manner;

  b.    this Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and

  c.    this Plan has been proposed in good faith.

## C.    Best Interests of the Creditors Test.

The Bankruptcy Code requires that, with respect to an impaired class of claims or interests, each holder of an impaired claim or interest in such class either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than

28

the amount (value) such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the effective date.

The costs of a chapter 7 liquidation would necessarily include fees payable to a trustee in bankruptcy, as well as fees likely to be payable to attorneys, advisors, and other professionals that a chapter 7 trustee may engage to carry out its duties under the Bankruptcy Code. Other costs of liquidating the Debtor's Estate would include the expenses incurred during the Chapter 11 Case and allowed by the Bankruptcy Court in the chapter 7 case. The foregoing types of claims, costs, expenses, and fees that may arise in a chapter 7 liquidation case would be paid in full before payments would be made towards chapter 11 administrative, priority, and unsecured claims. Like a chapter 7 trustee, the Liquidating Trustee will have the power to retain professionals, but unlike a chapter 7 trustee's professionals, the Bankruptcy Court does not need to approve the retention of such professionals, or their fees. The "learning curve" that the chapter 7 trustee and new professionals would be faced with comes with potential additional costs to the Estate and with a delay compared to the timing of Distributions under the Plan. Furthermore, a chapter 7 trustee would be entitled to statutory fees relating to the Distributions. Accordingly, a portion of the Cash that will be available for Distribution to Holders of Allowed Claims would instead be paid to the chapter 7 trustee. Notwithstanding, like the chapter 7 trustee, the Liquidating Trustee also will be paid fees for his or her services.

Accordingly, as demonstrated in the liquidation analysis appended to the Plan Supplement, the Debtor believes that in a chapter 7 liquidation, Holders of Claims would receive less than such Holders would receive under this Plan. There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Plan Proponent's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

**D.      Plan Feasibility.**

Pursuant to section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor under the plan, unless such liquidation or reorganization is proposed under the plan. Pursuant to the Plan, the Debtor's remaining assets will be transferred to the Liquidating Trust. These Assets will be liquidated and distributed to Holders of Allowed Claims pursuant to the terms of this Plan and the Liquidating Trust Agreement. Therefore, as this is a liquidating plan, the Bankruptcy Court's confirmation of this Plan will not be followed by liquidation or the need for any further reorganization.

**E.      Classification of Claims and Interests.**

Section 1122 of the Bankruptcy Code requires a plan to place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. This Plan creates separate Classes to treat the Other Priority Claims, the Sandton Capital Secured Claim, Other Secured Claims, General Unsecured Claims, and Equity Interests of the Debtor. The Plan Proponents believe that the Plan's classification scheme places substantially similar Claims or Equity Interests in the same Class and thus meets the requirements of section 1122 of the Bankruptcy Code.

**EXCEPT AS SET FORTH IN THE PLAN OR UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 3019(A), UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The classification of Claims and Equity Interests and the nature of Distributions to members of each Class are summarized herein. The Plan Proponents believes that the consideration, if any, provided under the Plan to Holders of Claims reflects an appropriate resolution of their Claims taking into account the differing nature and priority (including applicable contractual subordination) of such Claims and Equity Interests. The Bankruptcy Court, however, must find that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of Holders of Claims or Equity Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

**F.      Impaired Claims or Interests.**

Pursuant to section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes "Impaired" by the Plan and receiving a Distribution under this Plan may vote on this Plan. Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be "Impaired" if the Plan alters the legal, equitable, or contractual rights of the Holders of such Claims or Equity Interests treated in such Class. The Holders of Claims or Equity Interests not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan. The Holders of Claims or Equity Interests in any Class that will not receive any Distribution or retain any property pursuant to this Plan are deemed to reject this Plan and do not have the right to vote.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 2 AND 4.**

**G.      Eligibility to Vote on this Plan.**

Unless otherwise ordered by the Bankruptcy Court, only Holders of Allowed Claims in Classes 2, and 4, may vote on this Plan. To vote on this Plan, you must hold an Allowed Claim in Class 2 or 4 or be the Holder of a Claim that has been temporarily Allowed for voting purposes under Bankruptcy Rule 3018(a).

**H.      Voting Procedure and Deadlines.**

For your Ballot to count, you must (1) properly complete, date, and execute the Ballot and (2) deliver the Ballot to the Balloting Agent at one of the following addresses: (i) if by First Class mail, Kalera Ballot Processing, c/o BMC Group, Attn: Kalera Ballot Processing, 3732 West 120th Street, Hawthorne, CA 90250; (ii) if by hand delivery or overnight delivery, Kalera Ballot Processing, c/o BMC Group, Attn: Kalera Ballot Processing, PO Box 90100, Los Angeles, CA

90009; or (iii) if by electronic ballot, by using the electronic balloting service available at https://bmcgroup.com/limetree.

The Balloting Agent must **RECEIVE** original ballots on or before November [  ], **2023 at _:00 _.m. (prevailing Central Time)**. Except as otherwise ordered by the Bankruptcy Court, you may not change your vote once a Ballot is submitted to the Balloting Agent.

Any Ballot that is timely received, executed, that contains sufficient information to permit the identification of the claimant and that is cast as an acceptance or rejection of this Plan will be counted and cast as an acceptance or rejection, as the case may be, of this Plan.

The following Tabulation Rules will be utilized for tabulating the Ballots in determining whether this Plan has been accepted or rejected by the Class in which such Holder holds a Claim or Equity Interest:

a. any Ballot that is timely received, that contains sufficient information to permit the identification of the claimant and that is cast as an acceptance or rejection of the Plan will be counted and cast as an acceptance or rejection, as the case may be, of the Plan. Except as otherwise ordered by the Bankruptcy Court, a claimant may not change its vote once a Ballot is submitted to the Balloting Agent;

b. any Ballot that is illegible or contains insufficient information to permit the identification of the claimant will not be counted;

c. any Ballot cast by a Person or Entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan will not be counted;

d. any Ballot cast for a Claim designated or determined as unliquidated, contingent, or disputed or as zero or unknown in amount and for which no 3018(a) Motion has been filed by the 3018(a) Motion Deadline will not be counted;

e. any Ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of the Plan or that indicates both acceptance and rejection of the Plan will not be counted;

f. any Ballot received by the Balloting Agent after the Voting Deadline will not be counted;

g. any Ballot not bearing an original signature will not be counted (for the avoidance of doubt, the electronic signature on a Ballot submitted and signed electronically by using the electronic balloting service established by the Balloting Agent shall constitute an original signature); and

h. any Ballot received by the Balloting Agent by facsimile, e-mail or other electronic communication will not be counted, provided however that a

31

Ballot may be submitted electronically by using the electronic balloting service established by the Balloting Agent.

**I.      Acceptance of this Plan.**

As a Creditor, your acceptance of this Plan is important.  For this Plan to be accepted by an impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept this Plan.  At least one impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept this Plan.  The Plan Proponents strongly urge that you vote to accept this Plan but you are not required to accept it and failure to accept will not preclude you from receiving a Distribution under this Plan to which you are entitled.  **YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY RETURN THE BALLOT OR SUBMIT A BALLOT VIA THE BMC ELECTRONIC BALLOTING SERVICE. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR AND, IF SUBMITTING A PHYSICAL BALLOT, INCLUDE AN ORIGINAL SIGNATURE ON THE BALLOT.**

**J.      Elimination of Vacant Classes.**

Any Class of Claims or Equity Interests that does not contain, as of the date of commencement of the Plan Confirmation Hearing, a Holder of an Allowed Claim or Equity Interest, or a Holder of a Claim temporarily allowed under Bankruptcy Rule 3018, shall be deemed deleted from this Combined Plan and Disclosure Statement for all purposes, including for purposes of determining acceptance of this Plan by such Class under section 1129(a)(8) of the Bankruptcy Code.

## V.  TREATMENT OF UNCLASSIFIED CLAIMS

**A.      Administrative Expense Claims.**

Unless otherwise agreed by the Holder of an Administrative Expense Claim and the Debtor or the Liquidating Trustee, each Holder of an Allowed Administrative Expense Claim will be paid the full unpaid amount of such Allowed Administrative Expense Claim in Cash by the Debtor or Liquidating Trust, as applicable: (a) if Allowed, on the Effective Date or as soon as practicable thereafter, but in no event later than 30 days after the Effective Date (or, if not then due, when such Allowed Administrative Expense Claim is due or as soon as practicable thereafter); (b) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter, but in no event later than 30 days after such Claim is Allowed; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtor or Liquidating Trust, as applicable; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

The Bankruptcy Court established the Administrative Expense Claim Bar Date (i.e., July 21, 2023) as the deadline for any interested party to file a request for the allowance of an Administrative Expense Claim accruing on or after the Petition Date.  Any such Claim not filed by the Administrative Expense Claim Bar Date shall be deemed waived and the Holder of such Claim shall be forever barred from receiving payment on account thereof.  Notwithstanding the

4873-4343-6936.5

foregoing, or any other provision herein or prior order of the Bankruptcy Court, Sandton Capital shall be deemed to hold an Allowed Administrative Expense Claim in the amount of $534,100 (i.e., the Sandton Capital Deferred Administrative Claim), plus any other amounts loaned to the Debtor or Liquidating Trust by Sandton Capital on or after September 29, 2023, including the Liquidating Trust Funding Amount; *provided*, *however*, Sandton Capital has agreed and consented to the payment of the Sandton Capital Deferred Administrative Claim following the Effective Date through the Liquidating Trust in accordance with the treatment and terms provided in the Liquidating Trust Agreement.  For the avoidance of doubt, any payments on account of the Sandton Capital Secured Claim and Sandton Capital Deficiency Claim shall not reduce the amount due and owing on account of the Sandton Capital Deferred Administrative Claim.

Funds required for the payment of Allowed Administrative Expense Claims shall be advanced under the DIP Facility and pursuant to the DIP Orders and Final DIP Budget to Debtor on or before the Effective Date.  In the event the Final DIP Budget proves insufficient to pay any Allowed Administrative Expense Claims, excluding Allowed Administrative Expense Claims and Professional Fee Claims of the Debtor, Sandton, the Committee, and their respective Professionals, Sandton agrees to advance additional funds to pay such expenses, unless the subject Holder(s) of the Allowed Administrative Expense Claim(s) agree to payment post-confirmation by and through the Liquidating Trust.

To the extent the Liquidating Trustee comes into possession of any funds advanced for the payment of Allowed Administrative Expense Claims, the Liquidating Trustee shall act as escrow agent and hold such funds in trust for Holders of Allowed Administrative Expense Claims pending distribution, which shall occur as soon as reasonably practicable following receipt of such funds. On the Effective Date, the Debtor shall transfer to the Liquidating Trust any Cash advanced under the DIP Facility and Final DIP Budget remaining after that payment of all Allowed Claims under the Plan requiring payment on the Effective Date; *provided, that* such funds shall not constitute Liquidating Trust Assets and shall be distributed Pro Rata to Holders of Deferred Administrative Claims as soon as reasonably practicable after the Effective Date.

No Liens, claims, or interests shall encumber the Cash held by Debtor or Liquidating Trustee and designated for the payment of Allowed Administrative Expense Claims in any way. Any portion of the funds designated for the payment of Allowed Administrative Expense Claims, Priority Tax Claims, and/or Other Priority Claims remaining after the payment in full of all Allowed Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims shall be distributed Pro Rata to Sandton Capital and the Debtor's Professionals on account of their respective Deferred Administrative Claims.

**B.**   **Professional Fee Claims.**

On the later of (i) the Effective Date and (ii) the date the Bankruptcy Court enters an order approving the final fee applications of the applicable Professional, the Debtor, or the Liquidating Trust, as applicable, shall pay all unpaid amounts approved by the Bankruptcy Court owing to such Professional, relating to prior periods and for the period ending on the Effective Date, including any "hold-back" from prior applications for the approval and payment of fees and expenses of Professionals; *provided, however*, Professionals have agreed and consented to payment of any Professional Fee Claims in excess of the aggregate budget for such fees and

expenses as provided in the Final DIP Budget (i.e., the Professionals Deferred Fee Claims) following the Effective Date through the Liquidating Trust in accordance with the treatment and terms provided in the Liquidating Trust Agreement.

On or prior to thirty (30) days after service of notice of the Effective Date, each Professional shall file with the Bankruptcy Court its final fee application seeking final approval of all fees and expenses from the Petition Date through the Effective Date; *provided* that the Liquidating Trustee may pay retained Liquidating Trust Advisors, Professionals or other Entities in the ordinary course of business for services rendered and expenses incurred after the Effective Date, without further Bankruptcy Court order. Objections to any Professional Fee Claim must be filed and served on counsel to the Liquidating Trustee and the requesting party no later than twenty-one (21) days after such Professional Fee Claim is filed with the Bankruptcy Court, and served on the parties entitled to service under the Interim Compensation Order. For the avoidance of doubt, to the extent there is any conflict between the terms of the Plan Confirmation Order, this Combined Plan and Disclosure Statement, and/or the Interim Compensation Order, the Plan Confirmation Order shall govern. Within ten (10) days after entry of a Final Order with respect to its final fee application, each Professional shall remit any overpayment or unused retainer to the Liquidating Trust, and the Liquidating Trust, shall pay any unpaid amounts approved by the Bankruptcy Court to each Professional.

Holders of Professional Fee Claims shall not constitute Beneficiaries of the Liquidating Trust and shall not receive any Distributions from the Liquidating Trust or Liquidating Trust Assets on account of their Professional Fee Claims; *provided, however*, that Liquidating Trust Advisors, even if formerly Professionals, shall be entitled to payment from the Liquidating Trust for fees and expenses incurred in service of the Liquidating Trust.

## C.     <u>Priority Tax Claims.</u>

On the later of the Effective Date or the date on which a Priority Tax Claim becomes an Allowed Priority Tax Claim, or, in each such case, as soon as practicable thereafter, but in no event later than 30 days after such event, each Holder of an Allowed Priority Tax Claim will be paid an amount equal to the Allowed amount of such Claim plus, to the extent applicable, any amount required to comply with section 1129(a)(9)(C) or 1129(a)(9)(D) of the Bankruptcy Code, in Cash by the Debtor or, if applicable, the Liquidating Trust.

Debtor, in consultation with Sandton Capital and the Committee, shall prepare a good faith estimate of the Allowed amount of each Priority Tax Claim. On or before the Effective Date, Sandton Capital shall advance to the Debtor pursuant to the DIP Facility and Final DIP Budget an amount equal to the estimated amount of Allowed Priority Tax Claims, which amount shall be transferred to and held in trust by the Liquidating Trustee for the benefit of holders of Allowed Priority Tax Claims on the Effective Date. All payments on account of Allowed Priority Tax Claims shall be paid, until such funds are depleted, from such funds. No Liens, claims, or interests shall encumber funds designated for the payment of Priority Tax Claims in any way. Any portion of the funds designated for the payment of Allowed Administrative Expense Claims, Priority Tax Claims, and/or Other Priority Claims remaining after the payment in full of all Allowed Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims shall be

4873-4343-6936.5

distributed Pro Rata to Sandton Capital and the Debtor's Professionals on account of their respective Deferred Administrative Claims.

## VI.  CLASSIFICATION OF CLAIMS AND INTERESTS; ESTIMATED RECOVERIES

Claims – other than Administrative Expense Claims, Priority Tax Claims, and Statutory Fees – are classified for all purposes, including voting, confirmation, and Distribution pursuant to the Plan, as follows:

| Class | Type | Status Under Plan | Voting Status | Recovery Estimate |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept | 100% |
| 2 | Sandton Capital Secured Claim | Impaired | Entitled to Vote | ___% |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept | 100% |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote | __%* |
| 5 | Equity Interests | Impaired | Deemed to Reject | 0% |

## VII.  TREATMENT OF CLAIMS AND INTERESTS

### A.    Classification and Treatment of Claims and Interests.

#### 1.  Class 1 — Other Priority Claims.

a.    *Classification*: Class 1 consists of all Other Priority Claims.

b.    *Treatment:* Each Holder of an Allowed Other Priority Claim shall receive in full and final satisfaction of such Holder's Allowed Claim: (i) Cash in an amount equal to such Allowed Claim on the Effective Date or as soon thereafter as is reasonably practicable, or if disputed, as provided elsewhere in the Plan, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; *provided*, *however*, to the extent any Other Priority Claim is disputed, such Other Priority Claim shall be treated as a Disputed Claim hereunder for all purposes.

Debtor, in consultation with Sandton Capital and the Committee, shall prepare a good faith estimate of the Allowed amount of each Other Priority Claim.[9]

To the extent any Other Priority Claims are not paid on or before the Effective Date, Debtor shall transfer to the Liquidating Trustee any funds designated for the payment of Allowed Other Priority Claims. The Liquidating Trustee shall act as escrow agent for such funds. No Liens, claims, or interests shall encumber funds designated for the payment of Allowed Other Priority Claims in any way. Any portion of the funds designated for the payment of Allowed Administrative Expense Claims, Priority Tax Claims, and/or Other Priority Claims remaining after the payment in full of all Allowed Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims shall be distributed Pro Rata to Sandton Capital and the Debtor's Professionals on account of their respective Deferred Administrative Claims.

c.   *Voting*: Class 1 is Unimpaired, and Holders of Allowed Other Priority Claims are conclusively deemed to have accepted this Plan.

**2.   Class 2 — Sandton Capital Secured Claim.**

a.   *Classification*: Class 2 consists of the Holder of the Sandton Capital Secured Claim.

b.   *Treatment*: Sandton Capital shall receive in full and final satisfaction of the Sandton Capital Secured Claim Cash in an amount equal to 80% of the net proceeds of the sale of the Light Bulb Assets, which sums shall be paid as soon as reasonably practicable following completion of such sale. For the avoidance of doubt, the Sandton Capital Deficiency Claim shall be treated as a General Unsecured Claim in Class 4 of the Plan.

c.   *Voting*: Class 2, Sandton Capital Secured Claim is impaired; the Holder of such Claim is entitled to vote on the Plan.

**3.   Class 3 — Other Secured Claims.**

a.   *Classification*: Class 3 consists of Allowed Other Secured Claims.

b.   *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive or retain, in full and final satisfaction and settlement of such Claim, at the election of the Debtor, except to the extent any Holder of an Allowed Other Secured

---

[9] On April 13, 2023, Marc Jennings filed proof of claim number 2-1 (the "**Jennings Claim**")—thereby asserting a priority wage claim in the amount of $560,865.00. The Jennings Claim exceeds the statutory limit for priority claims under section 507(a)(4) of the Bankruptcy Code. Debtor intends to file an objection to the Jennings Claim prior to the Confirmation Hearing. For purposes of the Plan, the Jennings Claims shall constitute a Disputed Claim.

4873-4343-6936.5

Claim agrees to different treatment: (i) the collateral securing such Allowed Other Secured Claim; (ii) Cash in an amount equal to the value of the collateral securing such Allowed Other Secured Claim; or (iii) the treatment required under section 1124(2) of the Bankruptcy Code for such Claim to be reinstated or rendered unimpaired.

c.      *Voting*: Class 3 Other Secured Claims is unimpaired; Holders of such Claims are deemed to accept the Plan.

**4.      Class 4 — General Unsecured Claims.**

a.      *Classification*: Class 4 consists of all General Unsecured Claims including the Sandton deficiency claim.[10]

b.      *Treatment*: In full and final satisfaction of each Allowed General Unsecured Claim, the Holder of such Claim shall receive in full and final satisfaction of such Holder's Allowed Claim its Pro Rata Share of Liquidating Trust Units, *provided, however,* that Sandton Capital shall not receive any portion of the proceeds of the sale(s) of Light Bulb Assets on account of any Class 4 Claim(s).

c.      *Voting*: Class 4 General Unsecured Claims are impaired; Holders of such Claims are entitled to vote on the Plan.

**5.      Class 5 — Equity Interests.**

a.      *Classification*: Class 5 consists of all Equity Interests.

b.      *Treatment*: On the Effective Date, all Equity Interests will be deemed cancelled and extinguished.  Holders of Equity Interests will receive no property or Distribution under the Plan on account of such Equity Interests.

c.      *Voting*: Class 5 Equity Interests are impaired; Holders of such Equity Interests are deemed to have rejected the Plan and are not entitled to vote.

## VIII.  <u>THE LIQUIDATION OF THE DEBTOR</u>

On and after the Effective Date, the Liquidating Trust and the Liquidating Trustee will, among other things, (i) investigate and, if appropriate, pursue the Liquidating Trust Causes of Action, (ii) administer, monetize and liquidate the Liquidating Trust Assets, (iii) resolve all Disputed Claims, if appropriate, and (iv) make all Distributions from the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement. The Liquidating Trust and Liquidating Trustee shall be authorized to take such actions without further order of the Bankruptcy Court; *provided, however,* the Liquidating Trustee may seek such Bankruptcy Court authority as the Liquidating Trustee, in its absolute discretion, deems necessary or appropriate.

---

[10] The amount of General Unsecured Claims is subject to ongoing review and without prejudice to the rights of the Debtor, the Committee, and the Liquidating Trustee to object to such Claims.

The transfer of the Liquidating Trust Assets attributable to the Beneficiaries of the Liquidating Trust shall be treated as a transfer of such assets directly to such Beneficiaries followed by a contribution of the Liquidating Trust Assets to the Liquidating Trust.

## IX.  PROVISIONS REGARDING THE LIQUIDATING TRUST

### A.    Appointment of the Liquidating Trustee.

The Liquidating Trustee shall be identified in the Plan Supplement and shall be selected by the Committee with the consent of Sandton Capital.  All compensation for the Liquidating Trustee, and Liquidating Trust Advisors, shall be paid from the Liquidating Trust Assets, in accordance with the Liquidating Trust Agreement. The Liquidating Trustee shall not be required to give any bond or surety or other security for the performance of his/her duties unless otherwise ordered by the Bankruptcy Court.  On the Effective Date, all Beneficiaries of the Liquidating Trust shall be deemed to have ratified and become bound by the terms and conditions of the Liquidating Trust Agreement. In the event that the Liquidating Trustee resigns or is removed, terminated, or otherwise unable to serve as the Liquidating Trustee, then a successor shall be appointed as set forth in the Liquidating Trust Agreement.  Any successor Liquidating Trustee appointed shall be bound by and comply with the terms of the Plan, the Plan Confirmation Order, and the Liquidating Trust Agreement.

### B.    Creation of the Liquidating Trust.

On the Effective Date, the Liquidating Trust shall be established pursuant to the Liquidating Trust Agreement for the purpose of, among other things, (i) investigating and, if appropriate, pursuing the Liquidating Trust Causes of Action, (ii) administering, monetizing and liquidating the Liquidating Trust Assets, (iii) resolving all Disputed Claims, if appropriate, and (iv) making all Distributions from the Liquidating Trust as provided for in the Plan and the Liquidating Trust Agreement.  The Liquidating Trust Agreement shall be filed with the Plan Supplement. The Liquidating Trust Agreement is incorporated herein in full and is made a part of this Combined Plan and Disclosure Statement.

Upon execution of the Liquidating Trust Agreement, the Liquidating Trustee shall be authorized to take all steps necessary to complete the formation of the Liquidating Trust; *provided, that*, prior to the Effective Date, the Debtor, in consultation with the Committee and Sandton Capital, may take such steps in furtherance of the formation of the Liquidating Trust as may be necessary, useful or appropriate under applicable law to ensure that the Liquidating Trust shall be formed and in existence as of the Effective Date. The Liquidating Trust shall be administered by the Liquidating Trustee in accordance with the Liquidating Trust Agreement.

Except for those Liquidating Trust Assets attributable to the Disputed Claims Reserve, it is intended that the Liquidating Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Sections 671 through 679 of the Internal Revenue Code.  In furtherance of this objective, the Liquidating Trustee shall, in its business judgment, make continuing best efforts not to unduly prolong the duration of the Liquidating Trust and have no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary

to, and consistent with, the liquidating purpose of the Liquidating Trust. All Liquidating Trust Assets held by the Liquidating Trust on the Effective Date (except for those assets attributable to the Disputed Claims Reserve) shall be deemed for federal income tax purposes to have been distributed by the Debtor on a Pro Rata share basis to those Holders of Allowed Claims that are entitled to receive Distributions from the Liquidating Trust, and then contributed by such Holders to the Liquidating Trust in exchange for the Beneficial Interests. All Holders of Claims have agreed or shall be deemed to have agreed to use the valuation of the Assets transferred to the Liquidating Trust as established by the Liquidating Trustee for all federal income tax purposes. The Beneficiaries under the Liquidating Trust will be treated as the grantors and deemed owners of the Liquidating Trust. The Liquidating Trustee will be responsible for filing information on behalf of the Liquidating Trust as grantor trust pursuant to Treasury Regulation Section 1.671-4(a).

## C.    Beneficiaries of the Liquidating Trust.

On the Effective Date, each Holder of an Allowed General Unsecured Claim shall, by operation of the Plan and Plan Confirmation Order, receive a Pro Rata Share of Liquidating Trust Units, as provided in Section VII. Holders of Disputed Claims shall be contingent Beneficiaries and funds for their Distribution shall be held by the Liquidating Trustee in the Disputed Claims Reserve pending allowance or disallowance of such Claims.

Upon the occurrence of the Effective Date, no other Entity or Person, including the Debtor, shall have any interest, legal, beneficial, or otherwise, in the Liquidating Trust, the Liquidating Trust Assets, or the Liquidating Trust Causes of Action. Without limiting the generality of the preceding sentence, and for the avoidance of doubt, Holders of Administrative Priority Claims, Professional Fee Claims, Priority Tax Claims, and Claims in Classes 1, 2, 3, and 5 of this Plan shall not constitute Beneficiaries of the Liquidating Trust. Neither the Liquidating Trust nor the Liquidating Trustee shall have any liability with respect to any such Claims and shall not be required to satisfy any such Claims from the Liquidating Trust Assets; *provided*, *however*, that the foregoing shall not affect or release the Liquidating Trust or Liquidating Trustee from any obligations or liability with respect to the Deferred Administrative Claims, or any of them, as provided in the Liquidating Trust Agreement.

The Beneficial Interests shall not be evidenced by any certificate, security, receipt, or any other form or manner whatsoever, except as maintained on the books and records of the Liquidating Trust by the Liquidating Trustee. Any and all Beneficial Interests shall be non-transferable except (i) upon death of the Holder, (ii) by operation of law or (iii) to an affiliate of the Holder. Beneficiaries shall have no voting rights with respect to such Beneficial Interests. The Liquidating Trust shall have a term of five (5) years from the Effective Date, without prejudice to the rights of the Liquidating Trust and Liquidating Trustee to extend such term by the filing of a motion in the Bankruptcy Court, conditioned upon the Liquidating Trust not becoming subject to the Securities Exchange Act of 1934 (as now in effect or hereafter amended).

## D.    Vesting and Transfer of Assets to the Liquidating Trust.

Except as otherwise set forth in the Plan, pursuant to section 1141(b) of the Bankruptcy Code, the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of all Claims,

Liens, charges or other encumbrances, on the condition that the Liquidating Trustee comply with the terms of the Plan, including the making of all payments and distributions to Creditors provided for in the Plan. If the Liquidating Trustee defaults in performing under the provisions of this Plan and the Chapter 11 Case is converted to a Chapter 7 Case, all property vested in the Liquidating Trust and all subsequently acquired property owned as of or after the conversion date shall revest and constitute property of the Estate in the Chapter 7 Case.

The Liquidating Trustee may abandon or otherwise not accept any Liquidating Trust Assets that the Liquidating Trustee believes, in good faith, has no value or will be unduly burdensome to the Liquidating Trust. Any Liquidating Trust Assets that the Liquidating Trustee so abandons or otherwise does not accept shall cease to be Liquidating Trust Assets. The Liquidating Trust Assets shall vest in the Liquidating Trust for the benefit of the Beneficiaries and the Debtor and its Estate will have no further interest in or with respect to the Liquidating Trust Assets or the Liquidating Trust.

On the Effective Date, the Liquidating Trustee shall be deemed the representative of the Debtor's Estate pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code and as such shall be vested with the authority and power (subject to the Liquidating Trust Agreement and the Plan) to, among other things: (i) administer, object to or settle any Claims; (ii) make distributions in accordance with the terms of the Plan and Liquidating Trust Agreement; and (iii) carry out the provisions of the Plan related to the Liquidating Trust, including but not limited to, prosecuting or settling all Liquidating Trust Causes of Action in his or her capacity as trustee, for the benefit of the Beneficiaries. As the representative of the Debtor's Estate, in its capacity as trustee for the benefit of the Beneficiaries, the Liquidating Trustee will succeed to all of the rights and powers of the Debtor and its Estate with respect to all Liquidating Trust Causes of Action assigned and transferred to the Liquidating Trust, and the Liquidating Trustee will be substituted and will replace the Debtor, its Estate, and the Committee, as applicable, in all such Liquidating Trust Causes of Action, whether or not such claims are pending in filed litigation.

## E.   Certain Powers and Duties of the Liquidating Trust and Liquidating Trustee.

### 1.   General Powers of the Liquidating Trustee

The rights and powers of the Liquidating Trustee are specified in the Liquidating Trust Agreement, which shall be filed with the Plan Supplement. This Article IX provides a summary of the terms of the Liquidating Trust Agreement. In the event of any conflict between this Article IX and the Liquidating Trust Agreement, the terms of the Liquidating Trust Agreement control, unless otherwise ordered in the Plan Confirmation Order. The omission of any terms or provisions of the Liquidating Trust Agreement from this summary shall not constitute a conflict between this section and the Liquidating Trust Agreement.

Except as expressly set forth in this Combined Plan and Disclosure Statement, the Plan Confirmation Order, or the Liquidating Trust Agreement, and subject to his or her duties and obligations, the Liquidating Trustee, on behalf of the Liquidating Trust, shall have absolute discretion in the administration of the Liquidating Trust and Liquidating Trust Assets.

The Liquidating Trust Agreement generally will provide for, among other things: (i) the payment of the Liquidating Trust Operating Expenses; (ii) the payment of other reasonable expenses of the Liquidating Trust; (iii) the retention and compensation of counsel, accountants, financial advisors, or other professionals for the Liquidating Trust; (iv) the investment of Cash by the Liquidating Trustee within certain limitations, including those specified in the Plan; (v) the orderly liquidation of the Liquidating Trust Assets; (vi) litigation of the Liquidating Trust Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action; and (vii) the prosecution and resolution of objections to such Claims as the Liquidating Trustee deems reasonable and appropriate.  Additionally, the Liquidating Trust Agreement shall provide for the payment of the Deferred Administrative Claims and the treatment and priority of such Claims vis-à-vis Liquidating Trust Operating Expenses and the fees and costs of Liquidating Trust Advisors.

The Liquidating Trustee, on behalf of the Liquidating Trust, may employ, without further order of the Bankruptcy Court, Liquidating Trust Advisors to assist in carrying out the Liquidating Trustee's duties under the Plan, Plan Confirmation Order, and Liquidating Trust Agreement and may compensate and reimburse the reasonable expenses of the Liquidating Trust Advisors from the Liquidating Trust Assets in accordance with the Plan and the Liquidating Trust Agreement without further Order of the Bankruptcy Court.

The Liquidating Trustee, on behalf of the Liquidating Trust, may incur debt as provided in this Plan or the Liquidating Trust Agreement, or as authorized by applicable law, to fund any costs of administering the Liquidating Trust, including, without limitation, pursuant to the Liquidating Trust Funding Amount or further loans from Sandton Capital to finance the investigation and prosecution of the D&O Causes of Action.

The Liquidating Trust Agreement provides that the Liquidating Trustee shall be indemnified by and receive reimbursement from the Liquidating Trust Assets against and from any and all loss, liability, expense (including reasonable attorneys' fees), or damage which the Liquidating Trustee incurs or sustains, in good faith and without willful misconduct, gross negligence, or fraud, acting as Liquidating Trustee under or in connection with the Liquidating Trust Agreement.

On and after the Effective Date, the Liquidating Trustee shall have the power and responsibility to do all acts contemplated by the Plan and Liquidating Trust Agreement to be done by the Liquidating Trustee and all other acts that may be necessary or appropriate in connection with the disposition of the Liquidating Trust Assets and the distribution of the proceeds thereof, as contemplated by the Plan and in accordance with the Liquidating Trust Agreement. In all circumstances, the Liquidating Trustee shall act in its reasonable discretion in the best interests of the Beneficiaries pursuant to the terms of the Plan and the Liquidating Trust Agreement.

## 2.    Books and Records

On or before the Effective Date, the Debtor or Sandton Capital shall provide the Liquidating Trustee an electronic copy of or access to any and all of Debtor's documents, books, records, files, and emails available to the Debtor and its Estate.

4873-4343-6936.5

### 3. Investments of Cash

To the extent provided in the Liquidating Trust Agreement, the Liquidating Trust may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code or in other prudent investments; *provided, however*, that such investments are permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

### 4. Costs and Expenses of Administration of the Liquidating Trust

All Liquidating Trust Operating Expenses, including the costs associated with retaining Liquidating Trust Advisors, shall be the responsibility of, and paid by, the Liquidating Trust in accordance with the Liquidating Trust Agreement from the Liquidating Trust Assets.

### 5. Reporting

No later than forty-five (45) days after the last day of each calendar quarter in which the Liquidating Trust shall remain in existence, the Liquidating Trustee shall file a report of all Liquidating Trust Assets held and received by the Liquidating Trust, all Available Trust Cash (as defined in the Liquidating Trust Agreement) disbursed to Beneficiaries, and all fees, income, and expenses related to the Liquidating Trust during the preceding calendar quarter.

### F.      **Post-Effective Date Notice.**

After the Effective Date, to continue to receive notice of documents pursuant to Bankruptcy Rule 2002, all Creditors and other parties in interest (except those listed in the following sentence) must file a renewed notice of appearance requesting receipt of documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Liquidating Trustee is authorized to limit the list of parties in interest receiving notice of documents pursuant to Bankruptcy Rules 2002 to the Office of the United States Trustee, the Debtor, and those parties in interest who have filed such renewed requests; *provided, however*, that the Liquidating Trustee also shall serve any known parties directly affected by or having a direct interest in, the particular filing in accordance with Local Rule 2002-1(b). Notice given in accordance with the foregoing procedures shall be deemed adequate pursuant to the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules. This information shall be provided in the Notice of Effective Date.

### G.      **Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets; Preparation and Filing of Tax Returns for Debtor.**

For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that such trust be owned by its Beneficiaries. Accordingly, for federal income tax purposes, it is intended that the Beneficiaries be treated as if they had received a distribution from the Estate of an undivided interest in each of the Liquidating Trust Assets ((i) to the extent of the value of their respective share in the applicable assets and (ii) except for those assets attributable to the Disputed Claims Reserve) and then contributed such interests to the Liquidating Trust, and the Liquidating Trust's Beneficiaries will be treated as the grantors and owners thereof.

The Debtor shall be responsible for filing all required federal, state, and local tax returns and/or informational returns for the Debtor (including final tax returns).

The Liquidating Trust shall be responsible for filing all required federal, state and local tax returns and/or informational returns for the Liquidating Trust and shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements. The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements including, without limitation, requiring that, as a condition to the receipt of a Distribution, the Holder of an Allowed Claim complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each Holder. Notwithstanding any other provision of this Combined Plan and Disclosure Statement, (a) each Holder of an Allowed Claim that is to receive a Distribution from the Liquidating Trust shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Liquidating Trustee to allow it to comply with its tax withholding and reporting requirements. Any property to be distributed by the Liquidating Trust shall, pending the implementation of such arrangements, be treated as an Unclaimed Distribution to be held by the Liquidating Trustee, as the case may be, until such time as the Liquidating Trustee is satisfied with the Holder's arrangements for any withholding tax obligations. If the Liquidating Trustee makes such a request and the Holder fails to comply before the date that is 180 days after the request is made, the amount of such Distribution shall irrevocably revert to the Liquidating Trust and any Claim or Equity Interest in respect of such Distribution shall be disallowed and forever barred from receiving a Distribution under the Plan or Liquidating Trust Agreement without further notice or order of the Bankruptcy Court.

The Liquidating Trustee (i) may timely elect to treat any Liquidating Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9, and (2) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including the Liquidating Trustee and the Holders of Trust Interests) shall report for U.S. federal, state and local income tax purposes consistently with the foregoing. The Liquidating Trustee shall file all income tax returns with respect to any income attributable to a "disputed ownership fund" and shall pay the U.S. federal, state and local income taxes attributable to such disputed ownership fund based on the items of income, deduction, credit, or loss allocable thereto.

## H.    Term of Liquidating Trust.

The Liquidating Trustee shall be discharged and the Liquidating Trust shall be terminated, at such time as (i) all Disputed or temporarily Allowed Claims have been resolved, (ii) all of the Liquidating Trust Assets have been liquidated, (iii) all duties and obligations of the Liquidating Trustee under the Liquidating Trust Agreement, the Plan and the Plan Confirmation Order have been fulfilled, (iv) all Distributions required to be made by the Liquidating Trust under the Plan, the Liquidating Trust Agreement and the Plan Confirmation Order have been made, and (v) the Chapter 11 Case has been closed; *provided, however*, that in no event shall the Liquidating Trust

4873-4343-6936.5

be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion filed prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension (not to exceed three (3) years per extension, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.  Upon the filing of such a motion, the term of the Liquidating Trust shall be automatically extended through entry of a Final Order thereon, unless the extension would adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes.

I.    **Limitation of Liability of the Liquidating Trustee.**

As shall be provided in the Liquidating Trust Agreement, the Liquidating Trust shall indemnify the Liquidating Trustee and any retained professionals against any losses, liabilities, expenses (including attorneys' fees and disbursements), damages, taxes, suits, or claims that the Liquidating Trustee and its professionals may incur or sustain by reason of being or having been a Liquidating Trustee or professionals thereof for performing any functions incidental to such service; *provided, however*, the foregoing shall not relieve the Liquidating Trustee or any retained professionals from liability for bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud, or self-dealing, or, in the case of an attorney or other professional and, as required any applicable rules of professional conduct, malpractice.

## X.  **MEANS FOR IMPLEMENTATION**

A.    **Preservation of Right to Conduct Investigations.**

The preservation for the Liquidating Trust of any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 is necessary and relevant to the liquidation and administration of the Liquidating Trust Assets. Accordingly, any and all rights to conduct investigations pursuant to Bankruptcy Rule 2004 or any other law, rule, or order, held by the Debtor prior to the Effective Date with respect to the Liquidating Trust Assets shall vest with the Liquidating Trust and shall continue until dissolution of the Liquidating Trust.

B.    **Prosecution and Resolution of Causes of Action and Avoidance Actions.**

From and after the Effective Date, prosecution and settlement of all Causes of Action and Avoidance Actions conveyed to the Liquidating Trust shall be the sole responsibility of the Liquidating Trust pursuant to the Plan, the Plan Confirmation Order, and the Liquidating Trust Agreement.  The Liquidating Trustee may pursue such Causes of Action and Avoidance Actions, as appropriate, in accordance with the best interests of the Liquidating Trust Beneficiaries. From and after the Effective Date, with respect to the Liquidating Trust Assets, the Liquidating Trust shall have exclusive rights, powers, and interests of the Estate to pursue, settle, or abandon such Causes of Action and Avoidance Actions as the sole representative of the Estate pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.  Notwithstanding the occurrence of the Effective Date, all Causes of Action and Avoidance Actions that are not expressly released or waived under the Plan are reserved and preserved and vest in the Liquidating Trust in accordance with the Plan.

As further consideration for the treatment provided hereunder, Sandton Capital has agreed to finance the reasonable fees and costs associated with the investigation and prosecution, or other resolution of, the D&O Causes of Action. The terms and conditions for such financing shall be set forth in the Plan Supplement or separate agreement filed as an appendix thereto.

**C.     Effectuating Documents and Further Transactions.**

All documents, agreements and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Combined Plan and Disclosure Statement, Plan Supplement, the Plan Confirmation Order and any other agreement or document related to or entered into in connection with the Plan, shall become, and shall remain, effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice or Order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person (other than as expressly required by such applicable agreement). The Liquidating Trustee may, and all Holders of Allowed Claims receiving Distributions pursuant to the Plan, at the request or direction of the Liquidating Trustee shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**D.     Funding of Liabilities and Distributions.**

On the Effective Date, the Debtor shall transfer to the Liquidating Trust the Liquidating Trust Assets and the Liquidating Trust Funding Amount. The Liquidating Trust shall administer the Liquidating Trust Assets and distribute Available Trust Cash to the Beneficiaries of the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement, Plan, and Plan Confirmation Order; *provided*, *however*, the Liquidating Trust Funding Amount shall not constitute Available Trust Cash, unless and until so designated by the Liquidating Trustee following the payment of all Liquidating Trust Operating Expenses and Deferred Administrative Claim. The Liquidating Trust shall be responsible for and shall have standing to evaluate, prosecute and settle all causes of action transferred to the Liquidating Trust.

The Debtor or Sandton Capital shall transfer to the Liquidating Trust the Liquidating Trust Funding Amount on the Effective Date for the administration of the Liquidating Trust. In the event of any inconsistency between the terms of the Plan, the Plan Confirmation Order and Liquidating Trust Agreement regarding the Liquidating Trust, the terms of the Plan shall govern, unless expressly ordered otherwise in the Plan Confirmation Order.

**E.     Release of Liens.**

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to this Combined Plan and Disclosure Statement, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estate shall be deemed fully released without any further action of any party, including, but not limited to, further order of the Bankruptcy Court or filing updated schedules or statements typically filed pursuant to the Uniform Commercial Code or other applicable law;

*provided, however*, that any tax liens that have been asserted against the Debtor shall not be released until the underlying tax claim has been satisfied.

**F.      Exemption from Securities Laws.**

Any and all Beneficial Interests shall not constitute "securities" and under section 1145 of the Bankruptcy Code, the issuance of beneficial interests in the Liquidating Trust under the Plan shall be exempt from registration under the Securities Act of 1933, as amended, and all applicable state and local laws requiring registration of securities.

**G.      Exemption from Certain Taxes and Fees.**

Pursuant to and to the fullest extent permitted by section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment, and upon entry of the Plan Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfer of property without payment of any such tax, recordation fee, or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Plan Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

**H.      Debtor's Privileges as to Certain Causes of Action.**

Effective as of the Effective Date, all Privileges of the Debtor relating to the Liquidating Trust Assets shall be deemed transferred, assigned, and delivered by the Debtor to the Liquidating Trust, without waiver or release, and shall vest with the Liquidating Trust. The Liquidating Trustee shall hold and be the beneficiary of all such Privileges and entitled to assert such Privileges. No such Privilege shall be waived by disclosures to the Liquidating Trustee of the Debtor's documents, information, or communications subject to attorney-client privileges, work product protections, or other immunities (including those related to common interest or joint defense with third parties), or protections from disclosure held by the Debtor. The Debtor's Privileges relating to the Liquidating Trust Assets will remain subject to the rights of third parties under applicable law, including any rights arising from the common interest doctrine, the joint defense doctrine, joint attorney-client representation, or any agreement; *provided, however*, prior to waiving such privilege, the Liquidating Trustee shall provide such third party any written notice required by any joint defense or common interest agreements that might have existed at the time Debtor filed the Petitions.  Nothing contained herein or in the Plan Confirmation Order, nor any Professional's compliance herewith and therewith, shall constitute a breach of any Privileges of the Debtor.

**I.**    <u>**Insurance Policies.**</u>

Except as otherwise specifically stated herein, nothing in this Combined Plan and Disclosure Statement, the Plan Confirmation Order, or the Liquidating Trust Agreement, alters the rights and obligations of the Debtor (and its Estate) and the Debtor's insurers (and third-party claims administrators) under the Insurance Policies or modifies the coverage or benefits provided thereunder or the terms and conditions thereof or diminishes or impairs the enforceability of the Insurance Policies. On the Effective Date, all of the Debtor's rights and its Estate's rights under any Insurance Policy related, in whole or in part, to any Liquidating Trust Asset to which the Debtor and/or the Debtor's Estate may have a claim or potential claim for coverage under shall vest with the Liquidating Trust and be fully enforceable by the Liquidating Trust. For the avoidance of doubt, the Debtor is deemed to have assumed all of the Insurance Policies prior to such vesting. Nothing in this provision shall be deemed to be an admission of any fact, liability or other matter whatsoever.

Each applicable insurer under the Insurance Policies is prohibited from, and the Plan Confirmation Order shall include an injunction against, denying, refusing, altering or delaying coverage on any basis regarding or related to the Chapter 11 Case, this Combined Plan and Disclosure Statement Plan or any provision herein, including the treatment or means of liquidation set out within this Combined Plan and Disclosure Statement for any insured Claims or Causes of Action. For the avoidance of doubt, nothing in Section X.I impairs the rights of the Debtor or the Debtor's directors and officers, or the Liquidating Trust with respect to the Insurance Policies.

**J.**    <u>**Filing of Monthly and Quarterly Reports and Payment of Statutory Fees.**</u>

All Statutory Fees due and payable prior to the Effective Date shall be paid by the Debtor on the Effective Date. On and after the Effective Date, the Liquidating Trustee shall be solely liable to pay any and all Statutory Fees when due and payable. The Debtor shall file all monthly reports due prior to the Effective Date, as they become due, in a form reasonably acceptable to the U.S. Trustee. Provided that the Debtor dissolves on the Effective Date, after the Effective Date, the Liquidating Trustee shall file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee. If, after the Effective Date, disbursements, other than those made by the Liquidating Trust, are made in any quarter, the entity making such disbursements shall report same to the Liquidating Trustee for inclusion in the appropriate separate quarterly report. The Debtor and the Liquidating Trustee shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee until the earliest of the Debtor's Chapter 11 Case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Expense Claim in the case and shall not be treated as providing any release under the Plan in connection therewith.

**K.**    <u>**Completion of Services of Professionals.**</u>

On the Effective Date, the Professionals for the Debtor and the Committee shall be deemed to have completed their services to the Debtor's Estate and such Professionals shall be able to file final and interim applications and be paid for reasonable compensation and reimbursement of expenses related thereto allowed by the Bankruptcy Court in accordance with Section V.B. above, including reasonable fees and expenses, including attorneys' fees, incurred after the Effective

Date, which shall be treated as Professionals Disputable claim. Any of such Professionals may be retained by the Liquidating Trustee to represent the Liquidating Trust.

**L.**     **Operations of the Debtor Between the Confirmation Date and the Effective Date.**

During the period from the Confirmation Date through and until the Effective Date, the Debtor shall continue to operate as debtor in possession, subject to the oversight of the Bankruptcy Court as provided in the Bankruptcy Code, the Bankruptcy Rules, and all orders of the Bankruptcy Court that are then in full force and effect.

## XI.   PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN

**A.**     **Distribution Record Date.**

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtor or its agents shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Equity Interests. The Debtor and the Liquidating Trustee shall have no obligation to recognize any ownership transfer of the Claims or Equity Interests occurring after the Distribution Record Date.  The Debtor and the Liquidating Trustee, or any party responsible for making Distributions shall be entitled to recognize and deal for all purposes under the Plan only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

**B.**     **Method of Payment.**

Unless otherwise expressly agreed, in writing, all Cash payments to be made pursuant to the Plan shall be made by check drawn on a domestic bank or an electronic wire or ACH transfer.

**C.**     **Claims Objection Deadline.**

The Debtor or Liquidating Trustee, as applicable, to the extent permitted pursuant to this Plan or section 502(a) of the Bankruptcy Code, shall file and serve any objection to any Claim no later than the Claims Objection Deadline; *provided, however*, the Claims Objection Deadline may be extended by the Bankruptcy Court from time to time upon motion of the Debtor or the Liquidating Trustee, as applicable, and notice to the Bankruptcy Rule 2002 service list and all parties holding claims as to which the objection is to be extended for cause.

**D.**     **No Distribution Pending Allowance.**

Notwithstanding any other provision of the Plan or the Liquidating Trust Agreement, no Distribution of Cash or other property shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order or as otherwise permitted by the Plan or the Liquidating Trust Agreement.

**E.**     **Reserve of Cash Distributions.**

On any date that Distributions are to be made under the terms of the Plan, the Debtor or Liquidating Trustee, or their respective agents, as applicable, shall reserve Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim, but for the pendency of a dispute with respect thereto. Such Cash or property shall be held in a separate bank account maintained by the Debtor or Liquidating Trust, as applicable, for the benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto, if any.

## F.    **Delivery of Distributions.**

Except as provided herein, Distributions to Holders of Allowed Claims shall be made: (i) at the addresses set forth on the respective proofs of Claim filed by such Holders; (ii) at the addresses set forth on any written notices of address changes delivered to the Claims Agent after the date of any related proof of Claim; or (iii) at the address reflected in the Schedules, or, if not reflected in the Schedules, then in other records of the Debtor, if no proof of Claim is filed and the Liquidating Trustee or the Debtor has not received a written notice of a change of address.

If the Distribution to the Holder of any Claim is returned to the Debtor or Liquidating Trustee as undeliverable, no further Distribution shall be made to such Holder unless and until Liquidating Trustee are notified in writing of such Holder's then current address. Undeliverable Distributions shall remain in the possession of the Liquidating Trustee until the earlier of (i) such time as a Distribution becomes deliverable, or (ii) such undeliverable Distribution becomes an Unclaimed Distribution pursuant to Section XI.I of this Combined Plan and Disclosure Statement. Undeliverable Distributions shall revert to the Liquidating Trust. The Liquidating Trustee shall not have an obligation to update or correct the contact information for recipients of undeliverable Distributions.

## G.    **Fractional Dollars; *De Minimis* Distributions.**

Notwithstanding any other provision of the Plan to the contrary, (a) the Debtor and Liquidating Trust shall not be required to make Distributions or payments of fractions of dollars, and whenever any Distribution of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down; and (b) the Debtor and Liquidating Trust shall have no duty to make a Distribution on account of any Allowed Claim (i) if the aggregate amount of all Distributions authorized to be made on such date is less than $25,000, in which case such Distributions shall be deferred to the next Distribution, (ii) if the amount to be distributed to a Holder on the particular Distribution date is less than $100.00, unless such Distribution constitutes the final Distribution to such Holder, or (iii) if the amount of the final Distribution to such Holder is $50.00 or less. If the Liquidating Trust or Debtor withhold any Distribution under this provision, the withheld funds shall inure to the benefit of the Liquidating Trust.

## H.    **Excess Funds.**

After final Distributions have been made from the Liquidating Trust in accordance with the terms of the Plan and the Liquidating Trust Agreement, if the amount of remaining Cash in the Liquidating Trust is $15,000 or less, the Liquidating Trustee, may donate such amount to charity;

*provided that* the charity shall be unrelated to the Debtor, the Committee and its members, the Liquidating Trustee, the Liquidating Trust Advisors, the DIP Lender, and their respective professionals.

**I.      Unclaimed Distributions.**

Any Cash or other property to be distributed under the Plan to a Beneficiary shall revert to the Liquidating Trust if it is not claimed by the Beneficiary within three (3) months after the date of such Distribution.  If such Cash or other property is not claimed on or before such date, the Distribution made to such Beneficiary shall be deemed to be reduced to zero and such returned, undeliverable, or unclaimed Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall be returned to the Liquidating Trust. All Unclaimed Distributions shall revert to the Liquidating Trust.

**J.      Set-Off.**

Except as otherwise provided herein, the Debtor or Liquidating Trustee, as applicable, retain the right to reduce any Claim by way of setoff in accordance with the Debtor's books and records.  Rights of setoff and recoupment, if any, held by any Entity or Person are preserved for the purpose of asserting such rights as a defense to any Claims or Causes of Action or Avoidance Actions of the Debtor, its Estate, or the Liquidating Trustee and regardless of whether such Entity or Person is the Holder of an Allowed Claim.

**K.      Maximum Recovery and Postpetition Interest.**

Except as may be expressly provided herein, interest shall not accrue on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date. No prepetition Claim shall be Allowed to the extent it is for postpetition interest or other similar charges, except to the extent permitted for Holders of Secured Claims under section 506(b) of the Bankruptcy Code.

Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim.

**L.      Allocation of Distributions Between Principal and Interest.**

To the extent that any Allowed Claim entitled to a Distribution under the Plan comprises indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid prepetition interest.

M.      **Prepayment.**

        Except as otherwise provided herein or the Plan Confirmation Order, the Debtor and the Liquidating Trustee, as applicable, shall have the right to prepay, without penalty, all or any portion of an Allowed Claim at any time on or after the Effective Date.

## XII.  EXECUTORY CONTRACTS

A.      **Rejection of Executory Contracts and Unexpired Leases.**

        This Plan shall constitute a motion to reject all executory contracts and unexpired leases not previously rejected pursuant to an order of the Bankruptcy Court unless (i) otherwise set forth in the Plan Supplement or (ii) expressly assumed by the Debtor under this Plan or previous order of the Bankruptcy Court, and the Debtor shall have no further obligation thereunder.  The entry of the Plan Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code and that the rejection thereof is in the best interest of the Debtor, its Estate and all parties in interest in the Chapter 11 Case.  The foregoing information shall be included in the notice of entry of the Plan Confirmation Order.  Notwithstanding the foregoing, to the extent any Insurance Policies are deemed to be executory, (i) the Debtor does not seek to reject the Insurance Policies through this general rejection provision and (ii) the Insurance Policies shall be assumed by the Debtor pursuant to Section X.I. of this Plan.

B.      **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

        Claims created by the rejection of executory contracts and unexpired leases pursuant to this Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Debtor no later than thirty (30) days after service of notice of entry of the Plan Confirmation Order by the Bankruptcy Court, which notice shall set forth the deadline to file such Claims.  Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Section XII.A, for which proofs of Claim are not timely filed within that period will be forever barred from assertion against the Debtor, its Estate, the Liquidating Trust, and their respective successors and assigns, and their respective assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims and shall be subject to the provisions of this Plan.

## XIII.  CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

        The following are conditions precedent to the Effective Date that must be satisfied or waived (as provided below):

          a.      The Plan Confirmation Order, which shall be in a form acceptable to the Debtor, the Committee, and Sandton Capital, shall have been entered by the Bankruptcy Court, and shall have become a Final Order;

b. The Plan Confirmation Order shall be in full force and effect;

c. The Liquidating Trust Agreement, in a form and substance acceptable to the Debtor, the Committee, and Sandton Capital, shall have been fully executed and the Liquidating Trust shall have been formed;

d. The final version of all schedules, documents, and Plan exhibits, including a Plan Supplement, shall have been filed in form and substance acceptable to the Sandton Capital in consultation with the Committee;

e. The Debtor shall have paid all reasonable and documented fees and expenses of the Sandton Capital, in accordance with the terms of the Plan and the Approved Budget;

f. All actions, agreements, instruments, or other documents necessary to implement the terms and conditions of the Plan are effected or executed and delivered; and

g. All Liquidating Trust Assets shall have been transferred to and/or vested in the Liquidating Trust, unless such transfer or sale to .

Notwithstanding the foregoing, the Plan Proponents may, acting jointly and in consultation with Sandton Capital, waive the occurrence of the conditions precedent to the Effective Date. Any such written waiver of a condition precedent set forth in this Section may be affected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate this Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

On the Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## XIV. RELEASE, EXCULPATION, INJUNCTION, AND RELATED PROVISIONS

### A. Releases by the Debtor.

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is hereby released by the Debtor, its Estate, the Liquidating Trustee, the Liquidating Trust, and each other Releasing Party (as applicable) from any and all Claims, Causes of Action, Avoidance Actions, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtor, its Estate, the Liquidating Trustee, or the Liquidating Trust), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims, asserted or that could be asserted on behalf of the Debtor, that the Debtor, its Estate, the Liquidating Trustee, the Liquidating Trust, or other Released Party (as applicable), that such Person or its estate, heirs, executors, administrators,**

52

successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor  (including the management, ownership, or operation thereof), its Estate, the Debtor's in- or out-of-court restructuring efforts, the [Prepetition Loan Documents (as defined in the DIP Orders)],[11] any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party, the restructuring of any Claim or Equity Interest before or during the Chapter 11 Case, or any restructuring, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Plan Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan Documents and any related agreements, instruments, and other documents, the Chapter 11 Case, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of any property pursuant to the Plan, the Plan Documentation, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Section XIV.A do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, including any such obligations created in connection with the restructuring, or (ii) any Preserved Claims and Causes of Action. Nothing in this Section XIV.A shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud or willful misconduct.

Entry of the Plan Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtor set forth in this Section XIV.A, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtor and its Estate; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtor or its Estate asserting any Claim or Cause of Action released pursuant to such releases.

B.     Releases by the Releasing Parties.

As of the Effective Date, each Releasing Party hereby releases the Debtor, its Estate, and each Released Party from any and all Claims, Causes of Action, Avoidance Actions,

---

[11] NTD:  Confirm defined terms in final Plan/DS

obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtor, its Estate, the Liquidating Trustee, or the Liquidating Trust), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, that such Releasing Party or its estate, affiliates (excluding the Debtor's affiliates that are not Debtor in this Chapter 11 Case), heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor (including the management, ownership, or operation thereof), its Estate, the Debtor's in- or out-of-court restructuring efforts, the Debtor's intercompany transactions, Prepetition Loan Documents (as defined in the DIP Orders), any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any security of the Debtor the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of any Claim or Equity Interest before or during the Chapter 11 Case, or any restructuring, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Plan Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan Documents and any related agreements, instruments, and other documents, the Chapter 11 Case, the filing of the Chapter 11 Case, the Sales Process, the pursuit of Confirmation, the pursuit of consummation of the Plan, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of any property pursuant to the Plan, the Plan Documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Section XIV.B do not release (i) any post-Effective Date obligations of any party or Entity under the Plan, including any such obligations created in connection with the restructuring, and (ii) any Preserved Claims and Causes of Action. Nothing in this Section XIV.B shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud or willful misconduct. The releases set forth in this Section XIV.B do not apply to any Holder of a Claim or Equity Interest if such Holder "opts out" of such releases in accordance with the solicitation procedures.

Entry of the Plan Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases set forth in this Section XIV.B, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtor and its Estate; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential

component of the Plan and the restructuring; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases.

## C.     Exculpation.

The **Exculpated Parties shall neither have nor incur any liability to any Entity, including the Exculpated Parties, for any and all claims, causes of action and any other debts, obligations, rights, suits, damages, actions, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, arising, in law, at equity, whether for tort, contract, violations of federal or state securities laws, \or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances taking place or arising during the Exculpation Timeframe related in any way to the Debtor, including, without limitation, those that the Debtor would have been legally entitled to assert (whether individually or collectively) or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of any of the Debtor or the Estate and further including those in any way related to the Liquidating Trust Agreement, Chapter 11 Case, or this Combined Plan and Disclosure Statement, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the post-petition debtor in possession financing approved by the Bankruptcy Court, the Liquidating Trust Agreement, or any other contract, instrument, release or other agreement or document created or entered into in connection with this Combined Plan and Disclosure Statement or any other post-petition act taken or omitted to be taken in connection with the Debtor; _provided, however_, the foregoing provisions of this section XIV.C shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence, fraud, or willful misconduct. Notwithstanding anything provided herein, the foregoing provisions of this section XIV.C shall have no effect on the liability of any Entity that results from any act or omission that occurred prior to the Exculpation Timeframe.**

## D.     Preservation of Causes of Action.

### 1.     Vesting of Causes of Action

Except as otherwise provided in this Plan or the Plan Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any and all Causes of Action and Avoidance Actions that are Liquidating Trust Assets are reserved for, assigned to, and shall become property of the Liquidating Trust, and the Liquidating Trustee shall be vested with any and all rights and standing to commence, prosecute, and resolve such Causes of Action, on the Effective Date.

Except as otherwise proved in this Plan, Plan Confirmation Order or the Liquidating Trust Agreement, after the Effective Date, the Liquidating Trustee shall have the exclusive right to institute, prosecute, abandon, settle, or compromise any Causes of Action conveyed to the Liquidating Trust, in its sole discretion and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Case.

2.        **Preservation of All Causes of Action Not Expressly Settled or Released.**

Unless a Cause of Action against any Entity is expressly waived, relinquished, released, compromised, or settled in this Plan or any Final Order (including the Plan Confirmation Order), the Plan Proponents expressly reserve such Cause of Action, including all Causes of Action to be transferred by the Debtor to the Liquidating Trust pursuant to this Plan and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata,* collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Plan Confirmation Order or Effective Date based on the Disclosure Statement, this Plan or the Plan Confirmation Order or any other Final Order (including the Plan Confirmation Order).  In addition, the Liquidating Trust reserves the right to pursue or adopt any claims alleged in any lawsuit in which the Debtor or the Committee is a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits. Furthermore, in the pursuit of an Avoidance Action, the Debtor, Liquidating Trust, the Liquidating Trustee and/or their assignees shall certify in writing in any demand, claim, complaint, and other effort to collect on an Avoidance Action to compliance with section 547(b) of the Bankruptcy Code.

The failure of the Debtor to list a claim, right, cause of action, suit or proceeding shall not constitute a waiver or release by the Debtor of such claim, right of action, suit or proceeding.  IT IS THE EXPRESSED INTENTION OF THE PLAN TO PRESERVE RIGHTS, CLAIMS, AND CAUSES OF ACTION OF THE DEBTOR, WHETHER NOW KNOWN OR UNKNOWN, FOR THE BENEFIT OF THE LIQUIDATING TRUST AND THE DEBTOR'S CREDITORS. **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Causes of Action against them as any indication that the Liquidating Trustee will not pursue any and all available Causes of Action against them.**

Notwithstanding the foregoing, the Debtor has made a good faith effort to identify and disclose all known Causes of Action. A schedule identifying the Debtor's known Causes of Action to be transferred and retained by the Liquidating Trust, which consists of the Preserved Claims and Causes of Action, shall be attached to the Plan Supplement.

E.        **Injunction.**

**From and after the Effective Date, all Persons are permanently enjoined from commencing or continuing in any manner against the Debtor, the Committee or its members, the Released Parties, the Liquidating Trust or the Liquidating Trustee, or their respective predecessors, successors, and assigns, consultants, partners, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case in their capacity as such, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, cause of action, interest or remedy released or to be released pursuant to the Plan or the Plan Confirmation Order.**

**No Person may commence or pursue a claim or cause of action of any kind against any Released Party or Exculpated Party based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Cases, the subject matter of, or the transactions or**

events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements with the Debtor and any Released Party or Exculpated Party, the restructuring of any Claim or Interest before or during the Cases, the negotiation, formulation, or preparation of the Disclosure Statement, this Plan and related agreements, instruments, and other documents (including the Plan Documents), the solicitation of votes with respect to this Plan, or any other act or omission, and/or any related agreements, instruments, or other documents, the pursuit of confirmation, any action or actions taken in furtherance of or consistent with the administration or implementation of this Plan, or other property under this Plan, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date arising from or relating to any of the foregoing or from the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or the administration of the Liquidating Trust or the transactions in furtherance of the foregoing without the Bankruptcy Court: (a) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, but not limited to, actual fraud, gross negligence, or willful misconduct against a Released Party or Exculpated Party and (b) specifically authorizing such Person to bring such claim or cause of action against any such Released Party or Exculpated Party.  The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.

Notwithstanding any other provision of this Plan, the Debtor shall not receive a discharge pursuant to section 1141(d)(3) of the Bankruptcy Code.

Except as otherwise specifically provided in the Combined Plan and Disclosure Statement, all Persons who have held, hold, or may hold Claims against or Equity Interests in the Debtor and any successors, assigns or representatives of such Person shall be precluded and permanently enjoined on and after the Effective Date from (a) commencing or continuing in any manner any Claim, action or other proceeding of any kind against any of the assets to be distributed under the Plan, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order with respect to any of the assets to be distributed under the Plan, and (c) creating, perfecting or enforcing any encumbrance of any kind with respect to any of the assets to be distributed under the Plan.  Except as otherwise expressly provided for in this Combined Plan and Disclosure Statement or with respect to obligations issued pursuant to this Combined Plan and Disclosure Statement, all Persons are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released hereby, from: (i) commencing or continuing in any manner any action or other proceeding of any kind against any the Liquidating Trust or the Liquidating Trustee, or their successors and assigns, and their assets and properties; enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any the Liquidating Trust or the Liquidating Trustee, their successors and assigns, and their assets and properties; (ii) creating, perfecting, or enforcing any encumbrance of any kind against any the Liquidating Trust or the Liquidating Trustee, or the property or estate of the Liquidating Trust; (iii) asserting any right of subrogation against any the Liquidating Trust or the

Liquidating Trustee, or against the property or estate of any of the Liquidating Trust, except to the extent that a permissible right of subrogation is asserted with respect to a timely filed proof of claim; or (iv) commencing or continuing in any manner any action or other proceeding of any kind in respect of any claim or equity interest or cause of action released or settled hereunder.

Notwithstanding any provision in this Combined Plan and Disclosure Statement or the Plan Confirmation Order to the contrary, nothing contained in this Combined Plan and Disclosure Statement or the Plan Confirmation Order shall (i) extinguish, impact, or release any right of setoff, recoupment, or subrogation of any kind (a) held by any creditor or vendor which is asserted in a timely filed proof of claim or objection to this Combined Plan and Disclosure Statement, or pursuant to section 503(b)(1)(d) of the Bankruptcy Code or (b) that is or may be asserted as an affirmative defense or other defense to a cause of action or claim asserted by a Debtor or the Liquidating Trust against such creditor or vendor; or (ii) affect the applicability of 26 U.S.C. § 7421(a).

C.      **Termination of All Employee and Workers' Compensation Benefits.**

Except as otherwise provided in the Liquidating Trust Agreement, all existing employee benefit plans and workers' compensation benefits not previously expired or terminated by the Debtor assumed and assigned or otherwise transferred to Sandton will be deemed terminated on or before the Effective Date.

D.      **Exclusions and Limitations on Liability.**

Notwithstanding anything in this Combined Plan and Disclosure Statement to the contrary, no provision of this Combined Plan and Disclosure Statement or the Plan Confirmation Order, including, without limitation, the exculpation provision contained in Section XIV.A of this Plan, shall (a) modify, release or otherwise limit the liability of any Entity not specifically released or exculpated hereunder, including, without limitation, any Entity that is otherwise liable under theories of vicarious or other derivative liability or that is a non-Debtor third party guarantor of any obligation of the Debtor, or (b) affect the ability of the Internal Revenue Service to pursue non-Debtor to the extent allowed by non-bankruptcy law for any liabilities that are related to any federal income tax liabilities that owed by the Debtor or its Estate.

## XV.   RETENTION OF JURISDICTION

After the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Case and all Entities with respect to all matters related to the Chapter 11 Case, the Debtor and this Plan as is legally permissible, including, but not limited to, jurisdiction to:

1.  allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Expense Claim and Professional Fee Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

2.  grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan, for periods ending on or before the Effective Date;

3.  resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired lease to which the Debtor is party or with respect to which the Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

4.  ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan;

5.  hear and determine any motions, adversary proceedings, mediations, contested or litigated matters, applications involving the Debtor, and any other matters that may be pending on the Effective Date or instituted by the Liquidating Trust after the Effective Date, including any Liquidating Trust Causes of Action;

6.  hear and determine disputes (i) arising in connection with the interpretation, implementation or enforcement of the Liquidating Trust or the Liquidating Trust Agreement or (ii) arising out of or related to the issuance of any subpoenas or requests for examination pursuant to Bankruptcy Rule 2004 issued before or after the entry of the Plan Confirmation Order relating to the subject matter of the Liquidating Trust Causes of Action;

7.  enter such orders as may be necessary or appropriate to implement, interpret, enforce or consummate the provisions of this Plan, the Confirmation Order, the Liquidating Trust Agreement and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with this Plan, Plan Supplement or the Disclosure Statement;

8.  resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of this Plan or any Entity's obligations incurred in connection with this Plan;

9.  issue and enforce injunctions and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of this Plan, except as otherwise provided in this Plan;

10.  enforce all of the provisions of this Plan;

11.  enforce all Orders previously entered by the Bankruptcy Court;

12.  resolve any cases, controversies, suits or disputes with respect to the exculpation, injunctions, releases, and other provisions contained in this Plan, and enter such orders as may be necessary or appropriate to implement or enforce all such exculpation, injunction, release and other provisions;

13. enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

14. resolve any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Plan Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with this Plan or the Disclosure Statement;

15. enter an order and/or the decree contemplated in Bankruptcy Rule 3022 concluding the Chapter 11 Case; and

16. hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code, including any request made under section 505 of the Bankruptcy Code for the expedited determination of any unpaid liability of a Debtor for any tax incurred during the administration of the Chapter 11 Case, including any tax liability arising from or relating to the transactions contemplated by the Plan, for tax periods ending after the Petition Date and through the closing of the Chapter 11 Case.

Notwithstanding anything contained herein to the contrary, the Bankruptcy Court retains jurisdiction to the fullest extent permitted by applicable law to adjudicate Liquidating Trust Causes of Action and to hear and determine disputes concerning Liquidating Trust Causes of Action and any motions to compromise or settle such Liquidating Trust Causes of Action or disputes relating thereto.  Despite the foregoing, if the Liquidating Trustee on behalf of the Liquidating Trust chooses to pursue any Liquidating Trust Cause of Action in another court of competent jurisdiction, the Liquidating Trustee will have authority to bring such action in any other court of competent jurisdiction.

## XVI.  <u>MISCELLANEOUS PROVISIONS</u>

### A.  <u>Modification of Plan.</u>

Subject to the limitations contained in this Plan: (1) the Plan Proponents reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, and subject to section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019 (a), to amend or modify this Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Plan Confirmation Order and before substantial consummation of the Plan, the Plan Proponents, upon order of the Bankruptcy Court, amend or modify this Plan, in accordance with section 1127(b) of the Bankruptcy Code, and Bankruptcy Rule 3019(b).

### B.  <u>Revocation of Plan.</u>

The Plan Proponents reserve the right to revoke or withdraw this Plan, prior to the entry of the Plan Confirmation Order and to file subsequent plans of liquidation.  If the Plan Proponents revoke or withdraw this Plan, or if entry of the Plan Confirmation Order or the Effective Date does not occur within one-hundred and eighty (180) days after entry of the Confirmation Order, then: (1) this Plan shall be null and void in all respects; (2) any settlement or compromise embodied in this Plan, assumption or rejection of executory contracts or leases effected by this Plan, and any

document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in this Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtor or any other Entity; or (c) constitute an admission of any sort by the Plan Proponents or any other Entity.

**C.**     **Successors and Assigns.**

The rights, benefits, and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

**D.**     **Governing Law.**

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the state of Texas, without giving effect to the principles of conflict of laws thereof.

**E.**     **Reservation of Rights.**

Neither the filing of this Plan, any statement or provision contained herein, nor the taking of any action by the Debtor or any Entity with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor with respect to the Holders of Claims or Equity Interests or other parties-in- interest; or (2) any Holder of a Claim or other party-in-interest prior to the Effective Date.

**F.**     **Effectuating Documents; Further Transactions.**

The Debtor or the Liquidating Trustee or its valid designee in accordance with the Liquidating Trust Agreement shall be authorized to (1) execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of this Plan and (2) certify or attest to any of the foregoing actions.

**G.**     **Further Assurances.**

The Plan Proponents and the Liquidating Trust shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan or the Plan Confirmation Order.

**H.**     **Dissolution of the Debtor and Closing of the Chapter 11 Case.**

Upon the Effective Date, the Debtor's officers and directors shall be deemed to have resigned their respective positions with the Debtor.  From and after the Effective Date, the Debtor shall be deemed to be immediately dissolved upon the Effective Date under applicable law and shall have no corporate existence thereafter without the necessity for any other or further actions

to be taken by or on behalf of the Debtor or action or formality which might otherwise be required under applicable non-bankruptcy laws.  The Debtor shall be treated as having completely liquidated for state, local, and U.S. federal income tax purposes, and the Debtor shall not be required to pay any taxes or fees to cause such dissolution.

The Liquidating Trustee shall file a motion closing the Chapter 11 Case after the Liquidating Trust Assets are fully administered or as soon as reasonably permissible.

**I.**      **Dissolution of the Committee.**

Upon the occurrence of the Effective Date, the Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be released from any duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except with respect to (i) obligations arising under confidentiality agreements, which shall remain in full force and effect, (ii) prosecuting applications for payment of fees and reimbursement of expenses of Professionals, or Committee members, or attending to any other issues related to applications for payment of fees and reimbursement of expenses of Professionals, and (iii) prosecuting or participating in any appeal of the Plan Confirmation Order or any request for reconsideration thereof.

**J.**      **Service of Documents.**

Any pleading, notice or other document required by this Plan to be served on or delivered to the Debtor, Committee, Sandton Capital, or Liquidating Trustee shall be sent by first class U.S. mail, postage prepaid, to:

| To the Debtor: | Kalera, Inc.<br>Gateway Business Center 23<br>18000 East 40th Avenue<br>Aurora, CO 80011<br><br>With a copy to:<br><br>Baker & Hostetler LLP<br>Attn: Elizabeth A. Green<br>SunTrust Center, Suite 2300<br>200 South Orange Avenue<br>Orlando, FL  32801-3432<br><br>And<br><br>Attn: Jorian L. Rose<br>45 Rockefeller Plaza<br>New York, New York 10111<br><br>AND<br><br>Michael T. Delaney, Esq.<br>Baker & Hostetler LLP<br>Key Tower, 127 Public Sq., Ste. 2000s<br>Cleveland, Ohio 44114Alynda |
| --- | --- |
| To the Committee: | Dykema Gossett, PLLC<br>Attn: Basil A. Umari<br>        Nicholas Zugaro<br>5 Houston Center,<br>1501 McKinney Street, Suite 1625<br>Houston, TX 77010 |
| To the Holders of the Sandton Capital Secured Claim: | Akerman LLP<br>Attn: David William Parham<br>2001 Ross Ave., Suite 3600<br>Dallas, TX 75201 |
| To the Liquidating Trust: | [•] |

**K.**      **Filing of Additional Documents.**

On or before the Effective Date, the Plan Proponents may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

## XVII.  RISKS AND OTHER CONSIDERATIONS

A.      **Bankruptcy Considerations.**

Although the Plan Proponents believe that this Combined Plan and Disclosure Statement will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm the Plan as proposed.  Moreover, there can be no assurance that modifications of this Combined Plan and Disclosure Statement will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent specified herein, and there can be no assurance that such conditions will be satisfied or waived.  In the event such conditions precedent have not been satisfied or waived (to the extent possible hereunder) within forty five (45) days after the Plan Confirmation Date, which period may be extended by the Plan Proponents, then the Plan Confirmation Order may be vacated, no Distributions will be made pursuant to the Plan, and the Debtor and all Holders of Claims and Equity Interests will be restored to the status quo ante as of the day immediately preceding the Plan Confirmation Date as though the Plan Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Plan Proponents believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Equity Interests encompass Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

While the Plan Proponents believe that there are sufficient Liquidating Trust Assets to make Distributions to Liquidating Trust Beneficiaries, there can be no assurance that the Liquidating Trust Assets will be sufficient to pay all Liquidating Trust Operational Expenses or make Distributions to the Liquidating Trust Beneficiaries.

B.      **No Duty to Update Disclosures.**

The Plan Proponents have no duty to update the information contained in this Combined Plan and Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Plan Proponents are required to do so pursuant to an Order of the Bankruptcy Court.  Delivery of this Combined Plan and Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

C.      **Alternatives to Confirmation and Consummation of the Plan.**

    1.      **Alternate Plan**

If the Plan is not confirmed, the Plan Proponents or any other party in interest (if, pursuant to section 1121 of the Bankruptcy Code, the Debtor has not filed a plan within the time period prescribed under the Bankruptcy Code) could attempt to formulate and propose a different plan.

Such a plan likely would result in additional costs, including, among other things, additional professional fees or potential asserted substantial contribution claims, all of which would likely constitute Administrative Expense Claims (subject to allowance). The Plan Proponents believe that the Plan provides for an orderly and efficient liquidation of the Debtor's remaining assets and enables creditors to realize the best return under the circumstances.

### 2.    Chapter 7 Liquidation or Dismissal

If a plan pursuant to Chapter 11 is not confirmed by the Bankruptcy Court, the Chapter 11 Case could be converted to a liquidation case under Chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed, pursuant to applicable provisions of Chapter 7 of the Bankruptcy Code, to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code. The Plan Proponents believe that liquidation under Chapter 7 of the Bankruptcy Code of the Debtor's remaining assets would result in a substantial reduction in the value to be realized by Holders of Claims as compared to Distributions contemplated under the Plan. This is so because a Chapter 7 liquidation would require the appointment of a trustee, which would require substantial additional expenses (including the costs associated with the Trustee's retention of attorneys and other professionals) and would delay the orderly liquidation of the Estate's Assets, thereby lowering recoveries to such Holders of Claims. Consequently, the Debtor believes that confirmation of the Plan will provide a substantially greater return to Holders of Claims than would liquidation under Chapter 7 of the Bankruptcy Code. A copy of the Plan Proponents' liquidation analysis is attached to this Plan.

### D.    Certain Federal Tax Consequences

**THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN TO CERTAIN HOLDERS OF ALLOWED CLAIMS. IT IS FOR GENERAL PURPOSES ONLY AND SHOULD NOT BE RELIED UPON FOR PURPOSES OF DETERMINING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST. THIS DISCUSSION DOES NOT PURPORT TO BE A COMPLETE ANALYSIS OR LISTING OF ALL POTENTIAL TAX CONSIDERATIONS. THIS SUMMARY DOES NOT ADDRESS THE FEDERAL INCOME TAX CONSEQUENCES THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST SUBJECT TO SPECIAL TREATMENT UNDER FEDERAL INCOME TAX LAWS, AND DOES NOT DISCUSS ANY ASPECTS OF STATE, LOCAL, OR FOREIGN TAX LAWS OR ANY FEDERAL ESTATE OR GIFT TAX CONSIDERATIONS. FURTHERMORE, THIS SUMMARY DOES NOT ADDRESS ALL OF THE FEDERAL INCOME TAX CONSEQUENCES THAT MAY RELEVANT TO A HOLDER OF A CLAIM OR EQUITY INTEREST, SUCH AS THE POTENTIAL APPLICATION OF THE ALTERNATIVE MINIMUM TAX.   THIS SUMMARY ALSO DOES NOT ADDRESS ALL OF THE FEDERAL INCOME TAX CONSEQUENCES THAT MAY BE RELEVANT TO HOLDERS OF CLAIMS WHO ARE UNIMPAIRED, DEEMED TO HAVE REJECTED THE PLAN IN ACCORDANCE WITH THE PROVISIONS OF SECTION 1126(g) OF THE BANKRUPTCY CODE, OR HOLDERS WHOSE CLAIMS ARE ENTITLED TO PAYMENT IN FULL IN CASH.**

This summary is based on the Tax Code, as amended, existing and proposed Treasury Regulations, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the federal income tax consequences described below.

The Debtor has not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan.  This discussion does not address all of the U.S. federal income tax consequences of the Plan to special classes of taxpayers (*e.g.*, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, controlled foreign corporations, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, states or their subdivisions or integral parts, other governmental entities, Holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for federal income tax purposes, Holders' whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on unearned income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction).  In addition, this discussion does not address federal taxes other than income taxes.

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtor for federal income tax purposes, and that all Distributions to Holders of Claims will be taxed accordingly.

**Internal Revenue Service Circular 230 Disclosure: to ensure compliance with requirements imposed by the United States Internal Revenue Service, any tax advice contained in this Disclosure Statement (including any attachments) is not intended or written to be used, and cannot be used, by any taxpayer for purpose of avoiding tax related penalties under the Tax Code. Tax advice contained in this Disclosure Statement (including any attachments) is not written to support the promotion, marketing or promotion of the transactions or matters addressed by the disclosure statement. Each taxpayer should seek advice based on the taxpayer's particular circumstances form an independent tax advisor.**

### 1.    Federal Income Tax Consequences to the Debtor

Generally, a discharge of a debt obligation by a debtor for an amount less than the debt's adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) gives rise to cancellation of indebtedness ("**COD**") income, which must be included in the debtor's income. However, COD income is not includable in gross income if it occurs in a case of bankruptcy or to the extent of the debtor's insolvency immediately before the COD income is recognized. The Debtor's COD income, if any, resulting from the Plan should satisfy these requirements, and, therefore, should not result in recognition of gross income to the Debtor.

COD income that is excluded from gross income will reduce certain attributes of the taxpayer, including net operating losses, capital loss carryovers, the tax basis of assets, and foreign tax credit carryforwards, in a specified order of priority beginning with net operating losses, unless

a taxpayer elects to have the reduction applied first to the tax basis of depreciable assets. In general, any reduction in tax attributes does not occur until the end of the tax year, after such attributes have been applied to determine the tax for the year or, in the case of any asset basis reduction, the first day of the taxable year following the tax year in which COD income occurs.

## 2.    Federal Income Tax Consequences to Holders of Allowed Claims

Pursuant to the Plan, each Holder of a Claim will receive, in full and final satisfaction of its applicable claim, Liquidating Trust Units or Cash, as applicable, as described in Section VII. As discussed below (see D.[4]—"Tax Treatment of the Liquidating Trust and Holders of Beneficial Interests Therein"), each Holder of a Claim that receives a Beneficial Interest will be treated for federal income tax purposes as directly receiving, and as a direct owner of, an undivided interest in the Liquidating Trust Assets consistent with its economic rights in the trust.

The tax consequences of the transactions contemplated by the Plan to Holders (including the character, timing and amount of income, gain or loss recognized) will depend on, among other things: (1) whether the Claim and the consideration received in respect of it are "securities" for tax purposes; (2) the manner in which a Holder acquired a Claim; (3) the length of time the Claim has been held; (4) whether the Claim was acquired at a discount; (5) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion of it) in the current tax year or any prior tax year; (6) whether the Holder has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (7) the Holder's method of tax accounting; and (8) whether the Claim is an installment obligation for tax purposes. Holders, therefore, should consult their own tax advisors regarding the particular tax consequences to them of the transactions contemplated by the Plan.

a.    <u>Realization and Recognition of Gain or Loss</u>.  In general, a Holder of an Allowed Claim will recognize gain or loss with respect to its Claim in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of its undivided interest in the Liquidating Trust Assets consistent with its economic rights in the trust received in respect of its Claim (other than any consideration attributable to a Claim for accrued but unpaid qualified stated interest) and (ii) the adjusted tax basis of the Claim exchanged therefor (excluding any adjusted tax basis attributable to accrued but unpaid interest).  Depending on the manner in which the Claim arose, applicability of the market discount rules and other factors, such loss or gain may be capital or ordinary in nature.  Due to limitations in the Code, a Holder of an Allowed Claim that recognizes a capital loss relating to its Claim may not be able to use such capital loss in the taxable year it arises or ever.

Holder's adjusted tax basis in a Claim will be its cost increased by the amount of original issue discount ("**OID**") and market discount previously taken into account and reduced by the amount of amortizable bond premium previously amortized with respect to the Claim and any cash payments on the Claim other than payments of qualified stated interest.  Pursuant to the Plan, the Liquidating Trustee will in good faith value the assets transferred to the Liquidating Trust, and all parties to the Liquidating Trust must consistently use such valuation for all U.S. federal income tax purposes.  To the extent that a portion of the Allowed Claim, as applicable, is allocable to accrued but unpaid qualified stated interest, the Holder will recognize ordinary interest income,

except to the extent previously included in income by a Holder under its method of accounting. See D.2.b—"Distributions to Holders in Respect of Accrued But Untaxed Interest" below.

In the event of the subsequent disallowance of any Disputed Claim or the reallocation of undeliverable Distributions, it is possible that a Holder of a previously Allowed Claim may receive additional Distributions in respect of its Claim. Accordingly, it is possible that the recognition of any loss realized by a Holder with respect to an Allowed Claim may be deferred until all Claims are Allowed or disallowed. Alternatively, it is possible that a Holder will have additional gain in respect of any additional Distributions received. See also Section XVII.D.3. —"Federal Income Tax Consequence to Holders of Disputed Claims," below.

After the Effective Date, a U.S. Holder's share of any collections received on the assets of the Liquidating Trust (other than as a result of the subsequent disallowance of Disputed Claims or the reallocation of undeliverable Distributions) should not be included, for federal income tax purposes, in the Holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such Holder's ownership interest in the underlying assets of the Liquidating Trust.

Subject to the market discount rules discussed below, if gain or loss is recognized, such gain or loss may be long-term capital gain or loss if the Allowed Claim disposed of is a capital asset in the hands of the Holder and has been held for more than one year. The deduction for capital losses is subject to limitations. Each Holder of an Allowed Claim should consult its tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

In general, a Holder's aggregate tax basis in its undivided interest in the Liquidating Trust Assets will equal the fair market value of such interest at the time of receipt increased by its share of the Debtor's liabilities to which such assets remain subject upon transfer to the Liquidating Trust, and a Holder's holding period generally will begin the day following establishment of the Liquidating Trust.

Although many Holders of Claims will not be required to recognize gain or income as a result of the property distributions (including Cash distributions) made or deemed to be made to them under the terms of the Plan, certain situations may exist that will require a Holder of a Claim to do so. For example, if a Claim relates to a transaction under which the Holder is required to recognize gain on payment (for example, an installment sale), the Holder may be required to recognize gain as a result of the actual or deemed distributions made to it under the Plan. Moreover, if (1) a Holder of a Claim previously took a deduction or loss relating to the partial or entire worthlessness of its Claim, and (2) the fair market value of the property (including Cash) it receives or is deemed to receive for its Claim under the Plan exceeds the remaining adjusted tax basis, if any, it has in its Claim, such Holder will be required to recognize gain or income. Similarly, a Holder of a Claim that purchased its Claim at a discount may be required to recognize gain if the amount received in satisfaction of the Claim exceeds such Holder's adjusted tax basis in the Claim. There are several other reasons why a Holder of a Claim may be required to recognize gain or income as a result of the actual or deemed distributions made to it under the Plan. Therefore, each Holder of a Claim should consult its own tax advisor to determine the tax consequences of the receipt of or deemed receipt of property (including Cash) under the Plan.

68

b.    Distributions to Holders in Respect of Accrued But Untaxed Interest.  In general, the gross amount of payments received (whether stock, Cash, or other property) by a Holder of a debt instrument in satisfaction of accrued qualified stated interest will be taxable to the Holder as ordinary interest income (if not previously included in the Holder's gross income for U.S. federal income tax purposes).  Conversely, a Holder generally recognizes a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent any accrued qualified stated interest was previously included in its gross income and is not paid in full by the Debtor.

The extent to which amounts received by a Holder will be attributable to accrued but untaxed interest is unclear.  Under the Plan, except as otherwise required by law (as reasonably determined by the Plan Proponents or Liquidating Trustee, as applicable), Distributions with respect to an Allowed Claim will be treated first as satisfying an amount equal to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, satisfying the remaining portion of such Allowed Claim, if any, such as accrued, but unpaid interest.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a bankruptcy plan is binding for U.S. federal income tax purposes. However, there is no assurance that such allocation would be respected by the IRS, and the IRS could take a position that the consideration received by a Holder should be allocated in some way other than as provided by the Plan.  Holders are urged to consult their own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid qualified stated interest and the character of any loss claimed with respect to accrued but unpaid qualified stated interest previously included in gross income for U.S. federal income tax purposes.

c.    Market Discount Considerations for Holders.  Holders who exchange Allowed Claims for Cash or other property may be affected by the "market discount" provisions of Sections 1276 through 1278 of the IRC.  Under these rules, some or all of any gain realized by a Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on the debt instruments constituting the exchanged Allowed Claim (unless the Holder elected to include market discount in income as it accrued).In general, a debt instrument with a fixed maturity of more than one year that is acquired by a holder on the secondary market (or, in certain circumstances, upon original issuance) is considered to be acquired with "market discount" as to that holder if the debt instrument's stated redemption price at maturity (or revised issue price, in the case of a debt instrument issued with OID) exceeds the tax basis of the debt obligation in the holder's hands immediately after its acquisition. However, a debt instrument will not be a "market discount bond" if such excess is less than a statutory de minimis amount (equal to .25 percent of the debt instrument's stated redemption price at maturity or revised issue price, in the case of a debt instrument issued with original issue discount). To the extent that a Holder has not previously included market discount in its taxable income, gain recognized by a Holder on the disposition of a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the Holder's period of ownership. A holder of a market discount bond that is required to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on the disposition of such bond. In addition, any partial principal payment received by a Holder that is attributable to a market discount bond will generally be treated as ordinary interest income to the extent such payment does not exceed the market discount accrued on such bond during the Holder's period of ownership.

       d.    <u>Original Issue Discount.</u> The original issue discount ("**OID**") rules provide an extremely detailed and complex method for determining and taxing the interest components of debt instruments. A holder of a debt instrument containing OID must include a portion of the OID in gross income in each taxable year in which the holder holds the debt instrument, regardless of whether any cash payments are received. OID is defined as the difference between the issue price and the stated redemption price at maturity of a debt instrument. As the OID rules are extremely complex, it is not certain how they will apply to the transactions contemplated by the Plan. Accordingly, each Holder must consult its own tax advisor.

**3.**       **Federal Income Tax Consequence to Holders of Disputed Claims**

Distributions deemed issued to a Holder of a Claim on consummation of the Plan will not include any distribution held in reserve for Holders of Disputed Claims. As a result, in determining the amount of loss or gain recognized by a Holder of a Claim on consummation of the Plan, the Holder will not be treated as receiving any property attributable to the assets that are held by or for the benefit of Holders of Disputed Claims. As discussed below, when a Disputed Claim becomes Disallowed in whole or in part, the Holders of a Claim will be treated as receiving additional consideration in respect of their Claim at that time. It is possible, however, that the IRS or a court may conclude that the amount of consideration deemed received for tax purposes by a Holder of a Claim on consummation of the Plan should be determined by disregarding the Disputed Claims and treating any distribution held in reserve for Holders of Disputed Claims as proportionately distributed to the Holders of Claims. In such case, appropriate downward adjustments would be made on the allowance of a Disputed Claim in whole or in part. Holders of Claims should consult with their tax advisors as to the proper amount of consideration deemed received on consummation of the Plan.

Holders of Disputed Claims will not be treated as receiving any consideration in respect of their Claims on consummation of the Plan. On the allowance of a Disputed Claim, the Holder of the Disputed Claim will be treated as realizing in satisfaction of its Claim the amount of Cash distributed to the Holder at such time plus the fair market value of any property distributed to such Holder. On the disallowance of a Disputed Claim, the distribution attributable to such Disputed Claim will be cancelled and the Cash attributable to the Disallowed Disputed Claim and held in reserve will be released from the reserve. While not entirely clear, at such time, Holders will likely be treated as having received additional consideration in satisfaction of their Claims equal to their proportional shares of (i) the Cash released from the reserve, less (ii) the fair market value of the cancelled distributions. If the Disputed Claim becomes disallowed in the year in which the Plan is consummated, then such additional consideration would either reduce the loss or increase the gain that was recognized with respect to Holders' Claim on consummation of the Plan and would possess the same character (i.e., capital or ordinary) as the gain or loss recognized on consummation of the Plan. If the Disputed Claim becomes disallowed after the year in which the Plan is consummated, then the additional amount deemed received on disallowance of the Disputed Claim will be treated as gain with the same character (i.e., capital or ordinary) as the gain or loss recognized on consummation of the Plan. Holders of a Claim would increase the tax bases in their distribution by the additional amounts deemed received on the disallowance of a Disputed Claim. Similarly, in the event that undeliverable Distributions are redistributed to other claimants entitled to Distribution, such recipients will likely be subject to comparable tax treatment as discussed in this paragraph.

**4.      Tax Treatment of the Liquidating Trust and Holders of Beneficial Interests Therein**

a.      <u>Classification of the Liquidating Trust</u>.  The Liquidating Trust is intended to qualify as a "liquidating trust" for federal income tax purposes (other than in respect of any portion of the Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims, as discussed below).  In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  The Liquidating Trust will be structured with the intention of complying with such general criteria.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtor, the Liquidating Trustee, and Holders of Beneficial Interests) shall treat the transfer of Liquidating Trust Assets to the Liquidating Trust as (1) a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Holders of Beneficial Interests (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such beneficiaries to the Liquidating Trust of Liquidating Trust Assets in exchange for the Beneficial Interests.  Accordingly, except in the event of contrary definitive guidance, Holders of Beneficial Interests shall be treated for federal income tax purposes as the grantors and owners of their respective share of Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to Disputed Claims).  While the following discussion assumes that the Liquidating Trust would be so treated for federal income tax purposes, no ruling will be requested from the IRS concerning the tax status of the Liquidating Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidating Trust as a grantor trust. If the IRS were to challenge successfully such classification, the federal income tax consequences to the Liquidating Trust and the U.S. Holders of Claims could vary from those discussed herein.

b.      <u>General Tax Reporting by the Liquidating Trust and Holders of Beneficial Interests</u>. For all federal income tax purposes, all parties must treat the Liquidating Trust as a grantor trust of which the Holders of Beneficial Interests are the owners and grantors, and treat the Holders of Beneficial Interests, as the direct owners of an undivided interest in the Liquidating Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein.  The Liquidating Trustee will file tax returns for the Liquidating Trust treating the Liquidating Trust as a grantor trust or liquidating trust pursuant to Treasury Regulations Section 1.671-4(a) and/or Treasury Regulation Section 301.7701-4(d) and related regulations. Therefore, for federal income tax purposes, the Liquidation Trust's taxable income (or loss) should be allocated pro rata to its beneficiaries.  The Liquidating Trustee also shall annually send to each Holder of a Beneficial Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for federal income tax purposes.

Allocations of taxable income of the Liquidating Trust (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims, if such income is otherwise taxable at the Liquidated Trust) among the Holders of Beneficial Interests will be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such

4873-4343-6936.5

deemed Distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and, if applicable, other than assets allocable to Disputed Claims) to the Holders of Beneficial Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating Distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for purposes of allocating taxable income and loss shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets. All parties to the Liquidating Trust (including, without limitation, the Debtor, the Liquidating Trustee, and Holders of Beneficial Interests) must consistently use such valuation for all federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to Holders of Beneficial Interests should be treated as income or loss with respect to such holder's undivided interest in the Liquidating Trust Assets, and not as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss may depend on the particular situation of the Holders of the Beneficial Interests.

The federal income tax obligations of a Holder with respect to its Beneficial Interest are not dependent on the Liquidating Trust distributing any Cash or other proceeds. Thus, a Holder may incur federal income tax liability with respect to its allocable share of the Liquidating Trust's income even if the Liquidating Trust does not make a concurrent Distribution to the Holder. In general, other than in respect of Cash retained on account of Disputed Claims and Distributions resulting from undeliverable Distributions (the subsequent distribution of which still relates to a Holder's Allowed Claim), a distribution of Cash by the Liquidating Trust will not be separately taxable to the Holders of Beneficial Interests since the beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Liquidating Trust). Holders are urged to consult their tax advisors regarding the appropriate federal income tax treatment of any subsequent distributions of Cash originally retained by the Liquidating Trust on account of Disputed Claims.

The Liquidating Trustee will comply with all applicable governmental withholding requirements.

        c.    <u>Tax Reporting for Assets Allocable to Disputed Claims</u>. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee (A) may elect to treat any Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims (i.e., a Disputed Claim Reserve)

as a "disputed ownership fund" governed by Treasury Regulations Section 1.468B-9, if applicable, and (B) to the extent permitted by applicable law, will report consistently for state and local income tax purposes.  Accordingly, if a "disputed ownership fund" election is made with respect to a Disputed Claim Reserve, such reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidating Trust Assets (including any gain recognized upon the disposition of such assets).  All Distributions from such reserves (which Distributions will be net of the expenses, including taxes, relating to the retention or disposition of such assets) will be treated as received by Holders in respect of their Claims as if distributed by the Debtor. All parties (including, without limitation, the Debtor, the Liquidating Trustee and the Holders of Beneficial Interests) will be required to report for tax purposes consistently with the foregoing. A Disputed Claim Reserve will be responsible for payment, out of the assets of the Disputed Claim Reserve, of any taxes imposed on the Disputed Claim Reserve or its assets.  In the event, and to the extent, any Cash in the Disputed Claim Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Disputed Claim Reserve may be sold to pay such taxes. Each Holder of a Disputed Claim is urged to consults its tax advisor regarding the potential tax treatment of the Disputed Claim Reserve, distributions therefrom, and any tax consequences to such Holder relating thereto.

### 5.    FATCA

Under the Foreign Account Tax Compliance Act ("**FATCA**"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account Holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of interest on certain types of obligations. FATCA withholding may apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax. U.S. Holders that hold Claims through foreign financial institutions and Non-U.S. Holders are encouraged to consult their tax advisors regarding the possible implications of these rules on their Claim.

### 6.    Backup Withholding and Information Reporting

Distributions to certain Holders of Allowed Claims under the Plan generally will be subject to information reporting requirements.  In addition, certain Holders may be subject to backup withholding with respect to the distributions or payments made purusnat to the Plan unless the Holder: (a) comes within certain exempt categories (which generally includes corporations) and, when required, demonstrates that fact, or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.  Thus, the amount of any backup withholding from a payment to a Holder may be allowed as a credit against the Holder's federal income tax liability and may entitle the Holder to a refund, provided that the required information is timely furnished to the IRS.

The Debtor will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtor will comply with all applicable reporting requirements of the IRC.

Treasury Regulations generally require disclosure by a Holder on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the Holder's tax returns.

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### 7.    Reservation of Rights

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan.  The Debtor and its advisors reserve the right to further modify, revise, or supplement this Section and the other tax related sections of the Plan prior to the date by which objections to Confirmation of the Plan must be filed and served.

## XVIII.  **RECOMMENDATION AND CONCLUSION**

The Plan Proponents strongly believe that the Plan is in the best interests of the Estate and urges the Holders of Impaired Claims entitled to vote to accept the Plan and to evidence such acceptance by properly voting and timely returning their Ballots.

Dated: _____ ___, 2023                    KALERA, INC
Houston, Texas

By: */s/*_____
Name: Mark Shapiro
Title: Chief Restructuring Officer

- and -

THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS OF KALERA,
INC.

By: /s/_____
Name: Masoud Vaghefi
Title: National Sales Manager, Turatti North
America, and Chair of the Official Committee
of Unsecured Creditors of Kalera, Inc.

75

4873-4343-6936.5